VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD (P46787)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
tmichaud@vmtlaw.com

Attorney for Plaintiff

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

## SOUTHERN DIVISION

| | |
|---|---|
| CITY OF ST. CLAIR SHORES POLICE AND FIRE RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>LINEAGE, INC., ADAM FORSTE, KEVIN MARCHETTI, WALTER GREGORY LEHMKUHL, ROBERT CRISCI, ABIGAIL FLEMING, SHELLYE ARCHAMBEAU, JOHN CARRAFIELL, JOY FALOTICO, LUKE TAYLOR, MICHAEL JOHN TURNER, LYNN WENTWORTH, JAMES WYPER, BAY GROVE CAPITAL GROUP, LLC, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, BofA SECURITIES, INC., J.P. MORGAN SECURITIES LLC, and WELLS FARGO SECURITIES, LLC,<br><br>Defendants. | Civ. No.  2:25-cv-12383<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff City of St. Clair Shores Police and Fire Retirement System ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Lineage, Inc. ("Lineage" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Lineage common stock in or traceable to the registration statement used in connection with the Company's July 2024 initial public offering (the "IPO") seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act") against Lineage, the Company's senior officers and directors, and the underwriters of the IPO.

## JURISDICTION AND VENUE

2.      The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15

U.S.C. §§77k and 77o.  This Court has jurisdiction over the subject matter of this

action pursuant to §22 of the 1933 Act, 15 U.S.C. §77v.

3.      This Court has personal jurisdiction over each of the defendants and

venue is proper in this District.  Defendants conducted the IPO in substantial part from

this District, drafted the Registration Statement (defined below) in substantial part in

this District, disseminated the statements alleged to be false and misleading herein

from this District, and solicited purchasers of Lineage common stock in and from this

District.

## PARTIES

4.      Plaintiff City of St. Clair Shores Police and Fire Retirement System

purchased Lineage common stock, as stated in the certification attached hereto and

incorporated herein by reference, in or traceable to the registration statement used in

connection with the IPO and has been damaged thereby.

5.      Defendant Lineage is a cold storage focused real estate investment trust

("REIT") headquartered in Novi, Michigan.  Lineage common stock trades on the

Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "LINE."

6.      Defendant Adam Forste ("Forste") co-founded Lineage and served as its

Co-Executive Chairman at the time of the IPO.  Defendant Forste signed the

Registration Statement.  Defendant Forste also co-founded Bay Grove (defined below) and served as its Managing Partner at the time of the IPO.

7.      Defendant Kevin Marchetti ("Marchetti") co-founded Lineage and served as its Co-Executive Chairman at the time of the IPO.  Defendant Marchetti signed the Registration Statement.  Defendant Marchetti also co-founded Bay Grove and served as its Managing Partner at the time of the IPO.

8.      Defendant Walter Gregory Lehmkuhl ("Lehmkuhl") served as Lineage's Chief Executive Officer ("CEO") and President at the time of the IPO and was named as a director nominee in the Registration Statement.  Defendant Lehmkuhl signed the Registration Statement.

9.      Defendant Robert Crisci ("Crisci") served as Lineage's Chief Financial Officer ("CFO") and President at the time of the IPO.  Defendant Crisci signed the Registration Statement.

10.     Defendant Abigail Fleming ("Fleming") served as Lineage's Chief Accounting Officer at the time of the IPO.  Defendant Fleming signed the Registration Statement.

11.     Defendants Shellye Archambeau ("Archambeau"), John Carrafiell ("Carrafiell"), Joy Falotico ("Falotico"), Luke Taylor ("Taylor"), Michael John Turner ("Turner"), Lynn Wentworth ("Wentworth"), and James Wyper ("Wyper") were named as Lineage director nominees in the Registration Statement.

12.    The defendants identified in ¶¶6-11 are referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement and/or were named as directors or director nominees of Lineage in the Registration Statement as detailed above.  In addition, the Individual Defendants participated in the solicitation and sale of Lineage common stock to investors in the IPO for their own benefit and the benefit of Lineage and Bay Grove as directors, executive officers, and/or major shareholders of the Company and/or the principals of Bay Grove.

13.    Defendant Bay Grove Capital Group, LLC ("Bay Grove") is a private equity firm founded by defendants Forste and Marchetti.  Bay Grove (together with its affiliates) owned Lineage prior to the IPO and sponsored the IPO.  Prior to going public, Bay Grove extracted hundreds of millions of dollars from Lineage through a variety of service transactions and other agreements with the Company.  Bay Grove and its principals, defendants Forste and Marchetti, and the Underwriter Defendants were the primary beneficiaries of the IPO, as Lineage used the IPO proceeds to buy operating units from Bay Grove and pay down loans issued, in substantial part, by the Underwriter Defendants.  In addition, in connection with the IPO, Bay Grove received a one-time profit sharing increase from Lineage worth $200 million, received $75 million for the repurchase of Lineage operating units, and entered into a transition services agreement with Lineage that obligated Lineage to pay Bay Grove $8 million

annually *even if Bay Grove failed to provide any services pursuant to the agreement*, as well as numerous other one-sided transactions and agreements with Lineage favorable to Bay Grove. Following the IPO, Bay Grove continued to control a majority of Lineage's combined voting power and, through a stockholders agreement, exerted control and influence over the Lineage Board of Directors (the "Board") disproportionate with its economic stake in the Company.

14. Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, BofA Securities, Inc., J.P. Morgan Securities LLC, and Wells Fargo Securities, LLC are referred to herein as the "Underwriter Defendants." Pursuant to the 1933 Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities. They served as the underwriters of the IPO and shared over $191 million in fees collectively for their services, which included the full exercise of their over-allotment option. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of Lineage common stock in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market Lineage common

stock, and those personnel worked on and approved the content of Lineage's Registration Statement and other offering materials.

(b)     The Underwriter Defendants demanded and obtained an agreement from Lineage that Lineage would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that Lineage had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Lineage and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Lineage, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Lineage's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Lineage's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including

the price range at which Lineage stock would be sold; (iii) the language to be used in the Registration Statement; and (iv) what disclosures about Lineage would be made in the Registration Statement.   As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Lineage's management and top executives, such as the Individual Defendants, the Underwriter Defendants knew, or should have known, of Lineage's existing problems as detailed herein.

(e)     The Underwriter Defendants solicited and sold in the IPO Lineage common stock to plaintiff and other members of the Class (defined below) for their own financial benefit.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

15.    Defendants Forste and Marchetti founded Bay Grove in 2007. Approximately a year later, defendants Forste and Marchetti acquired their first cold-storage warehouse.  In 2012, after a series of acquisitions, defendants Forste and Marchetti rebranded their cold-storage business as Lineage, which they owned through Bay Grove.

16.    Lineage is a Maryland REIT focused on temperature-controlled cold-storage facilities.  To qualify as a REIT, Lineage must distribute annually at least 90%

of its REIT taxable income.  The Company operates two reportable segments: (i) a Global Warehousing Segment; and (ii) a Global Integrated Solutions Segment.

17.    Through its Global Warehousing Segment, Lineage owns and operates hundreds of temperature-controlled storage facilities used by companies such as grocers and retailers to store food and other perishable products.  These warehouses group into four types: (i) distribution centers used by Lineage customers in or near difficult to duplicate metropolitan, infill, or port locations; (ii) public warehouses used to store products for customers outside metropolitan and infill locations; (iii) production-advantaged warehouses near customer production facilities; and (iv) managed warehouses owned or leased by Lineage customers for which the Company manages the warehouse operations on their behalf.

18.    Through its Global Integrated Solutions Segment, Lineage provides customers with logistics solutions to move products through the food supply chain and reduce transportation costs.  The largest component of these services relates to transportation and refrigerated car leasing, with a core focus on multi-vendor less-than-full-truckload consolidation, drayage services to and from ports, over-the-road trucking, and freight forwarding.

19.    The Global Warehousing Segment is the Company's largest and most profitable segment.  For Lineage's fiscal 2023, total Global Warehousing Segment revenue was approximately $3.9 billion and its net operating income was over $1.5

billion, compared to $359 million and $64 million for the Global Integrated Solutions Segment, respectively.

20.     In the years leading up to the IPO, Bay Grove embarked on a dramatic expansion of its warehouse acquisition strategy.  By 2019, Lineage had become the largest cold-storage company globally, surpassing one billion cubic feet of storage capacity for the first time.  Between 2020 and the first quarter of 2024 this acquisition spree accelerated, with Lineage buying dozens of local and regional temperature-controlled storage businesses and roughly tripling its storage capacity.  As of March 31, 2024, Lineage operated an interconnected global temperature-controlled warehouse network, comprising over 84.1 million square feet and 3 billion cubic feet of capacity across 482 warehouses predominantly located in densely populated markets, with 312 in North America, 82 in Europe, and 88 in Asia-Pacific.

21.     During this same time period, Lineage's results were buoyed by the effects of the COVID-19 pandemic, as supply chain disruptions and temporary shortages of food and medicine led to efforts by businesses and governments to improve cold-storage supply chain and distribution networks.

22.     Lineage's rollup acquisition strategy and macroeconomic trends grew the Company's revenue and earnings.  For its fiscal year ended December 31, 2023, Lineage generated over $5.3 billion in net revenue, a 43% increase over its fiscal year ended December 31, 2021.  Similarly, Lineage's income from operations increased

from $88 million in its fiscal 2021 to more than $398 million during its fiscal 2023 – a 350% increase.  Lineage represented that these growth metrics were stable and sustainable based on the characteristics of the cold storage industry, for example stating at the time of the IPO that "the U.S. temperature-controlled warehousing industry has experienced relatively stable revenue growth, even in periods marked by significant turmoil in the global financial markets, commodity shocks, secular shifts in consumer habits and preferences, the global COVID-19 pandemic and the ensuing supply chain disruption and periods of significant global inflation."  The Company similarly stated that its "broad network of warehouses" located in "critical nodes" of its customers' supply chains supported "high economic occupancy, low volatility in demand, productive NOI [net operating income] generation and strong growth."

23.     On June 26, 2024, Lineage filed a registration statement for the IPO on Form S-11 with the SEC which, after amendments, was declared effective on July 24, 2024 (the "Registration Statement").  On July 26, 2024, Lineage filed a prospectus for the IPO on Form 424B4 with the SEC, which was incorporated into and formed part of the Registration Statement.

24.     Defendants used the Registration Statement to sell over 65 million shares of Lineage common stock to investors at $78 per share, which included the full exercise of the Underwriter Defendants' over-allotment option.  The IPO raised more

than $5 billion in gross offering proceeds, making it the largest U.S. initial public offering of 2024.

25.    The Registration Statement contained material misrepresentations about Lineage's business, historical financial results, and the industry trends purportedly facing the Company at the time of the IPO.

26.    For example, the Registration Statement failed to disclose that Lineage's financial and operational results had been temporarily inflated leading up to the IPO as a result of artificial market distortions caused by the COVID-19 pandemic, increased supply of cold-storage facilities, and the imposition of unsustainable price increases by Lineage.  These trends had peaked in the latter half of 2023 and begun to dramatically reverse prior to the IPO.  Rather than disclose these facts, the Registration Statement portrayed Lineage's more muted results for the first six months of 2024 as a return to normalized customer inventory levels, which, after this short "rationaliz[ation]" period, would purportedly allow the Company to enjoy stable revenue growth and steady occupancy and rent escalations as global demand for cold-storage products and services continued to increase and Lineage's purported competitive and technological advantages and economies of scale drove favorable operational and financial results.

27.    In truth, Lineage was in the midst of a sustained downturn, as the Company's customers not only destocked excessive inventory built up during the

COVID-19 pandemic, but also shifted to the maintenance of leaner inventories on a go-forward basis and as more cold-storage supply came on line, with Lineage suffering particularly negative effects in terms of occupancy rates and pricing power due to its recent imposition of unsustainable price increases amongst its customer base.

28.     Since the IPO, which occurred approximately one year before the filing of this complaint, the price of Lineage stock has fallen to lows near $40 per share – **_approximately half the IPO price_**.  The price of Lineage stock has remained substantially below the IPO price at the time of filing this complaint.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

29.     The Registration Statement contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the applicable SEC rules and regulations.

30.     Specifically, the Registration Statement stated that the lingering effects of the COVID-19 pandemic had "accelerated trends that had a marked short-term impact on cold storage demand and have the potential to be growth engines for the industry in coming years" after the IPO.  The Registration Statement stated:

*Outlook*

For the past two decades, the cold storage sector has performed consistently well in both commercial real estate and industry fundamentals.  More recently, the COVID-19 pandemic ushered in a period of significant growth for the cold storage industry.  Supply chain disruptions in general, but particularly the persistent shortages of food and medicine during the height of the pandemic, led to a rise in awareness among consumers, governments, and investors around the importance of an optimally functioning global cold chain.  This awareness contributed to both public and private capital being funneled into the sector, fueling construction activity and revenue growth that allowed cold storage operators to better respond to rising demand for space.

***The pandemic also accelerated trends that had a marked short-term impact on cold storage demand and have the potential to be growth engines for the industry in coming years.  Two key examples are the rapid adoption of online food sales and the heightened emphasis on biopharmaceutical production and distribution (the latter stemming from the lack of suitable facilities for vaccine storage, particularly in developing countries and rural areas of advanced economies).***

31.     The Registration Statement represented that these favorable trends were poised to continue, stating that "significant barriers to entry" in the cold-storage industry, such as high construction costs, "will likely continue to limit speculative construction and competition from new market participants, which typically supports high occupancy and steady rent escalation."  The Registration Statement further represented that businesses such as Lineage in the cold-storage industry were therefore purportedly "well positioned for both near-and long-term growth as global demand for temperature-sensitive goods is expected to rise faster than the limited supply of cold storage facilities."

- 13 -

32.     The Registration Statement similarly stated that "steady demand in the food industry has created consistent cold chain demand," which purportedly provided Lineage "with strong cash flows even during periods of broader economic stress." The Registration Statement stated that businesses such as Lineage in "the U.S. temperature-controlled warehousing industry" had "experienced relatively stable revenue growth, even in periods marked by significant turmoil in the global financial markets, commodity shocks, secular shifts in consumer habits and preferences, the global COVID-19 pandemic and the ensuing supply chain disruption and periods of significant global inflation."

33.     The Registration Statement provided the following chart, which depicted the cold-storage industry as experiencing stable revenue growth leading up to the IPO despite broader market volatility:



34.    The Registration Statement described the cold-storage market as "large, growing and resilient, driven by the durability of food consumption through macro cycles, stock-keeping unit proliferation, global population growth, rising disposable incomes and shifting consumer preferences towards perishable foods." Referencing the "growing demand for cold storage," the Registration Statement represented that these factors "further increase the need for additional temperature-controlled warehousing capacity to meet current and anticipated future market demand" and that "large, well-capitalized operators like Lineage are often best positioned to meet the growing demand for cold storage, provide value-added integrated solutions to their customers and differentiate themselves through investments in technology."

35.    The Registration Statement also highlighted the "history of robust same warehouse growth" purportedly enjoyed by Lineage, stating:

*We have a history of robust same warehouse growth with strong operating leverage and cash flow generation. In 2023, our same warehouse NOI was $1,210.9 million, representing growth of 15.3% compared to same warehouse NOI of $1,050.6 million the prior year, and in 2022, our same warehouse NOI was $936.2 million, representing growth of 12.7% compared to same warehouse NOI of $830.5 million in 2021, which growth rates compare favorably to those of our largest competitor and publicly traded peer*. Our same warehouse NOI margins of 40.3% in 2023 compared to 37.2% in the prior year and 39.0% in 2022 compared to 38.8% in the prior year compare favorably to those of our largest publicly traded competitor. *In addition, we increased our global same warehouse storage revenue per economic pallet 6.2% and 8.1% and our same warehouse services revenue per pallet 7.4% and 13.8% in 2023 and 2022, respectively*.

36.     The Registration Statement further stated that this organic growth was "expect[ed] to continue" at the time of the IPO through the following business initiatives implemented by Lineage:

- Leverage the scale of our warehouse network and the breadth of our integrated solutions offerings to win new customers and expand our footprint with existing customers;

- Maximize our same warehouse NOI growth through occupancy and commercial optimization initiatives;

- Further implement productivity tools and cost containment measures;

- Use our integrated platform, scalable corporate infrastructure and business processes to realize synergies from recent acquisitions and drive same warehouse growth post-acquisition;

- Strategically deploy innovative technologies to provide customers more sophisticated solutions while enhancing profitability; and

- Transform the industry through our data science driven approach to warehouse control and design.

37.     The statements in ¶¶30-36 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a)     that Lineage was then experiencing sustained weakening in customer demand, as additional cold-storage supply had come on line, the Company's customers destocked a glut of excessive inventory built up during the COVID-19 pandemic, and the Company's customers shifted to maintaining leaner cold-storage inventories on a go-forward basis in response to changed consumer trends;

(b)     that Lineage had implemented price increases in the lead-up to the IPO that could not be sustained in light of the weakening demand environment facing the Company;

(c)     that Lineage was unable to effectively counteract the adverse trends listed in (a)-(b) above through the use of minimum storage guarantees or as a result of operational efficiencies, technological improvements, or its purported competitive advantages;

(d)     that, as a result of (a)-(c) above, rather than enjoying stable revenue growth, high occupancy rates, and steady rent escalation as represented in the Registration Statement, Lineage was in fact suffering from stagnant or falling revenue, occupancy rates, and rent prices; and

(e)     that, as a result of (a)-(d) above, Lineage's financial results, business operations, and prospects were materially impaired.

38.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the

registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

39.     Under Item 303, the Registration Statement was required to disclose that Lineage was suffering from sustained weakened demand and price erosion at the time of the IPO for the reasons detailed in ¶37 as these facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.  Similarly, under Item 105, these adverse facts should have been disclosed because they created significant risks that made an investment in Lineage stock speculative or risky.  No such disclosures were made.

40.     Indeed, the risk factors that were provided in the Registration Statement were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose that the potential future adverse impacts described therein were already occurring.  For example, the Registration Statement stated that occupancy rates "*may* decrease relative to 2023 as customers rationalize inventory levels," but failed to disclose that Lineage was *already* suffering from a sustained decrease in occupancy rates at the time of the IPO.  Furthermore, the Registration Statement misleadingly represented that "increased usage of minimum storage guarantees" was expected to "mitigate flow-through of declines in physical occupancy to economic occupancy" when in fact economic and physical occupancy

rates were ***both*** declining significantly, and were on track to continue to significantly decline, at the time of the IPO.

## EVENTS FOLLOWING THE IPO

41.     On August 21, 2024, Lineage filed with the SEC its financial results on Form 10-Q for its second fiscal quarter ended June 30, 2024 – the quarter ***before*** the IPO.  The Form 10-Q stated that Lineage had suffered an $80 million net loss for the quarter, a 67% increase from the Company's $48 million net less during its first fiscal quarter of 2024.   While the Registration Statement provided an expected revenue range for Lineage's second fiscal quarter of 2024, the Registration Statement stated that preliminary estimates of net income (or loss) for the quarter were not available "due to the lack of availability of certain financial information, such as preliminary estimates of certain adjustments (including income tax expense and non-consolidated entity results) that are necessary to provide preliminary estimates of net income (loss)."

42.     On November 6, 2024, Lineage issued a release providing its financial results for its third fiscal quarter ended September 30, 2024 – the quarter during which the IPO was conducted.  The press release stated that Lineage had generated $1.335 billion in total revenue, a 0.5% year-over-year increase, and suffered a $543 million net loss during the quarter.

43.     On January 14, 2025, *The Wall Street Journal* reported that Lineage was laying off employees just six months after the IPO due to reduced customer demand.

44.     On February 26, 2025, Lineage issued a press release providing its financial results for its fourth fiscal quarter and year ended December 31, 2024.  The press release stated that Lineage had generated $1.339 billion in total revenue, a 0.4% year-over-year increase, and suffered an $80 million net loss during the fourth quarter.

45.     Also on February 26, 2025, Lineage held an earnings call with analysts and investors to discuss the Company's fourth quarter and year end 2024 results.  During the call, defendant Lehmkuhl stated:

> [I]nventory holdings have fluctuated over the past several years.  Here is a brief timeline of what happened back in 2020, 2021, we saw supply chain chaos, production shortages, port shutdowns, and the inventory was bled down.  2022 was the year where customers began to rebuild inventories quickly, leading to overbuilding.
>
> That overbuilding continued into the 3rd quarter of 2023 when the excess inventory began to unwind.  That unwinding continued through the 2nd quarter of 2024.  S[aid] another way, inventory levels remained elevated for the first half of 2024.  Since then, we've experienced a more normal seasonal pattern, which is what we expect to continue moving forward.

46.     Multiple analysts questioned the elongated timeline for "normaliz[ation]" of Lineage's customer storage inventories following the COVID-19 pandemic.  In response, defendant Crisci admitted that Lineage's business had been "highly unusual" leading up to the IPO and the Company's customers "still had elevated inventory levels" in the first half of 2024.

47.     On April 7, 2025, Lineage announced the dismissal of its auditor KPMG LLP.

48.     On April 30, 2025, Lineage issued a press release providing its financial results for its first fiscal quarter ended March 31, 2025.  The press release stated that Lineage had generated $1.292 billion in total revenue, a 2.7% year-over-year **_decrease_**.

49.     Also on April 30, 2025, Lineage held an earnings call with analysts and investors to discuss the Company's first quarter 2025 results.  During the call, analysts expressed "surprise[]" and frustration at Lineage's consistent underperformance.  One analyst questioned why the purported "normalization" of customer inventory levels had not occurred on the timeline previously represented by Lineage and its management, stating:

> For the past few quarters, we've been talking about this normalization of inventory levels and obviously, you guys have a lot of experience in the business, but it does seem that each quarter it seems to be the next quarter.
>
> So just curious, as you look at the normalization of inventory levels and the stable consumption that you guys see in the food business, is there something different about this cycle versus your 15-plus years in the in the business that seems to be taking longer for inventories to normalize?
>
> Because I mean, COVID was a few years ago, presumably the destocking occur[red] to[o] a few years ago, and the tenant should have been back, especially pre-April 2.  So just sort of curious why it seems to just be taking a little bit longer than what we initially spoke about?  I think it was back on the on your initial earnings call.

- 21 -

50.     On June 2, 2025, Lineage filed with the SEC a Form 8-K, which announced, among other things, that defendant Crisci planned to retire from his position as CFO.

51.     On June 3, 2025, defendants Lehmkuhl and Crisci spoke on behalf of Lineage at the NAREIT REITweek Investor Conference.  Rather than the steady growth depicted in the Registration Statement, during the conference defendant Lehmkuhl admitted that "in the last couple of years you've seen pretty much flat demand" for Lineage's products and services and that the Company was operating in a "flattish environment" in terms of demand.

52.     Since the IPO approximately one year before the date of this complaint, the price of Lineage stock has fallen to lows near $40 per share – ***approximately half the IPO price***.  The price of Lineage stock has remained substantially below the IPO price at the time of filing this complaint.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action on behalf of all purchasers of Lineage stock in or traceable the IPO (the "Class").  Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Lineage common stock is actively traded on the Nasdaq and millions of shares were sold in the IPO.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lineage or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

55.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the 1933 Act;

(b)     whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations, and risks of investing in Lineage; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against All Defendants

59.     Plaintiff repeats and realleges ¶¶1-58 by reference.

60.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

61.     This Count does not sound in fraud.  Plaintiff does not allege that any of the defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

62.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

63.     The defendants named herein were responsible for the contents and dissemination of the Registration Statement as signatories and/or directors and director nominees of the Company named with their consent in the Registration Statement or as the underwriters of the IPO.

64.     Lineage, which was owned by Bay Grove, is the registrant for the IPO. As the issuer of the shares, Lineage is strictly liable to plaintiff and the Class for the misstatements and omissions.

65.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

66.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

67.     Plaintiff purchased Lineage stock registered pursuant to the Registration Statement and traceable to the IPO.

68.     Plaintiff and the Class have sustained damages.  The value of Lineage stock has declined substantially subsequent to and due to defendants' violations.

69.     At the time of their purchases of Lineage common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against Bay Grove, Lineage, and the Individual Defendants

70.     Plaintiff repeats and realleges ¶¶1-69 by reference.

71.     This Count is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, against Bay Grove, Lineage, and the Individual Defendants.

72.     Bay Grove controlled Lineage at the time of the IPO through its ownership of Lineage shares and private operating units, its appointment of Lineage executives and members of the Board, its control over the Company through various transactions and agreements with Lineage as detailed herein, and its historical relationship with the Company and its management.

73.     The Individual Defendants controlled Lineage at the time of the IPO by virtue of their dominant voting power and status as the Company's controlling shareholders, directors, and/or senior officers as detailed herein.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Lineage and through their positions with Lineage's private equity owner, Bay Grove.

74.     Defendant Lineage and Bay Grove controlled the Individual Defendants and all of their employees.

75.     The defendants named herein each also participated in the violations of §11 of the 1933 Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing of the Registration Statement, selling Lineage common stock in the IPO, and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 1, 2025              VANOVERBEKE, MICHAUD &
                                    TIMMONY, P.C.
                                    THOMAS C. MICHAUD (P46787)


                                        s/ Thomas C. Michaud
                                    THOMAS C. MICHAUD

                                    79 Alfred Street
                                    Detroit, MI  48201
                                    Telephone:  313/578-1200
                                    tmichaud@vmtlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
<u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

City of St. Clair Shores Police and Fire Retirement System ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Coleman v. Charles River Laboratories International, Inc.*, No. 1:23-cv-11132 (D. Mass.)

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___22___ day of July, 2025.

City of St. Clair Shores Police and Fire Retirement System

By: _____
DocuSigned by:
*James Hall*
0BA73279ADC74D5...

Its: _____
Chairman

LINEAGE

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/26/2024 | 376 | $81.84 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 11/13/2024 | 42 | $65.72 |
| 11/14/2024 | 52 | $64.58 |
| 11/15/2024 | 109 | $62.80 |
| 11/18/2024 | 173 | $63.52 |

Prices listed are rounded up to two decimal places.