**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE LINEAGE, INC. SECURITIES LITIGATION | Case No.: 2:25-cv-12383-DPH-CI<br><br>Hon. Denise Page Hood<br><br>Hon. Curtis Ivy, Jr.<br><br>**DEMAND FOR JURY TRIAL** |

# AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ....................2

II. JURISDICTION AND VENUE ....................10

III. PARTIES ....................10

A. Lead Plaintiffs ....................10

B. Defendants ....................11

1. The Corporate Defendant ....................11

2. The Individual Defendants ....................12

3. Defendant Bay Grove ....................13

4. The Underwriter Defendants ....................14

IV. FACTUAL BACKGROUND ....................16

A. Lineage's Business ....................16

B. In the Years Leading up to the IPO, Lineage Capitalized on a COVID-Fueled Spike in Demand for Cold Storage Space Due to Customer Overstocking ....................20

C. Defendants Face Internal Pressure to Effectuate the IPO as COVID-Fueled Overstocking Subsides, Lineage's Debt Balloons, and Growing Competition Eats into the Company's Business ....................22

D. In Connection with the IPO, Lineage Issues the Materially False and Misleading Offering Documents and Roadshow Presentation ....................24

E. On the Back of the Materially Misleading Offering Documents and Roadshow Presentation, Lineage Sells More Than $5 Billion Worth of Stock in "The Year's Hottest IPO" ....................30

F. Events Following the IPO Confirm That Defendants Had Made False and Misleading Statements in Connection with the IPO ........... 30

1. Following the IPO, Lineage Reports Quarter After Quarter of Declining Financial Results Due to Issues That—as Defendants Ultimately Admit—Existed Well Before the IPO ........... 30

2. Defendants Disclose That as Far Back as Q3 2023—*a Year Prior to the IPO*—They Had Known That Customers Had Begun to "Destock Excess Inventory" to Revert Back to "More Rational," Pre-Pandemic Supply Chains ........... 37

3. Former Lineage Executives and Employees Have Confirmed That the Offering Documents and Roadshow Presentation Were Misleading ........... 46

V. THE MATERIALLY FALSE AND MISLEADING OFFERING DOCUMENTS AND ROADSHOW PRESENTATION ........... 68

A. The Offering Documents Misrepresented Lineage's Growth and Demand, and Omitted Critical Information About Its "Expected" "Return" to "Normal" Levels That Were Significantly Lower Than at the Time of the IPO ........... 69

1. Misrepresentations and Omissions About "Growing" and "Resilient" Demand for Lineage's Services ........... 69

2. Misrepresentations About the Specific Causes and Sources of Growth in Lineage's Occupancy and Same Warehouse Metrics Leading up to the IPO ........... 74

3. Misrepresentations About the Nature of and Reasons for the Decline in Lineage's Business in Early 2024 ........... 77

4. The Offering Documents and Roadshow Presentation Contained Materially False and Misleading Statements About the Company's Automation Technology and Automated Facilities ........... 80

5. The Offering Documents Contained Materially False and Misleading Statements About the Company's Acquisition Strategy ....85

6. The Offering Documents Omitted Material Facts That Were Required to Be Disclosed by Item 303 of Regulation S-K....88

VI. CLASS ACTION ALLEGATIONS....89

VII. CLAIMS FOR RELIEF....92

COUNT I For Violations of Section 11 of the Securities Act Against All Defendants Except Defendant Bay Grove....92

COUNT II For Violations of Section 12(a)(2) of the Securities Act Against All Defendants....95

COUNT III For Violations of Section 15 of the Securities Act Against Bay Grove and the Individual Defendants....97

VIII. PRAYER FOR RELIEF....98

IX. JURY DEMAND....99

Lead Plaintiffs the Public Employees' Retirement System of Mississippi and Indiana Public Retirement System ("Lead Plaintiffs" or "Plaintiffs"), by and through the undersigned counsel, bring this action for violations of Sections 11 ("§11"), 12(a)(2) ("§12(a)(2)"), and 15 ("§15") of the Securities Act of 1933 (the "Securities Act"), relating to Lineage, Inc.'s ("Lineage" or the "Company") initial public offering (the "IPO" or "Offering"), on July 25, 2024, of over 65 million shares of common stock at a price of $78 per share. This action is brought on behalf of a Class (as defined herein) of persons or entities who purchased or otherwise acquired Lineage common stock pursuant and/or traceable to the Offering Documents (as defined herein) issued in connection with the IPO, and who were damaged thereby.

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, the investigation of Plaintiffs, which included review and analysis of: (i) filings made by Lineage with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, earnings and analyst call transcripts, and other public statements; (iii) Company website and marketing materials; (iv) trading data for Lineage common stock; (v) research reports from securities analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former Lineage employees; and (viii) other publicly available information.

Plaintiffs' investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' possession, custody, or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

1. This is a securities class action in which Defendants materially misrepresented the business and growth prospects of Lineage, the world's largest cold storage company, which operates a global network of over 400 refrigerated warehouses used by major food producers, distributors, and retailers. Defendants made these misrepresentations in connection with Lineage's IPO—the largest U.S. IPO of 2024. To complete the IPO, Lineage issued a series of SEC filings in June and July 2024, including a registration statement and amendments thereto, prospectus, and related filings (the "Offering Documents"), and prepared a "roadshow" slide presentation (the "Roadshow Presentation"), to market the Company's shares to investors.

2. In the years leading up to the IPO, demand for Lineage's cold storage services surged because of supply chain chaos created by the COVID-19 pandemic. Specifically, Lineage customers stockpiled and stored large amounts of "excess" inventory in the Company's warehouses to ensure that they could weather ongoing

supply chain disruptions. This phenomenon substantially increased Lineage's warehouse occupancy levels—a critical metric that the Company referred to as one of the most "important driver[s] of our financial results." Lineage capitalized on this historic demand for its services by significantly raising its prices and fees, further elevating the growth in its revenue and profit.

3. Lineage also took advantage of pandemic-fueled demand by embarking on a massive acquisition spree, completing approximately 75 acquisitions between 2020 and 2024. This acquisition strategy was costly, saddling Lineage with roughly $9 billion in debt by March 31, 2024. Driven in part by the need to service this mountain of debt, Lineage launched its bid to go public.

4. In the Offering Documents, Defendants never disclosed to investors that Lineage's significant growth between 2021–2023 was the product of a one-off, pandemic-fueled increase in demand. To the contrary, the Company's growth was represented as the result of "***growing***" and "***resilient***" demand, such that there was "***ample demand to fill new space***." Defendants represented that Lineage's differentiated assets, competitive advantages, and unique operational initiatives would "***drive long-term value for both customers and shareholders***."

5. Similarly, the Offering Documents attributed Lineage's high warehouse occupancy levels to its "***organic business initiatives***." Defendants touted that, thanks to Lineage's "***utilization initiatives***," the Company's warehouses had

achieved an average occupancy level of 80% in 2023. These statements conveyed that Lineage had capitalized on the supposed growing and resilient demand in an organic and sustainable way, without disclosing that these impressive occupancy results substantially reflected the specific short-term effects of the anomalous COVID-era overstocking phenomenon.

6. The Offering Documents and Roadshow Presentation reinforced the notion that Lineage's growth was sustainable, by emphasizing the Company's supposed "competitive advantage." Most prominently, Lineage asserted that its industry leading "[d]ifferentiated [a]utomation" powered a portfolio of "81 fully- and semi-automated warehouses," meaning it operated the "most technologically advanced" network in its industry. Throughout the Offering Documents and Roadshow Presentation, this was depicted as both driving growth in demand for its services and reducing the Company's costs.

7. Moreover, Lineage emphasized that it was poised for continued success and growth for years to come because of the viability and quality of its acquisitions, as its "***acquisition strategy targets profitable businesses with strategic, high-quality assets that complement our network and customers' needs***." Accordingly, precisely because of these supposed operational and technological achievements, Lineage's growth was organic, durable, and sustainable, and the Company stated that it was "***well positioned for both near- and long-term growth***."

8. On the strength of these statements, the Company's IPO was a resounding success. Lineage shares opened for trading on July 25, 2024, and Defendants raised over $5 billion in the offering, selling over 65 million shares of Lineage stock at the artificially inflated price of $78 per share. Lineage's IPO was hailed by *The Wall Street Journal* as "[T]he Year's Hottest IPO."

9. However, the Offering Documents and Roadshow Presentation were materially false and misleading, and omitted material information, because they misrepresented the true state of Lineage's business.

10. In a series of disclosures beginning just months after the IPO, Defendants revealed that demand was not "growing" and "resilient," and that Lineage's performance in recent years had not been due to its "competitive advantage" and "organic business initiatives." Instead, Defendants revealed that the opposite was true: Lineage's 2021–2023 occupancy levels were inflated well above normal levels and reflected customers overstocking inventory in response to the pandemic. As Defendants would later reveal, Lineage customers had built up their inventory holdings directly "[i]n response to the COVID supply chain shocks," causing occupancy levels to "increase in excess of the typical seasonality trends" that Lineage had seen pre-COVID, but failed to disclose. Further, it was clear to Defendants—even prior to the IPO—that this trend was not going to sustain; as Defendants eventually admitted, "[b]eginning in Q3 2023"—nearly a year before

the IPO—"Lineage customers began to destock excess inventory looking for leaner, more rational supply chains overall."[1]

11. Moreover, Defendants admitted that, far from being poised for further growth, Lineage's occupancy levels had "remained elevated for the first half of 2024," meaning there was still significant "excess inventory" in Lineage's warehouses and inflated occupancy through the time of the IPO. Lineage's "normal" occupancy levels were later revealed to be effectively what they had been pre-pandemic—far below their levels at the time of the IPO. In Defendants' own words, just months after the IPO, moving forward, Lineage's business would track "pre-pandemic data back when our industry was more normal." Significantly, at no point in the run up to and through the IPO—*not* in the Registration Statement (defined below), *not* in the amendments thereto, *not* in the Roadshow Presentation, and *not* in the Prospectus (defined below)—did Defendants disclose this material information to investors.

12. As these disclosures emerged, securities analysts expressed frustration at management's failure to provide full transparency about the Company's demand and inventory levels in the run up to and through the IPO. For example, Piper Sandler noted that, following COVID, "pandemic overstocking hid normal seasonal

[1] Throughout this complaint, Lineage's fiscal quarters are abbreviated and referred to in a "Q# YYYY" format. For example, the Company's third fiscal quarter ended September 30, 2024 is referred to throughout as "Q3 2024."

trends," and that following Lineage's belated disclosures, management was finally "taking an honest self-assessment of how to improve transparency to better reflect the return to normality." Deutsche Bank emphasized that Lineage's repeated financial misses and its ever-lowering guidance had led to a "loss of management credibility," opining that "investors will likely be disappointed given that LINE has been overpromising but under delivering since the July IPO last year, leading to a stock that is off -43% since the IPO." Baird similarly underscored that, a year after the IPO, "[t]he number one question we continue to field from investors is 'when and where do inventories bottom?'"

13. Defendants' misrepresentations and omissions in the Offering Documents and Roadshow Presentation have had a devastating effect on the Company's shareholders. Lineage's stock price in the IPO was set at $78 per share. However, roughly one year later, when the initial complaint in this action was filed on August 1, 2025, Lineage's stock price closed at $42.35—a decline of approximately 46% from the IPO price. Investors have thus suffered billions of dollars in losses.

14. Plaintiffs' independent investigation has provided further support establishing that Defendants' statements in the Offering Documents and Roadshow Presentation were materially false and misleading and omitted material information,

including interviews with numerous Former Employees[2] that confirmed the falsity of the statements at the time they were made.

15. Former Employees described the pandemic-era overstocking phenomenon. They explained that customers engaged in "panic buying" (FE-4) and a "bull whip effect" (FE-6) in response to concerns about supply chain disruptions (FE-2, FE-3), resulting in stockpiling of inventory beyond what needed to be shipped out (FE-2, FE-3). During this time, warehouses were overfilled and overpacked, with facilities over 95% full and in some cases over 100%, and inventory stored in aisles and on docks (FE-2, FE-3, FE-5). Former Employees further explained that Lineage capitalized on these conditions by pushing minimum storage guarantees (FE-3) and raising prices on a take it or leave it basis (FE-4) while customers required space (FE-3, FE-5, FE-4).

16. Former Employees further explained that this excess inventory began to unwind before the IPO as customers reduced stockpiles and returned to more typical inventory levels, a process that varied by customer (FE-4) and took time as inventory bled out slowly (FE-6). They explained that as this occurred, occupancy declined materially across Lineage's network, with facilities dropping from

[2] Former Employees are identified herein by number (*e.g.*, FE-1) and described in the masculine to protect their identities. The full account of allegations attributed to Former Employees is stated in Section IV(F)(3), and references to information from Former Employees outside of that Section are based upon that Section.

pandemic-driven levels above 95% to the 70% range or lower in some locations (FE-4, FE-5). FE-3, a Director of Finance who participated in the Company's IPO readiness team, recalled that overstocking and anticipated destocking were discussed internally in the leadup to the IPO. Former Employees further described that as demand declined, Lineage experienced a network wide meltdown of customer demand (FE-6) and was getting killed by competitors, prompting regional leadership conferences in late 2023 or early 2024, and workforce reductions (FE-2).

17. Former Employees also provided information undermining the Company's automation narrative. FE-1, Lineage's former Director of Global Procurement, described the Company as selling a vision it was a technology company. He explained that automated warehouses generated far lower ROI per pallet slot, did not reduce labor costs, and lacked a product market fit. He identified Olathe and Sunnyvale—two of the four automated sites highlighted in the Roadshow Presentation—where the automation did not work or function. He further explained that manufacturers could not develop automated equipment for frozen warehouses despite years of requests from Lineage, and that Lineage's automated forklift demonstrations were not scalable. In turn, FE-7, who maintained automation systems at the Sunnyvale facility, explained that the equipment was not designed to operate in a -5 freezer and broke down virtually every week, with outages that could render over a thousand pallets inaccessible, lasting days.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77o.

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

20. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v). Substantial acts in furtherance of the IPO which utilized the Offering Documents at issue herein have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

21. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges.

## III. PARTIES

### A. Lead Plaintiffs

22. Lead Plaintiff the Public Employees' Retirement System of Mississippi ("MSPERS") is a defined benefit pension fund headquartered in Jackson, Mississippi, with more than $35 billion in assets that administers retirement benefits on behalf of its members. As reflected in its PSLRA certification (ECF No. 17-2),

MSPERS purchased Lineage's common stock pursuant and/or traceable to the Offering Documents. Upon information and belief, MSPERS purchased Lineage's common stock at a time when only shares offered in the IPO were in the market. MSPERS suffered damages as a result of the violations of the federal securities laws alleged herein.

23. Lead Plaintiff Indiana Public Retirement System ("Indiana" or "INPRS") provides retirement, disability, survivor, and other benefits to more than 500,000 members in the state of Indiana. Indiana manages net assets of approximately $50 billion. As reflected in its PSLRA certification (ECF No. 17-2), Indiana purchased Lineage's common stock pursuant and/or traceable to the Offering Documents. Upon information and belief, Indiana purchased Lineage's common stock at a time when only shares offered in the IPO were in the market. Indiana suffered damages as a result of the violations of the federal securities laws alleged herein.

## B. Defendants

### 1. The Corporate Defendant

24. Defendant Lineage is a cold storage-focused real estate investment trust ("REIT") headquartered in Novi, Michigan. Lineage common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "LINE."

### 2. The Individual Defendants

25. Defendant Adam Forste ("Forste") co-founded Lineage and served as its Co-Executive Chairman at the time of the IPO. Defendant Forste signed the Registration Statement. Defendant Forste also co-founded Bay Grove (defined below) and served as a Managing Partner at the time of the IPO.

26. Defendant Kevin Marchetti ("Marchetti") co-founded Lineage and served as its Co-Executive Chairman at the time of the IPO. Defendant Marchetti signed the Registration Statement. Defendant Marchetti also co-founded Bay Grove (defined below) and served as a Managing Partner of Bay Grove at the time of the IPO.

27. Defendant Walter Gregory Lehmkuhl ("Lehmkuhl") served as Lineage's Chief Executive Officer ("CEO") and President at the time of the IPO and was named as a Director Nominee in the Registration Statement. Defendant Lehmkuhl signed the Registration Statement.

28. Defendant Robert Crisci ("Crisci") served as Lineage's Chief Financial Officer ("CFO") at the time of the IPO. Defendant Crisci signed the Registration Statement.

29. Defendant Abigail Fleming ("Fleming") served as Lineage's Chief Accounting Officer at the time of the IPO. Defendant Fleming signed the Registration Statement.

30. Defendants Shellye Archambeau ("Archambeau"), John Carrafiell ("Carrafiell"), Joy Falotico ("Falotico"), Luke Taylor ("Taylor"), Michael John Turner ("Turner"), Lynn Wentworth ("Wentworth"), and James Wyper ("Wyper") were named as Lineage Director Nominees in the Registration Statement.

31. The foregoing defendants are referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement and/or were named as Directors or Director Nominees of Lineage in the Registration Statement, as detailed above. In addition, the Individual Defendants participated in the solicitation and sale of Lineage common stock to investors in the IPO.

### 3. Defendant Bay Grove

32. Defendant Bay Grove Capital Group, LLC ("Bay Grove") is a private equity firm founded by Defendants Forste and Marchetti. Bay Grove (together with its affiliates) owned Lineage prior to the IPO and sponsored the IPO. Prior to going public, Bay Grove received hundreds of millions of dollars from Lineage through a variety of service transactions and other agreements with the Company. Bay Grove, its principals (Defendants Forste and Marchetti), and the Underwriter Defendants (defined below) were the primary beneficiaries of the IPO. Lineage used IPO proceeds to purchase operating units from Bay Grove and to pay down loans issued, in substantial part, by the Underwriter Defendants.

33. In addition, in connection with the IPO, Bay Grove received a one-time profit sharing increase from Lineage worth $200 million, received $75 million for the repurchase of Lineage operating units, and entered into a transition services agreement with Lineage that obligated Lineage to pay Bay Grove $8 million annually, as well as numerous other one-sided transactions and agreements with Lineage favorable to Bay Grove. Following the IPO, Bay Grove continued to control a majority of Lineage's combined voting power and, through a stockholders agreement, exerted control and influence over the Lineage Board of Directors (the "Board") disproportionate with its economic stake in the Company.

**4. The Underwriter Defendants**

34. Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, BofA Securities, Inc., J.P. Morgan Securities LLC, and Wells Fargo Securities, LLC are collectively referred to herein as the "Underwriter Defendants." As underwriters who participated in the IPO, the Underwriter Defendants are liable under the Securities Act for the material omissions and materially false and misleading statements in the Offering Documents and Roadshow Presentation because they offered and sold the securities.

35. The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities. They served as the underwriters of the IPO and shared over $191 million in fees collectively for

their services, which included the full exercise of their over-allotment option. In return for their share of the IPO proceeds, the Underwriter Defendants solicited purchases of Lineage common stock in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market Lineage common stock, and those personnel worked on and approved the content of Lineage's Registration Statement and other IPO materials.

36. The Underwriter Defendants obtained an agreement from Lineage that Lineage would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. It is customary for underwriters to require an issuer to acquire directors' and officers' liability insurance, and Lineage purchased such insurance.

37. Representatives of the Underwriter Defendants also assisted Lineage and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Lineage, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," as the bankers promoting the IPO, the Underwriter Defendants had the ability to demand unbridled access to internal corporate information concerning Lineage's operations and financial prospects.

38. As the bankers promoting the IPO, the Underwriter Defendants' agents would have met with Lineage's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings would have been reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price range at which Lineage stock would be sold; (iii) the language to be used in the Registration Statement; and (iv) what disclosures about Lineage would be made in the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Lineage's management and top executives, such as the Individual Defendants, the Underwriter Defendants knew, or should have known, of Lineage's existing problems, as detailed herein.

39. The Underwriter Defendants solicited and sold Lineage common stock in the IPO to Plaintiffs and other members of the Class (defined below) for their own financial benefit. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## IV. FACTUAL BACKGROUND

### A. Lineage's Business

40. Lineage is the world's largest cold storage warehouse company. At the time of the IPO, Lineage operated a network of more than 460 temperature-

controlled storage facilities across North America, Europe, and the Asia-Pacific region—the large majority of which were in the United States or Canada. Lineage's cold storage facilities store seafood, meat, poultry, packaged frozen food, beverages, and other products for a wide range of food processing, retail, restaurant, and other companies. Lineage's customers use the Company's warehouses as a link in their supply chains.

41. Lineage was formed in 2008 by Bay Grove, a private equity company founded by Defendants Forste and Marchetti.[3] Bay Grove built Lineage utilizing a "roll up" strategy whereby it acquired hundreds of independently operated cold storage warehouses and warehouse groups around the world. Through its aggressive acquisition strategy, Lineage grew from owning a single warehouse in 2008, to becoming the largest cold storage company in the world by 2019. By March 2024, the Company's facilities comprised a total of 3 billion cubic feet of storage space.

42. Lineage operates in two segments: Global Warehousing, which provides temperature-controlled storage services; and Global Integrated Solutions, which provides transportation and supply chain services to complement the Company's warehousing services. Global Warehousing is, by far, the larger and

[3] Lineage is structured as a REIT. A REIT is a company that owns, leases, or operates income-producing real estate. REITs are subject to different federal tax rules than typical corporations and are generally exempt from corporate income tax as long as they distribute most of their earnings to shareholders.

more profitable of the two segments, and the core of the Company's business. For example, in 2023, Global Warehousing accounted for more than $3.85 billion out of Lineage's $5.34 billion in revenue—or 72% of total revenue; and roughly $1.5 billion out of a total $1.7 billion net operating income ("NOI")[4]—or nearly 86% of NOI.

43. Lineage's Global Warehousing segment's revenue is reported in two categories: warehouse storage revenue and warehouse services revenue. Warehouse storage revenues are generated from per-day or per-month fees charged to customers for occupying storage space. Warehouse services revenues come from fees charged for handling and other services required to prepare and move customers' pallets into, out of, and around Lineage facilities.

44. At all relevant times, one of Lineage's critical performance metrics was its warehouse occupancy. For each quarter, Lineage reports the "average physical occupancy" and "average economic occupancy" of its warehouses. Physical occupancy is a measure of the percentage of physical pallet space taken up in

[4] NOI is a measure of profitability that comprises each Lineage business segment's revenues less its cost of operations (excluding certain items such as depreciation and amortization, impairment charges, corporate-level general and administrative expenses, corporate-level acquisition, transaction, and other expense and corporate-level restructuring and impairment expense). Lineage reports its NOI by business segment for each quarter. NOI is an important performance metric because it evidences the Company's ability to generate profits solely from its operations—either by increasing revenue per warehouse, decreasing operating costs, or a combination of both.

Lineage's warehouses, whereas economic occupancy is a percentage of pallet space that is paid for under contract, even if not physically occupied at all times.

45. Lineage's Offering Documents repeatedly emphasized that both physical occupancy and economic occupancy were "important driver[s] of our financial results." For example, the Offering Documents explained that "[i]ncreases in warehouse physical occupancy generate high flow-through to N[et] O[perating] I[ncome] due to operational leverage,"[5] *i.e.*, because warehouses have extensive fixed costs, increases in occupancy create dramatic increases in profit once those fixed costs are covered.

46. Lineage also stated that declines in occupancy could be highly detrimental to its business. As the Offering Documents explained, "decrease in demand for certain commodities or products produced by our significant customers and stored in our temperature-controlled warehouses would lower our physical occupancy rates and use of our services, without lowering our fixed costs, which could have a material adverse effect on us."

47. At the same time, Lineage's warehouses operated most optimally within a given range—roughly 80-85% physical occupancy. Lineage's facilities needed a significant amount of free space to allow for the free movement of pallets

[5] Operational leverage is a term for the effect whereby, after a business's fixed costs are covered by revenues, its profitability begins to increase dramatically with additional revenue.

into, out of, and within the warehouses, and levels above 85% could lead to reduced efficiency. As the Registration Statement explained:

> We do not believe that a 100% physical occupancy rate is an ideal target for utilization of our warehouses because optimizing pallet throughput and efficient delivery of relevant warehouse services requires a certain amount of free pallet position capacity at all times in order to be able to efficiently place, store and retrieve products from pallet positions, particularly during periods of greatest occupancy or highest volume.

**B. In the Years Leading up to the IPO, Lineage Capitalized on a COVID-Fueled Spike in Demand for Cold Storage Space Due to Customer Overstocking**

48. Beginning in 2020, the COVID-19 pandemic dramatically changed patterns of production, distribution, and consumption, as consumers spent less time and money eating in restaurants and consumed more food at home. At the same time, a variety of COVID-related supply chain disruptions made it more challenging for food producers, distributors, and retailers to ensure they had sufficient inventory on hand to meet demand. Accordingly, many of these companies sought to stock and store extra frozen and refrigerated goods to avoid shortages—*i.e.*, they "overstocked" or "overbuilt" their inventories in cold storage facilities.

49. Lineage benefitted greatly from these pandemic disruptions, as its customers began to stock more inventory and store it for longer periods of time. From fiscal year 2021 to fiscal year 2023, the average physical occupancy of Lineage's warehouses increased from 78.0% to 80.0%, and its economic occupancy

increased from 82.3% to 86.0%.[6] Consequently, Lineage's same warehouse NOI—a critical measure of the business's organic profitability growth—grew dramatically, rising 12.7% in 2022 and another 15.3% in 2023.[7] This same warehouse NOI growth was primarily driven by dramatic increases in same warehouse revenue, as high demand not only increased occupancy, but meant that Lineage could charge higher prices per pallet and increase its service fees.

50. Meanwhile, at the same time that Lineage was charging higher prices to customers for its services, the Company further sought to capitalize on the pandemic-era historic demand for cold storage by embarking on a massive acquisition spree. Between 2020 and 2024, Lineage completed approximately 75 acquisitions. Through these acquisitions, Lineage's warehouse network—which

---

[6] Because certain of Lineage's customers operated under "minimum storage guarantee" contracts, those customers leased fixed amounts of storage space, which was paid for regardless of whether that space was in use. Economic occupancy was thus typically higher than physical occupancy.

[7] "Same Warehouse NOI" is a measure of profitability that the Company reported every quarter, which was derived from the revenue generated by the "same warehouse pool" (warehouses that were owned, leased, or managed during both comparison periods) minus the direct operating expenses of those facilities. Same warehouse NOI is of particular importance to Lineage's investors because it evidences whether the Company is able to grow its profitability through higher occupancy levels and more cost-efficient operations, as opposed to merely by purchasing additional warehouses. Lineage reported same warehouse NOI growth as a percentage, which represented the change in NOI for a warehouse pool in one period compared to the NOI for that warehouse pool in a comparable period at an earlier point in time (*e.g.*, year-over-year).

had already become the largest in the world by 2019—grew by over 1.2 billion cubic feet, or 67%, for a total warehouse network capacity of over 3 billion cubic feet by March 2024.

### C. Defendants Face Internal Pressure to Effectuate the IPO as COVID-Fueled Overstocking Subsides, Lineage's Debt Balloons, and Growing Competition Eats into the Company's Business

51. In late 2023 and early 2024, Lineage faced significant negative pressures that made the prospect of accessing billions of dollars in proceeds through the IPO imperative.

52. First, by mid-2023, signs were emerging internally that COVID-era "overstocking" by the Company's clients was ending. Supply chain issues had subsided by that point and customers no longer needed as much excess inventory on hand. Thus, as Lineage would ultimately admit, by the third quarter of 2023, customers began to "destock" the "excess" inventory they had built up during the pandemic—a fact that Lineage was seeing first-hand internally but Defendants would not publicly disclose until well after they had completed the IPO.

53. Second, while this significant "destocking" was occurring, Lineage's competitors were also adding more storage space in many of the Company's key markets. This created greater pressure on Lineage's business, as it became harder to justify the high storage and service fees that the Company had charged during COVID, since customers could simply take their inventory elsewhere. As discussed

further below, former Lineage employees confirmed that, by late 2023 to early 2024, competition was eating into Lineage's business and putting pressure on its pricing.

54. One way Lineage attempted to mitigate this decline was through the use of minimum storage guarantees. These contracts reserved a fixed number of pallet positions for a customer and charged a flat fee for that space regardless of how much of it the customer actually used. While minimum storage guarantees helped to slow the post-COVID decline in Lineage's business, these contracts could not prevent Lineage's inevitable return to normal, pre-COVID occupancy levels. In fact, because of customer destocking and growing competition, Lineage's occupancy levels and same warehouse metrics began to decline by the first quarter of 2024. However, by that time, the wheels were already in motion for the Company's IPO.

55. Third, in the run up to the IPO, it became clear that the Company's aggressive acquisition strategy had proven costly. By 2024, Lineage had accumulated over $9 billion in long-term debt through its years of acquisition-driven expansion. This massive mountain of debt created significant fiscal pressure on the Company.

56. Accordingly, Lineage's need to raise capital to pay down its debt, in combination with the post-COVID warehousing boom and customer destocking, created an impetus to go to the public markets and seek to raise billions of dollars in capital from investors. Tellingly, by September 2023—*i.e.*, the same exact time that

Lineage would later admit customers had already begun to "destock excess inventory"—*Bloomberg* and other media outlets reported on leaked information that Lineage was planning to raise billions of dollars in capital through an IPO, and that the Company had already chosen investment banks.

**D. In Connection with the IPO, Lineage Issues the Materially False and Misleading Offering Documents and Roadshow Presentation**

57. Through the Offering Documents and Roadshow Presentation, Lineage solicited the market with false assurances that the Company was poised for continued growth and positive financial performance, and that the Company's recent financial performance was sustainable and not the product of a temporary demand surge spurred by COVID restrictions, supply chain chaos, and the resulting customer inventory overstocking. Instead, Lineage represented that the Company was worth a high premium to investors because it was experiencing "***growing***" and "***resilient***" demand, while asserting that its differentiated assets, competitive advantages, and unique operational and technological initiatives would "drive long-term value for both customers and shareholders."

58. On June 26, 2024, Lineage filed a registration statement for its IPO on Form S-11 with the SEC which, after amendments on July 16, 2024 and July 22, 2024, was declared effective on July 24, 2024 (the "Registration Statement" and, together with Lineage's other IPO-related SEC filings, the "Offering Documents").

[8] On July 16, 2024, Lineage commenced its investor "roadshow" to market its IPO, during which the Company presented the Roadshow Presentation. As discussed below and in Section V, the Offering Documents and Roadshow Presentation contained materially false and misleading statements and omitted material information.

59. *First*, the Offering Documents falsely attributed Lineage's success, in the run up to the IPO, to "***growing***" and "***resilient***" demand, when, in fact, it was almost entirely attributable to the temporary, COVID-fueled surge in demand that occurred during the pandemic. The Offering Documents described the market for the Company's services as "***growing and naturally resilient across macroeconomic cycles***," and that "***additional temperature-controlled warehousing capacity***" would be needed in the future "***to meet current and anticipated future market demand***,"

[8] The terms "Registration Statement" and "Offering Documents" were preliminarily defined in Section I; to the extent there is any ambiguity, the definitions stated in this paragraph and footnote are authoritative. The other IPO-related SEC filings include: (i) the July 26, 2024 Form 424B4 Prospectus, which was incorporated into, and formed part of, the Registration Statement (the "Prospectus"); (ii) the July 25, 2024 Form S-8 Registration Statement for the Company's Amended and Restated Lineage 2024 Incentive Award Plan, which incorporated by reference the Registration Statement and the Prospectus (the "2024 Plan Registration Statement"); and (iii) the July 25, 2024 Form S-8 for the Lineage Logistics Holdings, LLC 2021 Value Creation Unit Plan and the Amended and Restated Lineage Logistics Holdings, LLC 2015 Value Creation Unit Plan, each as supplemented by the Omnibus Supplement and Amendment "A" to Lineage Value Creation Unit Plans, which incorporated by reference the Registration Statement and the Prospectus (the "LVCP Awards Registration Statement," and collectively with the 2024 Plan Registration Statement, the "S-8 Registration Statements").

when the Company's increased demand from 2021–2023 was entirely due to COVID.

60. Moreover, the Offering Documents represented to investors that Lineage's financial performance was due to the Company's "competitive advantage" and "***numerous organic business initiatives***" and "***utilization initiatives***," which it claimed were specifically responsible for the Company's increased occupancy from 2021–2023. In reality—the opposite was true—as Defendants eventually disclosed; for example, in May 2025—the Company's spike in demand between 2021–2023 occurred because customers had stocked "excess inventory" in response to "COVID supply chain shocks," and, once COVID subsided, "[b]eginning in Q3 2023, Lineage customers began to destock excess inventory."

61. Further, the Offering Documents not only misrepresented the true causes of Lineage's occupancy growth but went so far as to claim that the pandemic's effects were an ongoing benefit to the Company. The pandemic had "led to a rise in awareness among consumers, governments, and investors around the importance of an optimally functioning global cold chain," which "accelerated trends" in the industry that had "the potential to be growth engines" for the Company. In fact, Lineage asserted that its market analysis showed that there was

still heightened demand for even more cold storage space—*i.e.*, there was "***still ample demand to fill new space as it delivers***."

62. Relatedly, the Offering Documents and Roadshow Presentation omitted the materially adverse information that, at the time of the IPO in July 2024, occupancy in Lineage's warehouses was still "elevated" well above its "normal" and "seasonal" levels—and that the Company's "normal" business conditions would track pre-pandemic 2019 levels moving forward. Significantly, Defendants did not disclose these critical facts to investors in the Offering Documents or the Roadshow Presentation, and, indeed, disclosed virtually no information about the Company's pre-COVID "normal" occupancy levels and patterns.

63. In addition, when the Offering Documents discussed a reduction in Lineage's occupancy levels that had occurred in early 2024, they falsely represented the reasons for that reduction. For example, while the Offering Documents vaguely warned that demand "***may decrease relative to 2023 as customers rationalize inventory levels***," Lineage in no way disclosed that, at the time of the IPO, Company-wide customer destocking was having an ongoing and serious impact on the Company's business, and that, even as of the IPO, inventory remained "elevated" beyond the normal levels the Company expected to see going forward. To the contrary, Lineage blamed any reduction in occupancy on "***lower physical utilization***

***as customers rationalize their inventory during continued economic pressures driven by higher interest rates***."

64. *Second*, the Offering Documents and Roadshow Presentation represented to investors misleadingly touted Lineage's automation technology, claiming that its "proprietary" automation technology was a "key differentiator" that would increase productivity, save costs, and attract customers. Lineage represented that its "Technology-Enabled Platform Designed for Tomorrow" was providing "Operational Excellence Inside the Warehouse of the Future," as Lineage's "[p]roprietary warehouse automation technology" was creating "[i]mprovements to both automated and conventional warehouses" and thus "[g]enerating efficiencies across the Lineage network."

65. Similarly, Lineage's Roadshow Presentation included slides that made highly specific claims about its automated warehouses and their ability to increase "Inventory Turns"—*i.e.*, increase the speed at which inventory could be moved—as well as decrease labor cost, increase the amount of pallets that could be stored within a warehouse, and decrease energy usage. The Roadshow Presentation also promoted four flagship automated facilities as examples of how Lineage's approach to automation "[c]reate[d] [v]alue," including facilities in Rotterdam, Netherlands; Sunnyvale, Texas; Olathe, Kansas; and Richland, Washington.

66. However, these statements were materially false and misleading. As set forth further below, numerous former executives and employees of Lineage confirmed that the Company's automation technology experienced widespread failures and was unable to generate the promised efficiencies and cost savings described in the Roadshow Presentation. At least two of the four flagship facilities featured in the Roadshow Presentation experienced regular and severe problems, with one—Olathe, Kansas—becoming the subject of a $10 million legal dispute with Lineage's largest US customer, Smithfield Foods, as a result.

67. *Third*, the Offering Documents touted Lineage's supposed "***proven acquisition strategy***," whereby the Company purportedly targeted "***profitable businesses***" and "***high-quality assets***." These statements were misleading because, by the time of the IPO, the Company's aggressive acquisition strategy and insufficient due diligence had saddled Lineage with billions of dollars in debt for facilities that were underperforming and of poor quality. As set forth below, former executives and employees confirmed that, as Lineage ramped up for its IPO, it began to acquire virtually any property it could get its hands on, no matter how poor quality or in need of repair, to pad its top-line revenue.

### E. On the Back of the Materially Misleading Offering Documents and Roadshow Presentation, Lineage Sells More Than $5 Billion Worth of Stock in "The Year's Hottest IPO"

68. The IPO was a resounding success, and demand for shares of Lineage's stock soared. As a result, through its IPO, Lineage was able to sell more than 65 million shares at $78 per share, thus raising more than $5 billion from investors—making it the largest IPO of the year, and the largest REIT IPO in history.

69. On July 26, 2024, *The Wall Street Journal* published an article headlined "Why a Cold-Storage Company Just Delivered the Year's Hottest IPO," which touted the efficiencies that supposedly gave Lineage an advantage over other cold storage companies, including its automation and other technology that supposedly reduced labor costs and increased speed. As the article noted: "In some warehouses, Lineage uses automation such as autonomous forklifts to reduce reliance on manual labor, something that not only helps speed up the process and reduces human error but also provides predictability, given the high turnover rate of such a physically demanding job."

### F. Events Following the IPO Confirm That Defendants Had Made False and Misleading Statements in Connection with the IPO

#### 1. Following the IPO, Lineage Reports Quarter After Quarter of Declining Financial Results Due to Issues That—as Defendants Ultimately Admit—Existed Well Before the IPO

70. Tellingly, virtually immediately following the IPO, Lineage's financial results began to falter, and, quarter after quarter thereafter, Lineage saw substantial

*declines* rather than growth in its key performance metrics, including, most significantly, its occupancy levels and same warehouse NOI. As Lineage began releasing these poor financial results mere months after completing the IPO, Defendants gradually revealed what they had failed to disclose in the Offering Documents and the Roadshow Presentation.

71. *First*, at the time of the IPO, Lineage was not experiencing "***growing***" or "***resilient***" demand for its services, and the Company's growth from 2021–2023 had not been the result of any "***organic business initiatives***" or "***utilization initiatives***," but was instead due to COVID-fueled overstocking of inventory. *Second*, as a result of this overstocking, the Company's occupancy rates were understood to be temporarily and unsustainably inflated, *i.e.*, "elevated" and "excess," from at least 2021 through the time of the IPO. *Third*, the decline in Lineage's occupancy and financial results through 2024 and beyond was not a result of "***higher interest rates***," but of a return to "normal," pre-COVID occupancy patterns, compounded by rising competition. And *fourth*, the Company's "normal" occupancy levels before COVID—which were never disclosed in any of the Offering Documents or Roadshow Presentation—were far lower than the levels Defendants reported at the time of the IPO.

72. On November 6, 2024, Lineage filed a press release with the SEC on Form 8-K reporting the Company's financial results for its third fiscal quarter ended

September 30, 2024—the quarter during which the IPO occurred. During Q3 2024, Lineage reported zero growth versus the same quarter the prior year, including $1.335 billion in total revenue that equated to a $543 million net loss during the quarter. During an earnings call held November 6, 2024, Defendant Lehmkuhl acknowledged, for the first time, that competition was putting pressure on Lineage's business, stating: "In select markets, we are seeing some competitive pressures as speculative development and new supply has come online." Asked by an analyst to elaborate on which markets were seeing competitive pressures, Lehmkuhl explained that the issue was "pretty widespread."

73. On January 14, 2025, Lineage announced a surprise round of employee layoffs due to its flagging business. While the Company did not publicly quantify the layoffs, *The Wall Street Journal* reported on their proximity to the IPO, noting that "Lineage, the world's largest refrigerated-storage company, is cutting staff six months after launching the largest initial stock offering in the U.S. last year."

74. On February 26, 2025, Lineage filed a press release with the SEC on Form 8-K reporting the Company's financial results for its fourth fiscal quarter ended December 31, 2024 and full-year 2024. Among other things, Lineage reported a massive increase in its full-year net loss ($751 million net loss versus $96 million net loss in 2023); near-zero growth in its overall revenue versus Q4 2023; and a 3.4% *decline* in its Q4 warehouse storage revenues (from $526 million to $508

million). Lineage's occupancy levels also declined substantially when comparing Q4 2024 to Q4 2023, with physical occupancy falling from 80.8% to just 78.1%, and economic occupancy falling even more, from 87.2% to 83.9%.

75. Significantly, during Lineage's February 26, 2025 earnings call, Defendants disclosed that Lineage's occupancy numbers in the first half of 2024—the critical six months leading up to the IPO—had "remained elevated" due to pandemic-era "overbuilding" by customers; that Lineage had only recently returned to a "more normal seasonal pattern;" and that the Company expected this "normal" business pattern "to continue moving forward." As Defendant Lehmkuhl explained:

> Back in 2020, 2021, we saw supply chain chaos, production charges, port shutdowns and the inventory was bled down. 2022 was the year where customers began to rebuild inventories quickly, leading to overbuilding. That overbuilding continued into the third quarter of 2023 when the excess inventory began to unwind. That unwinding continued through the second quarter of 2024. Said another way, inventory levels remained elevated for the first half of 2024. Since then, we've experienced a more normal seasonal pattern, which is what we expect to continue moving forward.

76. On the February 26, 2025 earnings call, Defendant Crisci similarly emphasized that "[i]nventory levels" had "remained elevated in the first half of 2024" and had only "stabilized" by "later in the year."

77. With their Q4 2024 results, Defendants also began to disclose that the pandemic had not "accelerated trends" that had "the potential to be growth engines"

for Lineage. Rather, as Defendant Crisci explained on the Q4 2024 earnings call, the 2024 quarterly results were "highly unusual," and the industry had now "stabilized at these lower levels." Going forward, the business was expected to more closely track "pre-pandemic data back when our industry was more normal."

78. On April 30, 2025, Lineage filed a press release with the SEC on Form 8-K reporting the Company's financial results for its first fiscal quarter ended March 31, 2025. Rather than having "normalized," Lineage's results continued to fall even further in nearly every major metric, both sequentially and versus the same quarter prior year. For example, Lineage generated $1.292 billion in total revenue, a 2.7% year-over-year *decrease*. Lineage's critical Same Warehouse NOI *fell* by 7.9% year-over-year, while same warehouse physical occupancy declined again to 76.5% (versus 77.5% the same quarter the year prior and 78.1% the previous quarter), and economic occupancy fell to 82.1% (versus 83.6% the same quarter the year prior and 83.9% the previous quarter).

79. Also on April 30, 2025, Lineage held an earnings call with analysts and investors to discuss its Q1 2025 results and issued a slide presentation to accompany the earnings call. The slide presentation acknowledged that the prior year's inventory levels—*i.e.*, the inventory levels the Company hyped in the run up to the IPO—were "elevated" all along, and as a result, the ongoing decline in Lineage's business had been entirely "expected" and the current results reflected a "return" to

"normal seasonality" for the business. Defendant Crisci echoed this admission during the Q1 2025 earnings call, stating that "[i]nventory levels were elevated in the last couple of years, helping drive 22% same warehouse NOI growth in the first quarter 2 years ago. The excess inventory appears to have stabilized, but we are now seeing more typical seasonality as revenue declined sequentially from the fourth quarter, representative of a more normal pattern."

80. Tellingly, the Offering Documents failed to disclose any such "expected" decline, and thus, failed to provide investors with any meaningful indication of what Lineage's "normal" pre-COVID occupancy looked like.

81. During the Q1 2025 earnings call, securities analysts indicated they were "surprised" following the results and expressed their frustration at Lineage's consistent underperformance since the IPO. A securities analyst from Piper Sandler questioned why the so-called "normalization" of customer inventory levels had taken so much longer than expected, inquiring: "it does seem that each quarter, it seems to be the next quarter . . . is there something different about this cycle versus your 15-plus years in the business that seems to be taking longer for inventories to normalize?" As the analyst underscored, the timing of Defendants' admission did not make sense:

> COVID was a few years ago. Presumably, the destocking occurred a few years ago, and the tenant should have been back, especially pre-April 2. So just sort of curious why it

> seems to just be taking a little bit longer than what we initially spoke about.

82. In response, Defendant Crisci again reiterated that the Company's declining occupancy and financial results reflected "normal seasonality," explaining that the results were "pretty close to our internal models on Q1." Similarly, Defendant Lehmkuhl emphasized that "the occupancy was right where we frankly hoped it would be in the first quarter [of 2025]."

83. On the Q1 2025 earnings call, Defendant Lehmkuhl also acknowledged that "new supply" of storage space from Lineage's competitors had impacted its business, and that this was already apparent in 2023—*the year before the IPO*. Specifically, Lehmkuhl explained that, "certainly, there's been new supply into the market over the last several years. That new capacity peaked in 2023 with about 4% [increased supply] in the U.S."

84. Following the Q1 2025 earnings call, securities analysts expressed dismay at the "confusion" Lineage had created by failing to give investors a clear picture of what "normal" occupancy levels and patterns looked like for Lineage prior to the IPO. For example, on April 30, 2025, CapitalOne analysts noted that "the weakness in LINE shares is stemming from confusion around where we sit in the cold storage demand cycle with challenging fundamentals seemingly continuing quarter to quarter." CapitalOne commented that Lineage had still not fully disclosed the key, highly material information investors needed to understand its revenues—

*i.e.*, the baseline "normal" revenue levels Lineage expected to experience based on its pre-pandemic results. As CapitalOne explained: "Investors need to know when at a minimum they can expect stabilized revenue levels so that LINE can then start to show growth from the competitive positioning in its markets and [management's] initiatives." Similarly, on April 30, 2025, Citi Research analysts noted that Lineage was reporting a "longer-term inventory reset" than previously represented, with "loss of pricing power" and a "sequential drop in occupancy, revenue per occupied pallet, and total same warehouse margin."

### 2. Defendants Disclose That as Far Back as Q3 2023—*a Year Prior to the IPO*—They Had Known That Customers Had Begun to "Destock Excess Inventory" to Revert Back to "More Rational," Pre-Pandemic Supply Chains

85. On May 7, 2025, Lineage filed a press release with the SEC on Form 8-K issuing an investor slide presentation that, for the first time, made clear to investors that the Company's occupancy growth between 2021–2023 had not been due to "***growing demand***" or "***organic business initiatives***," but, instead, was the dependent on "COVID supply chain shocks" that had led customers to overstock inventory, thus inflating occupancy levels "in excess of the typical seasonality trends." Moreover, the presentation disclosed that this overstocking trend had begun to reverse by at least Q3 2023—well before the IPO—and that, at the time of the IPO in July 2024, Lineage's warehouses still had significant "excess inventory" that had to be unwound before returning to "typical seasonality." As such, the occupancy

levels disclosed in the Offering Documents were not representative of the true state of Lineage's business, but, instead, were the product of artificially inflated inventory due to customer responses to COVID supply chain shocks.

86. Specifically, the May 2025 presentation explained:

> In Q4 2021, Lineage Global WH physical utilization was 77.3%. Lineage inventory levels then began to increase in excess of the typical seasonality trends. In response to the COVID supply chain shocks, Lineage customers increased resiliency and built-up their inventory holdings.
>
> Beginning in Q3 2023, Lineage customers began to destock excess inventory looking for leaner, more rational supply chains overall.
>
> By the end of 2024, Lineage customers had unwound their excess inventory levels. Since Q3 2024, Lineage utilization trends have more closely followed what would be expected under typical seasonality.

87. In connection with this narrative, Lineage included a detailed slide that disclosed material new information about its business. Specifically, the slide charted the quantified amount of "excess inventory" that had been in Lineage's warehouses each quarter. The chart also compared Lineage's quarterly occupancy rates to what Lineage considered to be "typical" levels when "normal seasonality patterns" were in effect. Significantly, utilization under "typical" seasonal patterns was shown to *peak* at approximately 77% in Q4 of each year—*i.e.*, below the occupancy levels reported at the time of the IPO. "Typical" seasonal occupancy would then fall to a trough in the low 70s in Q2 of each year. This meant that, in Q1 2024 and Q2 2024—

the last two quarters reported on in the Offering Documents—Lineage continued to have a significant amount of "excess inventory" compared to what was normal at that time of year. Tellingly, the Offering Documents failed to disclose this critical information to investors. The slide from the May 2025 investor presentation is reproduced below:[9]

[9] The footnotes at the bottom of the slide stated:

1. Source: United States Department of Agriculture, National Agricultural Statistics Service: Monthly Cold Storage Report. https://usda.library.cornell.edu/concern/publications/pg15bd892.

2. "typical seasonality" means the quarter-to-quarter changes reflected in the USDA quarterly average holdings from 2015 – 2019.

3. Hypothetical Utilization Under Typical Seasonality applies the observed q/q change in USDA quarterly average holdings from 2015 – 2019 to the LINE Global WH Physical Utilization of 77.3% in Q4 2021.

4. Cumulative Excess Inventory is calculated as the difference between LINE Global WH Physical Utilization and Hypothetical Utilization Under Typical Seasonality totaled from Q4 2021 to each respective period.

## Seasonal Inventory Patterns after Industry Destocking

| USDA Quarterly Average Holdings[1] 2015-2019 | (lbs in 000s) | q/q % Change |
|---|---|---|
| Q1 | 9,548,193 | (6)% |
| Q2 | 9,282,175 | (3)% |
| Q3 | 10,054,863 | +8% |
| Q4 | 10,151,516 | +1% |

Annually, cold storage inventory holdings have typically been higher in the second half of the year, due primarily to:

- Produce and protein that is seasonally harvested in the summer and then held in cold storage
- Inventory build up in preparation for the holiday season

Charted at right is the actual physical utilization of the Lineage Global WH segment against the hypothetical utilization if following the typical seasonality patterns.




1. In Q4 2021, Lineage Global WH physical utilization was 77.3%. Lineage inventory levels then began to increase in excess of the typical seasonality trends. In response to the COVID supply chain shocks, Lineage customers increased resiliency and built-up their inventory holdings.

2. Beginning in Q3 2023, Lineage customers began to destock excess inventory looking for leaner, more rational supply chains overall.

3. By the end of 2024, Lineage customers had unwound their excess inventory levels. Since Q3 2024, Lineage utilization trends have more closely followed what would be expected under typical seasonality. Lineage expects inventory and utilization levels to be higher in the second half of 2025 than the first half, in line with typical seasonality patterns.

1. Source: United States Department of Agriculture, National Agricultural Statistics Service: Monthly Cold Storage Report. https://usda.library.cornell.edu/concern/publications/pg15bd892.
2. "typical seasonality" means the quarter-to-quarter changes reflected in the USDA quarterly average holdings from 2015 – 2019.
3. Hypothetical Utilization Under Typical Seasonality applies the observed q/q change in USDA quarterly average holdings from 2015 – 2019 to the LINE Global WH Physical Utilization of 77.3% in Q4 2021.
4. Cumulative Excess Inventory is calculated as the difference between LINE Global WH Physical Utilization and Hypothetical Utilization Under Typical Seasonality totaled from Q4 2021 to each respective period.

Lineage onelineage.com 11

88. Notably, following the release of this presentation, Piper Sandler reprinted the above chart in its May 11, 2025 analyst report and, in response to that information, noted that Lineage had finally begun to make the disclosures needed for investors to meaningfully evaluate what normal occupancy was like at Lineage. Specifically, according to the Piper Sandler report, Lineage management was finally "listening to feedback and taking an honest self-assessment of how to improve transparency to better reflect the return to normality following 5 years that were anything but." Piper Sandler noted that, with Lineage's newly disclosed information, it was finally clear that "the post-pandemic overstocking was met with a sudden ramp of supply, that while now fading, is met by normal food production seasonality that typically troughs in 2Q and peaks in 4Q." Piper Sandler emphasized that the recent weaker demand meant a "return to normalcy," and that the "pandemic

overstocking masked the normal seasonality." Piper Sandler further noted that, "[i]mportantly, consumption hasn't changed but the inventory disruption from pandemic overstocking hid normal seasonal trends."

89. On June 2, 2025, Lineage announced that Defendant Crisci would resign from his position as CFO—less than a year after completing the IPO.

90. On June 3, 2025, Defendants Lehmkuhl and Crisci spoke on behalf of Lineage at the NAREIT REITweek Investor Conference. During the conference, Defendant Lehmkuhl acknowledged that "in the last couple of years you've seen pretty much flat demand" for Lineage's products and services, and that the Company was operating in a "flattish environment" in terms of demand. During the conference, Defendant Lehmkuhl again called out competition as impacting Lineage's business and admitted that the additional competition had put "more pressure on price" in "the last couple of years"—thus reaffirming that this competitive pressure was already impacting the Company's pricing power by the time of the IPO.

91. At the June 3, 2025 NAREIT REITweek Investor Conference, Defendant Lehmkuhl also further contradicted any prior suggestion of "accelerated" trends due to COVID serving as new "growth engines." To the contrary, Lehmkuhl acknowledged that the business's "normal" cycle would be similar to 2019—the last year before the pandemic. Specifically, Defendant Lehmkuhl noted that "[w]e

haven't had a normal year in food since 2019," and that "we really resumed a normal seasonal pattern starting in the second half of last year" (*i.e.*, Q3 and Q4 2024).

92. Following the June 3, 2025 presentation, securities analysts noted that it seemed that Lineage's inventory levels may finally be reaching normal. KeyBanc noted that "[m]anagement reiterated its view that the post-pandemic normalization in inventory levels (i.e., inventory destocking) is nearing the end and warehouse inventory levels are in the process of bottoming." As such, KeyBanc noted that management expected inventory to return to its pre-COVID patterns, *i.e.*, "[t]he expectation is that inventory levels stabilize through midyear, with more historical levels of seasonality anticipated moving forward (i.e., 2015-2019 seasonality patterns)."

93. On August 6, 2025, Lineage filed a press release with the SEC on Form 8-K reporting the Company's financial results for its second fiscal quarter ended June 30, 2025, which disclosed that occupancy levels had *again* declined as a result of destocking, with economic occupancy falling to 79.1% and physical occupancy falling to 73.3%. Accordingly, the Company's same warehouse NOI declined 6.3% versus the same quarter the year prior. On August 6, 2025, under the same Form 8-K, Lineage also filed an investor presentation with the SEC. The investor presentation noted that full-year 2025 same warehouse NOI was now projected to

decline by 3-5% versus 2024, with "[r]educed [second half 2025] occupancy assumptions driving lower guidance."

94. Securities analysts noted that occupancy levels continued to fall far below Lineage's IPO levels. An August 6, 2025 Truist Securities report, headlined "Outlook lowered; occ[upancy] recovery stays elusive," emphasized that "a weaker than expected occupancy recovery path was the primary reason for the guide reduction," and that the "pace of recovery is elongated each quarter." Baird noted on August 12, 2025 that "[t]he number one question we continue to field from investors is 'when and where do inventories bottom?'"

95. An August 6, 2025 Deutsche Bank report opined, "investors will likely be disappointed given that LINE has been overpromising but under delivering since the July IPO last year, leading to a stock that is off -43% since the IPO." As such, Deutsche Bank stated: "Despite the meaningful stock underperformance, we continue to worry that challenges in guiding around the business outlook may be resulting in loss of management credibility."

96. A few days later, in an August 11, 2025 report, analysts at Goldman Sachs described a meeting they had hosted with Lineage management on August 7, 2025, following the Company's Q2 2025 earnings release. In their report, Goldman Sachs explained that Lineage was now acknowledging that the Company did not even expect occupancy to reach *pre-COVID levels* in the near term, with even those

levels being only a "best case scenario." The Goldman Sachs report explained: "Management discussed that the 2025 seasonal pick up in occupancy was later and more gradual than historical norms. LINE still expects a pick up in occupancy, especially in 4Q for the holidays, but not to levels seen prior to the pandemic."

97. On November 5, 2025, Lineage filed a press release with the SEC on Form 8-K reporting the Company's financial results for its third fiscal quarter ended September 30, 2025. Physical occupancy was now down to 73.7%, and economic occupancy was reported at 80.3%. Lineage also held its Q3 2025 earnings call on November 5, 2025. Notably, during the earnings call, an analyst from BofA Securities pointed out that there had "clearly been a problem forecasting occupancy in [Lineage's] business." The BofA Securities analyst asked, "[d]o you have data going back prior to . . . 2020? Just trying to see if there was any other time before 2020 . . . where occupancy was below 80% . . . I was trying to figure out how today's levels compare to historically before 2020." This question not only indicated that analysts would have valued the historical data Lineage failed to disclose in the Offering Documents but also expressed frustration with Lineage's performance and lack of transparency.

98. In response, Defendant Lehmkuhl admitted that pre-pandemic occupancy numbers—which Defendants had now represented as "normal" for the Company—were even *lower* than Lineage's current levels of 80% economic

occupancy and 73.7% physical occupancy, and thus, occupancy could fall even further before reaching "normal." Specifically, Lehmkuhl stated that "[t]here were certainly times prior to 2021 where our occupancy was lower than it is today," including in "2016, '17, [and] '18."

99. In recent months, Lineage has reported additional ramifications to its business that further contradict the suggestion that demand was "***growing***" and "***resilient***" for Lineage's services. While Lineage had already announced in June 2025 that it had "idled" at least 8 warehouses, and was considering idling 5-10 more, during the Company's Q4 2025 earnings call on February 25, 2026, Defendant Lehmkuhl admitted that there was such an "oversupply" in the market that a significant number of warehouses would likely wind up "shuttered and repurposed"—comprising up to 1% of the available space per year. Notably, Lehmkuhl contrasted this to the period "coming out of COVID or during COVID, when every single pallet position basically in the U.S. and around the world was full, because our customers were overstocking."

100. The misrepresentations in the Offering Documents and Roadshow Presentation have materially impacted investors who purchased Lineage shares. Roughly one year after the IPO, at the time of the filing of the initial complaint in this action on August 1, 2025, Lineage's stock price closed at $42.35—a decline of approximately 46% from the IPO price of $78 per share.

### 3. Former Lineage Executives and Employees Have Confirmed That the Offering Documents and Roadshow Presentation Were Misleading

101. Former employees have corroborated the information establishing that Defendants' statements were materially false and misleading.

102. **FE-1.** FE-1, Lineage's former Director of Global Procurement, explained that there was a wishful thinking belief at the Company at times that COVID demand had created a "new normal," but confirmed that, in reality, the Company absolutely had data from its warehouses pre-COVID that showed normal occupancy and revenue at much lower levels.

103. FE-1 explained that, starting during COVID and continuing into 2023, the Company had dramatically increased its pricing. However, as COVID subsided and more competition simultaneously came online, customers balked at the price increases and fled to other cold storage providers. As FE-1 explained, as a result of Lineage's price increases and minimums, it "lost a significant percentage of their customer base, which was mostly grocery retailers, which operate with very thin margins." FE-1 explained that he was kept abreast of these customer losses through conversations with finance directors Chris Thurston and Chad Heron, and commented that "customers were starting to balk at the double digit price increases."

104. FE-1 explained that it was this loss of customers, and not just the factors cited in the Offering Documents, such as "***higher interest rates***" that caused

Lineage's occupancy rates to decline dramatically in 2024. FE-1 explained that companies like FreezPak and RealCold were winning Lineage's customers over with better pricing, and that customers didn't see any advantage offered by Lineage that justified a higher price.

105. FE-1 explained that Lineage senior executives "were absolutely observing a trend of customer losses. Everybody at Lineage was aware." FE-1 confirmed that Lineage customers were destocking, but that the loss of customers also reflected customers leaving for cheaper alternatives. FE-1 noted that by this time Lineage had developed a reputation for being "rapacious" with its prices and that added charges were "driving customers away."

106. As Director of Global Procurement, FE-1 was closely familiar with Lineage's automation efforts, because his team helped administer a $400 million annual budget expended on construction of new automated warehouses and modification of existing non-automated warehouses to include automation. FE-1 explained that Lineage was selling a false "story" to its investors, which he summarized as: "Lineage wasn't a cold storage company, they were a technology company." However, FE-1 said that the reality did not fit this story. As he explained "I started to see that Lineage was selling a vision, and they were building up these different parts of the vision to sell to investors precisely as a vision and not as something that was tangible."

107. For example, FE-1 indicated that the return on investment or ROI per-pallet slot at an automated warehouse was far below the ROI for per-pallet slot at their regular warehouses. He commented, "When that became clear to me, I was like why the heck are they doing these automated warehouses. If you look at the market, people were not clamoring for automated warehouses." FE-1 explained that the selling point with the automated warehouses was that they did not need as much temp labor and thus did not lead to labor cost overages. However, he said that this did not pan out.

108. FE-1 said that customers were not sold on the automated warehouses. FE-1 commented, "we were pouring in $400 million a year for automated warehouses and only $129 million allocated each year for existing warehouses" but explained that "my team always thought that it should have been reversed and that they should have been spending $400 million on the warehouses that are actually generating revenue as opposed to stuff that has a promise of generating money." FE-1 further explained that "there was never a product market fit for automated warehousing."

109. As an example of automation problems, FE-1 discussed Lineage's Olathe, Kansas warehouse, which it had constructed especially for Smithfield—which FE-1 believed was Lineage's largest customer in the US at the time. FE-1 explained that Lineage sold Smithfield a "bum deal" because the warehouse

automation did not work. FE-1 said that Smithfield then sued Lineage for $10 million in mid to late 2023. FE-1 said that he was told about the Smithfield legal dispute by Senior VP of Finance David Gress as well as Chris Thurston and other finance VPs, and said that he learned about it in mid to late 2023.[10] He said that when this happened, "it was one of the first signals that more work needed to be put into the automated warehouse strategy," and that "these representations that were going out and being made perhaps needed to be dialed back a little bit, because Lineage was writing checks that it could not cash in that regard."

110. FE-1 said that another one of its flagship automated facilities—Sunnyvale, Texas—had similar problems. He explained that a lot of Lineage's automation technology did not work in frozen conditions. He stated that Lineage was aware of that because they had tried to partner with Raymond Corporation and Crown Equipment Corporation for years to develop automated equipment that worked in freezing conditions, and could not do so. He explained that Raymond and Crown were the top material handling equipment manufacturers globally, and that Lineage had spent $40 to $50 million with them annually. However, he explained that "for ten years, Lineage asked them if they could make automated material handling equipment that can work in frozen warehouses, and they could not do it."

---

[10] When Lead Counsel informed FE-1 that they were unable to locate a public record of such litigation, FE-1 stated he believed it was likely a non-public arbitration, but could not confirm this.

He also explained that Lineage experienced automation failures because it involved "assembling all of these different types of pallet moving technologies," which came from different manufacturers and "had to be cobbled together." He explained, "all these things are being put together that weren't meant to be put together or were never envisioned to be put together."

111. FE-1 further stated that in or around 2023, Lineage's data science team started trying to create material handling equipment that could work in frozen conditions themselves. He added, "were they qualified to do that, no." He said that the data science team were able to generate LIDAR-based graphical interfaces depicting an autonomous forklift driving itself through a frozen warehouse, and that these graphics were shown to investors. However, FE-1 said that the executive leadership team was using this to create "smoke and mirrors" because none of the technology they came up with was ever scaled. When asked if the executives at Lineage knew that the technology did not work, FE-1 said that they knew because Elliot was a protégé of CIO Sudarsan Thattai. He commented, "If anybody knew that the technology coming from the data science team was not scalable and able to be commercialized, it was Sudarsan. Sudarsan knew and the rest of the C-suite knew."

112. FE-1 stated that whenever the investors visited the Company, they were shown the same graphics illustrating automated forklifts. As he explained, "after

looking at the same graphics for two years, it was common sense that they did not have this technology." FE-1 stated that CEO Lehmkuhl visited the warehouses "nonstop" and therefore was aware that they did not have functioning, scalable automation technology.

113. FE-1 stated that the investors got "sold a bill of goods" regarding their automated warehouses. He said that those warehouses were not profitable. The Company touted reliability with automated warehouses, yet their technology was very sensitive. For example, they placed a pallet on a moving track and as soon as it came time for the pallet to be handed over to another system, it would stop. He said that he was told a story about this happening in the middle of an investor or customer presentation by Finance Director Chris Thurston. As FE-1 explained, the theory was that they would pay more for an automated warehouse because it was easier to get goods in and out with reliability, yet it was the opposite.

114. During his in-person meeting with Lead Plaintiffs' counsel, FE-1 was shown slide 21 from Lineage's Roadshow Presentation, which touted four of the Company's flagship automated warehouses – Rotterdam (Netherlands); Sunnyvale, Texas; Olathe, Kansas; and Richland, Washington. FE-1 stated that Olathe (the Smithfield warehouse) and Sunnyvale in particular were "major fuckups" between 2022 and 2023 and that the automation in those two warehouses did not work. He added, "the warehouses did not work or function as per their agreements." With

respect to Olathe, he said that "Smithfield kept having to bring in temp workers." He said that it got so bad that "there came a point where people were forbidden from saying 'Olathe' in Lineage's corporate office."

115. FE-1 recalled attending a Global Finance Meeting in May 2023 where David Gress discussed their automated warehouses and their eCommerce initiative and "referred to the automated warehouses and the purchase of the e-commerce warehouses as a 'shit sandwich.'" FE-1 confirmed this fact, including the quote, by reviewing contemporaneous notes about the event he had made at the time. He said this meeting was one week long and attended by operations leadership, global financial leadership, and that Defendant Crisci was present when Gress made the remark, and that Lehmkuhl was told about it shortly thereafter.

116. FE-1 was also shown slide 22, which is headlined "We Believe Differentiated Automation Creates a Competitive Advantage." The left side of the slide features "Conventional vs Automated" bar graphs that show inventory turns increasing, labor cost decreasing compared to throughput, pallet positions per square foot increasing, and energy usage per pallet position decreasing. He said that none of these claims were actually true because the automation did not work, and because Lineage was spending excessively on it while generating negative ROI. For example, he said that automation could not generate more inventory turns since it constantly broke down or failed, it could not decrease labor costs since temporary

labor had to be brought in when it failed, and that, while in theory it allowed more pallet positions per square foot, this didn't matter if the warehouses couldn't function. He similarly noted that the claims, on the same slide, that the automation "provides customers with cost-effective solutions," and that it "drives market share as customers seek these solutions" were not true. FE-1 said that "nothing" about the "value proposition" of automation was accurate. He said that "If it worked" all would be true theoretically "however, based on the four examples [on the slide]… In practice none of the four worked." FE-1 characterized the statements about the automation as "their expectation of what they hoped to reality" and added "that was not a reality" at the time.

117. FE-1 explained some of the elements of the "value proposition" and why they didn't work. For example, he said the automated warehouses were supposed to be more efficient due to eliminating labor issues – you wouldn't have to worry about people being unavailable, calling out sick, etc. However, since the warehouses constantly malfunctioned, the opposite was true – labor had to be called in. He also said that the value proposition included an "economy of scale" where you could utilize more of each warehouse's space for pallet positions since you didn't need "people space." But the failures meant this wasn't true either. And he similarly said that the different automated components in the warehouses – like automated conveyors – wouldn't work properly with each other, such that items

would simply fall or stop rather than moving from one conveyor to another. Regarding the claim, on a Roadshow Presentation slide, that “Lineage automated facilities handle a variety of customer requirements at lower cost than conventional facilities,” FE-1 reacted: “It was not accurate and they knew it was not accurate.” and “those conditions were never met.”

118. FE-1 stated that Lineage was buying as many warehouses as it could to grow their revenue inorganically. For example, in 2022, Lineage bought VersaCold, a chain of 24 warehouses in Canada. In November or December 2023, FE-1 visited some of the properties with Lineage VP of Global Engineering Eric Krupa, and FE-1 noticed that they were in very poor condition. As he stated, “I visited three or four of them and there was something wrong with each one of them.” For example, he recalled that at one warehouse, “the concrete floors in the site were dipping,” and the doors that lead to the freezer areas were rusting. He also said that “there was another one where the roof seemed to be caving in.” He explained that “the condition of some of the warehouses would have been the equivalent of somebody buying a Toyota Tercel made in 1995.”

119. FE-1 looked at these acquisitions compared to prior acquisitions that were made, and said Lineage historically would not have bought something like that. However, FE-1 said that this changed in 2022 when it became clear that the US Federal Reserve was planning to raise interest rates. He also noted that he was fully

aware the Lineage "absolutely" was considering an IPO at the time, and that this was an "open secret."

120. FE-1 also recalled that Lineage initiated the purchase of three warehouses in 2022 that had e-commerce capability. He said that one of these packaged The Farmer's Dog brand dog food and another packaged ice cream for Haagen Dazs. FE-1 said that, at the time, the Company thought that they were going to become the Amazon for frozen food. After Lineage purchased those warehouses, however, they discovered that they were "nothing to write home about." As he explained, "the infrastructure was old and dated," and "the location of the three sites were not near population centers."

121. FE-1 stated that when he first joined Lineage, there was more due diligence on each acquisition, but that, subsequently, their buys then started getting "super sloppy" in the sense that they were buying warehouses and warehouse groups that needed a ton of money put into them. FE-1 commented, "they were buying trash even until I left the Company." In fact, Lineage became so known for buying low-quality and distressed warehouse properties that FE-1 said "to this day I still get calls," because "people who had these distressed properties knew that they could call Lineage." As he elaborated, "whatever reputation existed in the market for Lineage follows it to this day."

122. **FE-2**. FE-2 was a senior logistics leader in Lineage's corporate office from mid-2022 to early-2024.

123. FE-2 stated that fears about supply chain disruption caused distributors and manufacturers to overstock at Lineage's warehouses in 2021. FE-2 explained that in 2021, distributors and manufacturers were afraid that they were going to get caught by supply chain disruptions which could prevent them from getting their product to the recipients.

124. FE-2 explained that in response to these fears, in 2021 and 2022 distributors and manufacturers increased the amount of inventory they held in Lineage facilities, filling up the warehouses with excess inventory that did not immediately need to be shipped out. FE-2 confirmed that this overstocking trend led most of the Lineage warehouses he dealt with to be overpacked and have over 95% capacity.

125. According to FE-2, customers began to destock and started returning inventory to more normal levels in 2023. He said that this process would take time, because the customers had to do something with the excess inventory they had been storing, meaning that even if they wanted to reduce the amount they were storing, it would take time for them to do so. He explained that during this period, Lineage was also facing increased competition from companies like Freezpak. FE-2 explained that these outfits were undercutting Lineage's prices by more than 25%

and were including transportation in their prices. As a result, he said that customers were both destocking and leaving due to that competition.

126. FE-2 recalled that when business slowed down, Lineage had to reduce head count and let some drivers go. Lineage's initiative was to cut costs wherever it could. Lineage started releasing drivers during the third quarter of 2023, starting with the owner operators first and then the company men. Over 10% of company drivers were let go, in places such as Jacksonville, Jersey City, Miami and Georgia.

127. According to FE-2, Lineage starting holding regional leadership conferences in late 2023 or early 2024 to come up with strategy to address the loss of customers and lower occupancy. FE-2 explained that attendees discussed the destocking trend and competition that were causing Lineage's business to struggle. FE-2 detailed that attendees at these conferences acknowledged that Lineage was getting killed by competitors who were severely undercutting its prices.

128. **FE-3**. FE-3 was employed by Lineage from mid-2018 until early 2025. FE-3 had several titles throughout that period, including a "Director of Finance" title in the months before and after the IPO. During FE-3's tenure he initially reported to former SVP, Global Controller James Davis and then to current SVP Treasury, Transformation and Risk Management Michelle Domas.

129. FE-3 recalled that leading up to the July 2024 IPO, he was a member of a team that gathered weekly or every other week, and worked to prepare the IPO,

called the IPO Readiness Team. FE-3 detailed that this group worked with Lineage's auditor, Deloitte, and included employees at Lineage that worked on Financial Planning and Analysis or FP&A and technical accounting, external reporting, and members of the Project Management Office. FE-3 also explained that this group included former SVP, Global Controller James Davis. FE-3 noted that he was not in charge of creating the IPO offering documents but the team that prepared those documents communicated with him about that process.

130. FE-3 stated that he was on calls during his tenure at Lineage and in the leadup to the IPO, where the issue of Covid-era overstocking and anticipated destocking was discussed. FE-3 noted that Lineage understood that the high capacity it was experiencing had been driven by Covid. He also explained that the overstocking that had occurred meant that customers were stockpiling more in Lineage's facilities than they immediately needed. He explained that in some facilities occupancy was even over 100%, meaning that excess product sat in the aisles or the docks.

131. FE-3 explained that to respond to this overstocking issue, Lineage had started pushing minimum storage guarantees. FE-3 explained that Lineage was essentially telling its customers that if they wanted to store inventory for longer periods of time, they would need to pay for a long term storage deal, while at the same time saying customers could reserve storage space without stockpiling.

132. According to FE-3, customers were "not buying into the concept" of minimum storage guarantees and that minimum storage guarantees were "not taking" because customers were "balking" at the agreements. He recalled the customer pushback being discussed generally and recalled the negative customer reaction being discussed during monthly strategy calls in early 2024.

133. FE-3 recalled that Lineage was losing customers in the eastern United States and that the Company was attempting to retain them. FE-3 explained that these customers were leaving Lineage because the Company increased its rates.

134. According to FE-3, Lineage maintained and tracked metrics, including revenue, sales, customers, and warehouse data in metricsOne, which was accessible to all employees. FE-3 recalled that metricsOne was "highly used" internally and that Company executives used metricsOne to pull summaries.

135. **FE-4**. FE-4 was employed as a General Manager for Lineage in Maryland beginning in March 2022, after Lineage acquired the company that he had previously worked for. He managed a facility with over 25,000 pallet positions. He left Lineage in October 2023.

136. FE-4 explained that due to the Covid-19 pandemic there was a lot of "panic buying" and high occupancy. He said that after Covid, inventory at his facilities climbed to an all-time high and that occupancy had exceeded 100% at times. FE-4 added that when occupancy exceeds 85% you become less productive,

because product is getting stored in certain locations which are not optimal for handling, as opposed to easily accessible locations.

137. FE-4 explained that one of the large customers of his facility was a company called Fishin. Walmart was Fishin's largest account and sales were through the roof during the pandemic. Huge truckloads were moving product into the warehouse. He added that, demand was so high that Fishin bought an entire shipload of containers at one point.

138. FE-4 explained that Lineage started implementing price increases per pallet across the board, which really started to hit in Q3 and Q4 of 2022 and that Lineage's position was - take it or leave it. He explained that Lineage also implemented new accessorial charges, which had not been standard practice historically.

139. FE-4 advised that during the pandemic, Lineage instituted minimum storage guarantees where customers like Fishin paid for space whether or not they had product in that space. He added that, when competition opened up, Lineage lost a lot of leverage with respect to the minimum storage guarantees.

140. At the time FE-4 left Lineage, capacity had decreased to a percentage in the 70s. FE-4 described that after the panic of Covid, customers reduced inventory to normalized level. He recalled that he first began seeing customers gradually

destocking in Q2 and Q3 of 2022. However, he explained that the pace of returning inventory to normal levels would vary based on specific customers.

141. **FE-5**. FE-5 was a General Manager at a Lineage warehouse in the northeastern United States from August 2021 until September 2023. As the general manager of his facility, FE-5 held weekly meetings with his facility managers.

142. FE-5 advised that Lineage started increasing prices by early 2021 and continued increasing prices through 2022. He added that Lineage "absolutely" raised prices and took advantage of the COVID situation, especially with people who really needed warehousing space during that period. He explained that 2023 was the "tipping point" where prices began leveling out because competition increased and competitors started taking a lot of the business.

143. FE-5 identified Lineage's primary competition in his area as FreezPak. He added that FreezPak was "absolutely" taking customers from Lineage. He further added that it was spoken about frequently that Lineage was losing customers to FreezPak, and that this was especially true as to the bigger customers in his region. FE-5 identified AquaStar, Ora Cal, and Chicken of the Sea as examples of large customers that had either left or substantially reduced their business with Lineage. He recalled attending monthly regional meetings over Zoom, where the participants would discuss customers leaving to FreezPak. FE-5 indicated that he spoke to customers who were leaving Lineage and they told him that it was because of

pricing. He added, "It was pretty cut and dry." FE-5 advised that FreezPak was undercutting Lineage's price by anywhere from 10 to 30%.

144. FE-5 explained that, when he started at Lineage, his location was about 95% full in terms of physical inventory. He recalled that many Lineage facilities were at 90% to 100% capacity during the peak in 2022 and early 2023. He stated that during this period there was an abundance of inventory because the product was not moving. He further explained that, as a result, space was limited and so Lineage started doing space reservation guarantees, meaning that Lineage would "charge customers for guaranteed space in the freezer," which the Company wasn't "really doing prior to COVID." He advised that under these arrangements customers paid for the pallet positions per the minimum storage guarantees and also paid while they were using the space.

145. FE-5 also described an increase in ancillary charges following COVID. He described a new charge that had been imposed on customers when trailers were not unloaded in a timely manner. He stated that Lineage would charge upwards of $200 or $300 per day. He recalled that these types of charges generated a lot of revenue for his facility.

146. FE-5 explained that when occupancy was high, customers had few alternatives to accepting the space guarantees and price increases, but that as space became available, the customers started pushing back on the space guarantees. By

the time FE-5 left Lineage, physical occupancy at his facility had dropped to about 70% to 75%, and he had laid off 15 employees. He was aware of other facilities dropping down to 60% capacity and noted one facility in Newark that had fallen to between 50% and 60% capacity. FE-5 recalled that the minimum storage guarantees were scaring off customers. He also explained that customers shifted from storing abundant inventory with Lineage during COVID, to a "just-in-time" model where they kept less inventory in storage.

147. **FE-6**. FE-6 was employed with Lineage Inc. as a Sales Manager from 2020 to 2025. FE-6 advised that he managed both national strategic customers along with customers in his local area. FE-6 detailed that he oversaw over 50,000 pallet positions (the designated space within a storage system) and that he managed all topline activities in buildings he supported.

148. FE-6 stated the cadence during the start of Covid was that most of the inventories in his distribution markets, as opposed to the nearby port markets, plummeted. "The holdings were light and customers had no idea what the sales forecast would be." It was in 2021 that the velocity picked up and the product was going out faster than it could come in. According to FE-6, "you then have a bull whip effect where the customer orders slow down, but the production keeps going, creating a glut of inventory." The customers would cut back on production with way

too much inventory and then that created a slow down, with the inventory bleeding out slowly.

149. FE-6 stated in 2020 no one really knew what to expect so it was anemic. He added that, 2021 and 2022 were absolute gangbusters, in both distribution and at ports. FE-6 further added that in 2023, Lineage did grow, but not at the previous 40% increase.

150. FE-6 explained that during 2021 and 2022, Lineage would double sell space which inflated revenue. FE-6 estimated he was double-selling 30% of his space. But in 2023 the customer demand decreased, and FE-6 would no longer double sell because the customer could no longer commit to needing or wanting the space. He added that, in 2024 double-selling space became non-existent.

151. FE-6 stated that this occurred due to a lack of customer demand. FE-6 told his boss that he could no longer budget double selling and have a customer commit to numbers they had previously agreed. FE-6's RVP responded, "well we have to grow so you have to figure it out." He stated that this loss of double sales adversely affected revenue. He also explained that this was a common tactic by sales throughout the organization within the same timeline.

152. FE-6 stated customer needs changed along the way that adversely affected Lineage's revenue. He stated that customers reduced the amount of

products they were storing. According to FE-6: "2023 and 2024 was a network wide meltdown of customer demand, it just evaporated."

153. FE-6 detailed that demand began to decline in July 2023 because customers were purchasing less food than they had in recent years and therefore did not require as many pallets (storage units) as they previously had. FE-6 also recalled that beginning in 2023, customers either stopped signing minimum storage guarantees or signed minimum storage guarantees for less space than they required.

154. **FE-7**. As an Assistant Facility Manager for the automated half of the Sunnyvale facility from July 2023 until October 2024, FE-7 was responsible for repairing and maintaining automated equipment at the site.

155. FE-7 explained that the Sunnyvale facility was considered a semi-automated rather than a fully automated site, and that all the semi-automated really meant was that the facility was split down the middle by a wall with a refrigerated half that used human labor and a freezer side that used automation.

156. FE-7 explained that the automated technology in the Sunnyvale, Texas warehouse never worked properly. FE-7 said that for the Sunnyvale site, Lineage had acquired automation technology from a company called Swisslog, but the equipment that they used was upgraded to run in freezer conditions. He indicated that the Swisslog equipment was designed to run in a refrigerated warehouse and was not made to run at a -5 environment. Swisslog modified the equipment to run

in the freezer environment. Even with the upgrades, the system only worked 85% of the time. The rest of the time, equipment would be down because of the freezing conditions, as well as equipment failure in general.

157. FE-7 described in detail the layout and automation of the Sunnyvale facility. He explained that there are three rows, each with nine levels vertically, and each level of each row had its own automated cart, a machine that would retrieve pallets from their positions and bring them to a conveyor, making a total of 27 automated carts. FE-7 explained that each level of each row had roughly 55 lanes and that each lane in turn had either 12 or 24 pallet positions, depending on whether they were double stacked, meaning that each cart accessed anywhere from 660 to 1320 pallet positions.

158. FE-7 explained that only automated carts could access the pallets, not human workers, and that each row was only accessible by the cart dedicated to that row. He further explained that if even one cart broke down, hundreds or even over 1000 pallets could become inaccessible.

159. FE-7 explained that the carts broke down regularly and estimated that throughout his time at the Sunnyvale facility, at least one cart would break down virtually every week. FE-7 added that once a cart was down, it would take days to repair and could be out of commission anywhere from a few days to a week at a

time, rendering a massive amount of goods simply inaccessible to Lineage and its Sunnyvale facility customers during that time.

160. In addition to these Former Employees of Lineage, a former Executive VP at Lineage's competitor AmeriCold, provided additional insight into how Lineage's automation technology failed to live up to its promise in a February 2026 interview with a subscription research service. Specifically, during the interview, the interviewer noted that "Lineage has talked a lot more about automation," and asked "[i]n terms of automation, do you think it could meaningfully reduce labor cost going forward over the next one to three years, or maybe you think it's going to be a pretty slow process?" In response, the former AmeriCold executive explained that "the reality is automation . . . typically does not work in reality the way it was designed." The former AmeriCold executive further explained:

> In theory, if automation works, it absolutely reduces labor costs. The reality is automation as designed typically does not work in reality the way it was designed. I know this from firsthand experience. Americold and Lineage have both developed a lot of automated facilities. Again, anecdotally, they don't seem to be performing at the level that both companies told the market they'd be performing at.
>
> What happens if the automation doesn't work as designed? You're not getting the throughput, the efficiency, but you've still committed to a certain KPI matrix for the [C]ompany, for the customer that's demand the automation. You typically then have to solve that by manpower. If the worst-case scenario is automation doesn't work as planned, which was designed to take labor

> out, you have to put more labor in to be able to maintain the KPIs.

## V. THE MATERIALLY FALSE AND MISLEADING OFFERING DOCUMENTS AND ROADSHOW PRESENTATION

161. Through a series of false and misleading statements and omissions, the Offering Documents[11] and Roadshow Presentation presented investors with a misleading picture of Lineage's business. These misstatements and omissions created a misleading picture of the demand for Lineage's cold storage services, the sources of Lineage's growth in the leadup to the IPO, the impacts of competition on Lineage's business, the viability of Lineage's automated warehouse technology, and the nature of Lineage's acquisitions strategy.

162. The Offering Documents and Roadshow Presentation failed to disclose material information needed to make them not misleading, including the fact (i) that Lineage's growth had been fueled by unsustainable customer overstocking; (ii) that

---

[11] Each of the statements identified in this Section as false and misleading were printed in the Registration Statement and the Prospectus. Additionally, the Registration Statement is expressly incorporated into each of the S-8 Registration Statements. Thus, each statement identified in this Section was made in each of the Offering Documents. The bolded and italicized statements in this Section are the statements alleged to be false and misleading, except that for certain graphical materials the false and misleading statements could not be bolded and italicized. For the avoidance of doubt, that a statement is not alleged to be actionably false and misleading should not be construed to concede that the statement was accurate or complete. Any allegation that a statement is "misleading," includes an assertion that it was misleading in its manner of presentation and because it omitted to disclose information necessary in order for the statement to not be misleading.

inventory remained "elevated" beyond normal levels at the time of the IPO; (iii) that Lineage's automation technology was not providing the benefits and cost efficiencies that Lineage claimed; and (iv) that Lineage had abandoned its strategy of acquiring "high-quality assets" in favor of rapidly buying up distressed and poor-quality properties to generate inorganic growth.

### A. The Offering Documents Misrepresented Lineage's Growth and Demand, and Omitted Critical Information About Its "Expected" "Return" to "Normal" Levels That Were Significantly Lower Than at the Time of the IPO

#### 1. Misrepresentations and Omissions About "Growing" and "Resilient" Demand for Lineage's Services

163. The Offering Documents stated that demand for Lineage's services was "***large, growing and resilient***" due to macroeconomic factors that would supposedly "***increase the need for additional temperature-controlled warehousing capacity to meet current and anticipated future market demand***," and portrayed the Company as "***best positioned to meet the growing demand***." Specifically, the Offering Documents stated:

> ***We also believe that the temperature-controlled warehousing market is large, growing and resilient, driven by the durability of food consumption through macro cycles, stock-keeping unit proliferation, global population growth, rising disposable incomes and shifting consumer preferences towards perishable foods. These factors further increase the need for additional temperature-controlled warehousing capacity to meet current and anticipated future market demand.*** The market remains fragmented, with the top ten temperature-

> controlled warehousing operators representing only 23.5% of the global public temperature-controlled warehousing cubic feet capacity. ***Given the fragmented nature of the market, we believe that large, well-capitalized operators like Lineage are often best positioned to meet the growing demand for cold storage, provide value-added integrated solutions to their customers and differentiate themselves through investments in technology.***

164. The statements in the prior paragraph conveyed that demand for Lineage's services was sustainable and increasing, by touting the "growing and resilient" market for cold storage and by claiming there was a "further increase [in] the need for additional temperature-controlled warehousing capacity to meet current and anticipated future market demand." This was misleading because demand for Lineage's services was neither sustainable nor increasing; instead, recent performance reflected Covid-era overstocking that inflated occupancy, which was already unwinding by the time of the IPO such that the Company expected occupancy to return to normal pre-Covid levels. Lineage itself subsequently admitted to this situation, eventually disclosing that customers "began to destock excess inventory" in Q3 2023—nearly a year before the IPO—and that "excess" inventory remained in the Company's warehouses at the time of the IPO. Roughly a year after the IPO, Defendant Lehmkuhl disclosed that demand had been "pretty much flat" for "the last couple years." Multiple Former Employees of Lineage likewise confirm this reality, describing the trends of anomalous overstocking and destocking.

165. Similarly, the Offering Documents stated that demand for Lineage's services as "***growing and naturally resilient across macroeconomic cycles***," which was a "***driving force[] of our temperature controlled warehousing investment thesis***" that "***remain[ed] true today.***" Specifically, the Offering Documents stated:

> We have always believed that temperature-controlled warehousing is a sector ripe for long-term investment to build a differentiated and institutional-quality platform. ***The driving forces of our temperature-controlled warehousing investment thesis at our founding remain true today:***
>
> - ***temperature-controlled warehousing demand is driven by frozen and refrigerated food, and such demand is growing and naturally resilient across macroeconomic cycles;***

166. The statements in the prior paragraph conveyed that demand for Lineage's services was sustainable and increasing, by claiming it "remain[ed] true" that "demand is growing" and "resilient." This was misleading because demand for Lineage's services was neither sustainable nor increasing, as explained herein. *See, e.g.*, ¶164.

167. The Offering Documents stated that "***growth***" was "***tied to long-term***" trends and had been only "***minimally impacted by past economic and real estate cycles***." Specifically, under the heading "Long-Term Demand Drivers and Growth Trajectory," the Offering Documents stated:

> Because food storage is the primary driver of demand for refrigerated warehouse space, ***growth in the sector is tied***

> ***to long-term demographic, economic and technological trends and has been minimally impacted by past economic and real estate cycles***. Though downturns may have some impact on what and where consumers eat (e.g., restaurant vs. grocery), overall demand for food is largely inelastic.

168. The statement in the prior paragraph conveyed that demand for Lineage's services was sustainable, by asserting that Lineage's growth was "tied to long-term . . . trends" and was only "minimally impacted" by economic disruptions like the recent Covid pandemic. This was misleading because demand for Lineage's services was neither sustainable nor increasing, as explained herein. *See, e.g.*, ¶164. Claiming Lineage was "minimally impacted" by economic disruptions was especially notable, because in reality Lineage's growth was fueled by anomalous overstocking in response to COVID, not long-term trends. For example, Lineage itself subsequently admitted to this situation, disclosing that "[i]n response to the COVID supply chain shocks, Lineage customers increased resiliency and built-up their inventory holdings" and that Lineage's occupancy levels remained "elevated" due to "excess inventory" at the time of the IPO.

169. The Offering Documents also stated that, as of the IPO date, notwithstanding construction of new warehouse space by competitors, there was still "***ample demand to fill new space as it delivers***." Specifically, the Offering Documents stated:

> From 2020-2023, more square feet of refrigerated warehouse space delivered than in any other four-year period on record (going back to 1990), according to data from Costar. While this relieved some of the supply-demand imbalance, the vacancy rate is still very low as of December 31, 2023—***indicating there is still ample demand to fill new space as it delivers.***

170. The statement in the prior paragraph conveyed that demand for Lineage's services was sustainable and growing, by asserting that there was "ample demand" for Lineage's services, and even "ample demand" to consume growing warehouse capacity. This was misleading because demand for Lineage's services was neither sustainable nor increasing, as explained herein. *See, e.g.*, ¶164. Lineage later admitted that occupancy at the time of the IPO was "elevated" by overstocking and higher than the levels "expected" under normal conditions. Moreover, as multiple former employees confirmed, and as Lineage later acknowledged, even before the IPO, Lineage's business was being harmed by competitors who were bringing new warehouses online, which demonstrates that there was not "ample demand to fill new space as it delivers."

171. The Offering Documents also stated that Lineage was "***well positioned for both near- and long-term growth***." Specifically, the Offering Documents stated:

> ***However, the significant barriers to entry in the industry will likely continue to limit speculative construction and competition from new market participants, which typically supports high occupancy and steady rent escalation.*** The high degree of market fragmentation also presents operators with industry expertise and access to

> capital potential opportunities to acquire and update existing cold storage properties. ***Given these dynamics, the industry appears well positioned for both near-and long-term growth as global demand for temperature-sensitive goods is expected to rise faster than the limited supply of cold storage facilities.***

172. The statement in the prior paragraph conveyed that demand for Lineage's services was sustainable and growing, by asserting that Lineage was "well positioned for both near- and long-term growth" and asserting that "global demand" would rise, and even more specifically "rise" faster than the growth in supply. This was misleading because demand for Lineage's services was neither sustainable nor increasing, as explained herein. *See, e.g.*, ¶164. The statement also conveyed that Lineage's "occupancy" and "rent" (*i.e.*, storage fees) would not be negatively impacted by competition, which was misleading because, as detailed herein, Lineage was already facing growing competition and suffering negative consequences from that competition at the time of the IPO.

### 2. Misrepresentations About the Specific Causes and Sources of Growth in Lineage's Occupancy and Same Warehouse Metrics Leading up to the IPO

173. The Offering Documents misrepresented the sources of Lineage's growth by claiming such growth was achieved through specific factors reflecting Lineage's operational success.

174. The Offering Documents claimed that Lineage's "***utilization initiatives***" were responsible for its increase in physical occupancy from 78% in 2021 to 80% in 2023:

> **Optimizing Physical Warehouse Occupancy Through Increased Utilization**. Increases in warehouse physical occupancy generate high flow-through to NOI due to operational leverage. We seek to optimize physical occupancy in our existing warehouse network by winning new customers, expanding our business with existing customers and more efficiently matching customer profiles to the best available pallet positions in our markets. . . . ***These utilization initiatives have increased our physical occupancy from 78.0% in 2021 to 79.2% in 2022 and to 80.0% in 2023.***

175. Similarly, the Offering Documents stated: "***We grow our same warehouse NOI and free cash flow through numerous organic business initiatives we have developed over many years***. This growth helps delever our balance sheet and creates capacity for new investments."

176. The Offering Documents also stated that Lineage "***expect[ed] to continue our organic growth through the following business initiatives***," which included "***[m]aximiz[ing] our same warehouse NOI growth through occupancy and commercial optimization initiatives***," and "***realiz[ing] synergies from recent acquisitions and driv[ing] same warehouse growth post-acquisition.***"

177. Elsewhere in the Offering Documents, Lineage again attributed its increased economic occupancy between 2021–2023 to its "***minimum storage***

***guarantee initiatives***," claiming that it believed such contracts would "***continue to boost recurring revenue and enhance stability of cash flows***":

> Increasing use of Minimum Storage Guarantees to Improve Economic Occupancy. We plan to expand our use of minimum storage guarantees that pay us minimum or fixed storage fees for pallet positions, whether they are physically occupied or not. We believe that transitioning certain customer contracts from on-demand, as-utilized structures to minimum storage guarantee structures will drive greater consistency of our NOI by increasing revenue predictability and enabling us to better manage our labor force while meeting customers' needs. This strategy helps maintain our storage revenues during periods of lower inventories[,] matching ongoing revenue streams with fixed warehousing costs while allowing customers to reserve space to meet their needs. ***We believe that implementing minimum storage guarantees will continue to boost recurring revenue and enhance stability of cash flows***, while allowing customers to plan for periods of increased need by reserving capacity and ultimately enabling a better temperature-controlled warehousing experience for our customers. ***Our minimum storage guarantee initiatives have increased our economic occupancy from 82.3% in 2021 to 83.2% in 2022 and to 86.0% in 2023***.

178. The statements in the four prior paragraphs conveyed that Lineage's prior growth was due to specific operational actions that Lineage had taken, such as "organic business initiatives," "occupancy and commercial optimization initiatives," or "minimum storage guarantee initiatives." This was misleading because Lineage's growth was not due to such operational actions but instead reflected temporary Covid-era overstocking that inflated occupancy, and because its performance was

"expected" return to "normal" (pre-COVID) patterns. As detailed herein, after the IPO, Lineage itself disclosed that this was the true source of its growth in the period before the IPO, which multiple Former Employees also confirmed. By misrepresenting the sources of its recent growth, Lineage provided investors with an inaccurate picture of its performance, whether such growth would continue, and the demand for its services.

### 3. Misrepresentations About the Nature of and Reasons for the Decline in Lineage's Business in Early 2024

179. The Offering Documents placed the blame for recent declines in occupancy squarely on "***economic pressures driven by higher interest rates***":

> Economic occupancy at our same warehouses was 85.1% for the three months ended March 31, 2024, a decrease of 420 basis points compared to 89.3% for the three months ended March 31, 2023. Our economic occupancy at our same warehouses was 600 basis points higher than our corresponding average physical occupancy of 79.1%. ***Economic occupancy was lower than the prior year due to lower physical utilization as customers rationalize their inventory during continued economic pressures driven by higher interest rates***. Same warehouse storage revenues per economic occupied pallet increased 2.2% period-over-period, primarily driven by pricing actions taken to offset inflationary pressures.

180. The statement in the prior paragraph was materially false and misleading, because it blamed declining occupancies on "higher interest rates" when, in fact, as explained herein, declining occupancies were the result of Lineage customers "destocking excess inventory" that they had accumulated during the

temporary "COVID supply chain shocks." As the Company itself acknowledged in May 2025, "[b]eginning in Q3 2023, Lineage customers began to destock excess inventory looking for leaner, more rational supply chains overall" following a period of overstocking due to COVID. Thus, inventories were merely declining to their "normal" pre-COVID levels, and, moreover, still had further to fall at the time of the IPO, because, as Lineage later acknowledged, inventories remained "elevated" at that time. By blaming recent declines on interest rates, Defendants misrepresented the extent to which the real situation would cause near-inevitable future declines.

181. Elsewhere in the Offering Documents, Lineage similarly misrepresented the cause of any recent decline and misleadingly downplayed the inevitability of further decline, stating:

> **Occupancy.** Following widespread supply chain backlogs during 2021 and early 2022, customers in North America increased production later in 2021 leading to higher inventories by the end of 2022. As a result, we experienced increased physical occupancy in 2023, particularly in North America. In addition, our increased usage of minimum storage guarantees has further driven an increase in economic occupancy. Going forward, we expect physical occupancy ***may*** decrease ***relative to 2023 as customers rationalize inventory levels***.
>
> To that end, we saw a decrease in occupancy during the first quarter of 2024 as customer inventory levels declined, ***driven in part by higher interest rates***. The year-over-year occupancy headwind was ***also impacted by the aforementioned elevated occupancy during the three months ended March 31, 2023***. At the same time, ***we expect our increased usage of minimum storage***

> ***guarantees to mitigate flow-through of declines in physical occupancy to economic occupancy***.

182. The statement in the prior paragraph was materially false and misleading. Specifically, it was misleading to claim that physical occupancy merely *may* decrease when, as explained herein, the Company was experiencing a material ongoing destocking trend that made further declines essentially inevitable. Additionally, it was misleading to suggest that the recent decline was merely a decline relative to strong performance in 2023, when occupancy remained elevated above normal pre-Covid levels. Additionally, it was misleading to attribute any recent declines to customers rationalizing in light of higher interest rates when such declines were the result of this destocking trend. Additionally, it was misleading to attribute any recent declines to customers rationalizing in light of higher interest rates, while omitting that the recent decline reflected growing competition in Lineage's key markets. As numerous Former Employees confirmed, once the COVID "overstocking" phenomenon began to subside, many customers no longer wanted to pay the high prices Lineage had charged during COVID and fled to competitors like FreezPak that were increasingly building spaces in Lineage's key markets.

#### 4. The Offering Documents and Roadshow Presentation Contained Materially False and Misleading Statements About the Company's Automation Technology and Automated Facilities

183. The Offering Documents and Roadshow Presentation repeatedly presented Lineage's "differentiated" automation technology as a "***competitive advantage***" that would lower costs, increase throughput, and give Lineage an edge over competitors with its customers. For example, a slide in the Roadshow Presentation described the supposed "***competitive advantage***" afforded by Lineage's automation technologies. These advantages purportedly included: (i) a higher number of "inventory turns" (*i.e.*, higher throughput); (ii) lower labor cost; (iii) maximization of space, such that Lineage could store more pallets per square foot; and (iv) lower energy usage and costs. Consequently, Lineage represented that its automated facilities not only could "***provide[] customers with cost-effective solutions***" but would actually drive market share for Lineage, as its customers would seek out automated rather than non-automated cold-storage warehouses:




184. The statements in the above Roadshow Presentation slide were materially false and misleading. FE-1 was also shown slide 22, which is headlined "We Believe Differentiated Automation Creates a Competitive Advantage." He said that none of these claims were actually true because the automation did not work, and because Lineage was spending excessively on it while generating negative ROI. FE-1 indicated that the return on investment or ROI per-pallet slot at an automated warehouse was far below the ROI for per-pallet slot at their regular warehouses. He said that automation could not generate more inventory turns since it constantly broke down or failed, it could not decrease labor costs since temporary labor had to be brought in when it failed, and that, while in theory it allowed more pallet positions per square foot, this didn't matter if the warehouses couldn't function. Regarding

the claim, on a Roadshow Presentation slide, that "Lineage automated facilities handle a variety of customer requirements at lower cost than conventional facilities," he said that it was not accurate and they knew it was not accurate and those conditions were never met.

185. FE-1 said that "nothing" about the "value proposition" of automation was accurate. He said that "If it worked" all would be true theoretically "however, based on the four examples [on the slide]," i.e., increased inventory turns, lower labor costs, more pallet positions per square foot, and lower energy usage, "In practice none of the four worked."

186. FE-7 explained that the automated technology in the Sunnyvale, Texas warehouse never worked properly. He said that for the Sunnyvale site, Lineage had acquired automation technology from a company called Swisslog, but the equipment that they used was upgraded to run in freezer conditions. He indicated that the Swisslog equipment was designed to run in a refrigerated warehouse and was not made to run at a -5 environment. Even with the upgrades, the system only worked 85% of the time. FE-7 explained that the carts broke down regularly and estimated that throughout his time at the Sunnyvale facility, at least one cart would break down virtually every week. He added that once a cart was down, it would take days to repair and could be out of commission anywhere from a few days to a week at a

time, rendering a massive amount of goods simply inaccessible to Lineage and its Sunnyvale facility customers during that time.

187. Also, in its Roadshow Presentation, Lineage presented four automated warehouses as supposed paradigmatic examples of how Lineage's "***[u]nique [a]pproach to [a]utomation***" served to "[***c]reate [v]alue [f]or [b]oth [c]ustomers and Lineage***," which served to indicate that these facilities in Rotterdam, Netherlands; Sunnyvale, TX; Olathe, KS; and Richland, WA provided the supposed cost savings and benefits detailed in paragraph 183. The slide was as follows:




188. The above slide from the Roadshow Presentation was materially false and misleading. Specifically, it was misleading to highlight Lineage's Sunnyvale, Texas and Olathe, Kansas facilities as flagship examples of the Company's

"***[u]nique [a]pproach to [a]utomation***" that "***[c]reate[d] [v]alue [f]or [b]oth [c]ustomers and Lineage***," when these facilities were in fact plagued by severe problems that prevented them from creating value for customers or Lineage.

189. Former employees described problems at the Company's automated facilities. FE-1 discussed Lineage's Olathe, Kansas warehouse, which it had constructed especially for Smithfield—which FE-1 believed was Lineage's largest customer in the US at the time—and explained that Lineage sold Smithfield a "bum deal" because the warehouse automation did not work. FE-1 said that Smithfield then sued Lineage for $10 million in mid to late 2023. FE-1 said that another one of its flagship automated facilities—Sunnyvale, Texas, had similar problems. FE-7 explained that the automated technology in the Sunnyvale, Texas warehouse never worked properly. He said that the carts broke down regularly and estimated that throughout his time at the Sunnyvale facility, at least one cart would break down virtually every week.

190. The Offering Documents also stated that Lineage's automation technology presented an "***attractive solution to our customers***" and positioned Lineage "***well to win new business***." Specifically, the Offering Documents stated:

> ***Automated facilities generally produce a lower cost to serve and lower resource consumption, presenting an attractive solution to our customers and positioning us well to win new business and grow our cash flows from operations***.

191. The Offering Documents also stated that the "***lower cost and more customized solutions***" associated with Lineage's automated facilities were capable of "***improving the customer experience and driving customer retention***." Specifically, the Offering Documents stated:

> We also look to direct our high-case volume customers to our automated or semi-automated facilities because ***we believe these automated facilities can provide lower cost and more customized solutions to our customers, thereby improving the customer experience and driving customer retention***. ***We are seeing increased demand for automated solutions from our customers***.

192. The statements in the prior two paragraphs conveyed that Lineage's automation technology improved its financial performance by reducing costs and attracting customers. This was misleading because, as detailed herein, Lineage's automation technology was ineffective and prone to regular breakdowns that imposed costs and delays and lacked a product market fit driven by customer desire. *See, e.g.*, ¶¶184-86, 189.

### 5. The Offering Documents Contained Materially False and Misleading Statements About the Company's Acquisition Strategy

193. The Offering Documents repeatedly touted Lineage's purported "***acquisition strategy***" as one of the key pillars of its overall growth strategy. Specifically, the Offering Documents claimed that its acquisition strategy targeted "***profitable businesses***" with "***strategic, high quality assets***" that would enable

Lineage not only to grow its revenue by acquisition, but to grow profitably and create synergies with existing warehouses. For example, the Offering Documents stated:

> We believe we are an acquiror of choice in the industry, as demonstrated by our long history of acquiring leading companies through direct sourcing and long-term relationships with their owners. ***Our acquisition strategy targets profitable businesses with strategic, high-quality assets that complement our network and customers' needs.*** These businesses often present opportunities to accretively deploy capital and recognize revenue and cost synergies. We have extensive experience acquiring cold chain companies of all sizes. In the last 16 years through March 31, 2024, we have executed 116 acquisitions with nearly two-thirds of those proprietarily sourced. Moreover, through 2023, we have achieved an approximately 12% NOI compounded annual growth rate from the temperature-controlled warehousing companies we acquired during the period of 2011 through 2021, excluding additional NOI growth as a result of post-acquisition greenfield and expansion initiatives, demonstrating the positive impact of Lineage's comprehensive approach to integration and Lineage's ability to compound capital over a long period of time.

194. The Offering Documents also made a largely similar statement about the Company's "***proven acquisition strategy***":

> The temperature-controlled warehousing sector remains highly fragmented and is generally comprised of many family-owned and independent companies that may lack the capital, technology, customer relationships, development expertise, technical knowledge and management sophistication that we possess. For example, we estimate based on GCCA data that over 100 temperature-controlled warehousing companies operate in the U.S. market alone and that there are approximately 4.4 billion cubic feet available for growth in North America.

> We believe that there remain substantial whitespace opportunities in geographies such as Europe, Asia, the Middle East and Africa and that there are approximately 22.4 billion cubic feet available for growth globally. As a result, we see significant potential opportunity in ***continuing to execute on our proven acquisition strategy, which targets profitable businesses with strategic, high-quality assets that complement our warehouse network and customers' needs***. In addition to operating businesses, there also remain real estate opportunities to acquire triple-net-leased facilities and execute sale-leaseback transactions with customers and other cold storage operators.

195. The statements in the prior two paragraphs were materially false and misleading. Specifically, it was misleading to tout the Company's "proven acquisition strategy" that purportedly targeted "profitable businesses" and "strategic, high-quality assets." FE-1 stated that when he first joined Lineage, there was more due diligence on each acquisition, but that, subsequently, their buys then started getting "super sloppy" in the sense that they were buying warehouses and warehouse groups that needed a ton of money put into them. FE-1 stated that Lineage was buying as many warehouses as it could to grow their revenue inorganically. FE-1 commented, "they were buying trash even until I left the Company." FE-1 said that Lineage became so known for buying low-quality and distressed warehouse properties that "to this day I still get calls," because "people who had these distressed properties knew that they could call Lineage." He also explained that "whatever reputation existed in the market for Lineage follows it to this day."

### 6. The Offering Documents Omitted Material Facts That Were Required to Be Disclosed by Item 303 of Regulation S-K

196. Pursuant to Form S-11, the Registration Statement was required to include the information specified in Item 303 of Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii). Item 303 required the registrant to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." The regulation further provides that, "[i]f the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues. . . , the change in the relationship must be disclosed." *Id.* As a result, the Registration Statement was required to disclose all material known trends and uncertainties ("Known Trends"); the failure to do so rendered the Offering Documents materially incomplete and misleading.

197. The Offering Documents were thus required to disclose Known Trends, including: (a) the build-up of excess customer inventory during and following the COVID-19 period, (b) the subsequent destocking of that excess inventory beginning in 2023, and (c) the resulting downward pressure on utilization and occupancy levels as inventory levels normalized. As described further herein, the Known Trends were evidenced by facts that were later disclosed by Defendants, including: (i) the fact that, "[i]n Q4 2021, Lineage Global WH physical utilization was 77.3%," Lineage's

"inventory levels then began to increase in excess of the typical seasonality trends" because of the phenomenon that, "[i]n response to the COVID supply chain shocks, Lineage customers increased resiliency and built-up their inventory holdings"; (ii) the fact that, "[b]eginning in Q3 2023, Lineage customers began to destock excess inventory looking for leaner, more rational supply chains overall"; and (iii) the fact that inventory levels remained "elevated" as of the IPO (and thus had further to fall to reach "normal" levels).

198. Defendants failed to disclose these Known Trends. Defendants failed to provide any data or information on what they later called the Company's "normal" seasonal occupancy levels and patterns, or any information about its pre-COVID occupancy levels. Likewise, Defendants failed to quantify the Company's "excess" inventory at the time of the IPO, even though, as they later revealed through post-IPO disclosures, they clearly had the ability to provide that information, clearly considered that information to be material to investors, and even touted it as the most appropriate way to understand Lineage's business cycles.

## VI. CLASS ACTION ALLEGATIONS

199. Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities that purchased or otherwise acquired Lineage common stock pursuant and/or traceable to the Offering Documents for the IPO, and were damaged thereby.

> Excluded from the Class are: (i) Defendants and the Individual Defendants' immediate family members; (ii) the officers, directors, affiliates, and subsidiaries of Lineage and the Underwriter Defendants, at all relevant times; (iii) Lineage's affiliates and employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired Lineage's common stock pursuant or traceable to the Offering Documents through any such plan(s); (iv) any person who had or has a controlling interest in Lineage, at all relevant times; (v) any entity in which any of the Defendants have or had a controlling interest, provided, however, that any "Investment Vehicle" shall not be excluded from the Class; and (vi) the legal representatives, heirs, successors, or assigns of any such excluded person or entity, in their capacity as such.

200. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery. Plaintiffs believe there are thousands of members of the proposed Class, as the Company offered over 65 million shares of common stock in the IPO. Record owners may be identified from records maintained by Lineage or its transfer agent, and members of the Class may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

201. Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein.

202. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

203. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act;

(b) whether the Offering Documents issued in connection with the IPO and Roadshow Presentation contained untrue statements of material fact;

(c) whether the Offering Documents omitted material facts required to be stated therein or necessary to make the statements therein not misleading;

(d) whether the alleged misstatements and omissions were material;

(e) whether the securities purchased by Plaintiffs and other members of the Class were issued pursuant and/or traceable to the Offering Documents;

(f) whether Defendants are liable to the Class under Sections 11, 12(a)(2), and 15 of the Securities Act;

(g) whether the prices of Lineage common stock were artificially inflated as a result of Defendants' conduct; and

(h) the extent of damages sustained by Plaintiffs and other members of the Class and the proper measure of damages.

204. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII. CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 11 of the Securities Act Against All Defendants Except Defendant Bay Grove

205. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except Defendant Bay Grove.

207. This Count does not sound in fraud. Plaintiffs do not allege that any of the Defendants had scienter or fraudulent intent, which are not elements of a §11 claim. To the extent any allegations herein state or imply that a Defendant knew about, was aware of, or disregarded certain facts, these allegations are included solely to allege a "known trend or uncertainty" that was omitted from the Offering

Documents under Item 303 of Regulation S-K, and not to allege scienter, fraudulent intent, or recklessness.

208. The Offering Documents were inaccurate and misleading, contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

209. Defendant Lineage is the registrant and issuer of the common stock sold pursuant to the Offering Documents. Therefore, Lineage is subject to strict liability under §11 of the Securities Act because the Offering Documents contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading.

210. The Individual Defendants, as signatories to the Offering Documents and/or Directors or Director Nominees of the Company, and the Underwriter Defendants, as underwriters of the IPO, are among the persons subject to liability under §11 of the Securities Act because the Offering Documents contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading.

211. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the

Offering Documents were true and without omissions of any material facts and were not misleading.

212. The PSLRA safe harbor for forward-looking statements does not apply because the statements at issue were made in connection with the Company's IPO. In any event, the alleged misstatements and omissions were materially false and misleading when made. To the extent any statements could be construed as forward-looking, they were not accompanied by meaningful cautionary language and were contradicted by then-existing facts known to Defendants.

213. By reason of the conduct alleged herein, each Defendant, except Defendant Bay Grove, is liable under §11 of the Securities Act.

214. Plaintiffs and other members of the Class purchased Lineage common stock registered pursuant to and/or traceable to the Offering Documents.

215. Plaintiffs and other members of the Class have sustained damages. The value of Lineage common stock has declined substantially, subsequent to, and due to, Defendants' violations.

216. At the time of their purchases of Lineage common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning Defendants' wrongful conduct alleged herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint.

Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act Against All Defendants

217. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

218. This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of the Class, against all Defendants.

219. This cause of action does not sound in fraud. Plaintiffs do not allege that any of the Defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim. To the extent any allegations herein state or imply that a Defendant knew about, was aware of, or disregarded certain facts, these allegations are included solely to allege a "known trend or uncertainty" that was omitted from the Offering Documents under Item 303 of Regulation S-K, and not to allege scienter, fraudulent intent, or recklessness.

220. Each of the Defendants named in this cause of action were sellers, offerors, and/or solicitors of purchases of Lineage common stock pursuant to the defective Prospectus, as well as related written and oral communications used to market the securities in the IPO, including the Roadshow Presentation. The actions

of solicitation by these Defendants included participating in the marketing of the common stock to investors, including members of the Class, through the roadshow, offering process, and related communications, for their own financial benefit. In the absence of Defendants' efforts to publicize the IPO and solicit purchasers of Lineage common stock, the IPO could not have occurred.

221. The Prospectus for the IPO, together with the related written and oral communications used to market the securities in the IPO, including the Roadshow Presentation, were materially inaccurate and misleading in that they contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading.

222. In offering and selling Lineage common stock pursuant to the Prospectus and by means of related written and oral communications used to market the securities in the IPO, including the Roadshow Presentation, Defendants failed to exercise reasonable care to ensure that such statements were true and did not omit material facts necessary to make the statements therein not misleading. By virtue of this conduct, the Prospectus and related communications contained untrue statements of material fact and omitted material facts necessary to make the statements therein not misleading.

223. Plaintiffs and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions

contained in the Prospectus issued in connection with the IPO at the time they purchased Lineage common stock.

224. Defendants are liable under §12(a)(2) of the Securities Act because they offered and sold Lineage common stock by means of the Prospectus and related written and oral communications used to market the securities in the IPO, including the Roadshow Presentation, that included untrue statements of material fact and omitted material facts necessary to make the statements therein not misleading.

225. As a direct and proximate cause of such violations, Lead Plaintiff MSPERS and the other members of the Class who purchased Lineage common stock pursuant to the Prospectus sustained damages. Accordingly, MSPERS and such Class members are entitled to rescission or damages as provided by law.

226. Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that this action was commenced. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time that this action was commenced.

## COUNT III

### For Violations of Section 15 of the Securities Act Against Bay Grove and the Individual Defendants

227. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

228. This Count is brought pursuant to §15 of the 1933 Act, 15 U.S.C. § 77o, against Bay Grove and the Individual Defendants.

229. Bay Grove controlled Lineage at the time of the IPO through its ownership of Lineage shares and private operating units, its appointment of Lineage executives and members of the Board, its control over the Company through various transactions and agreements with Lineage, as detailed herein, and its historical relationship with the Company and its management.

230. The Individual Defendants controlled Lineage at the time of the IPO by virtue of their dominant voting power and status as the Company's controlling shareholders, directors, and/or senior officers as detailed herein. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Lineage and through their positions with Lineage's private equity owner, Bay Grove.

231. Defendant Lineage is liable to Plaintiffs and members of the Class under §§11 and 12(a)(2) of the Securities Act as alleged above, and Bay Grove and the Individual Defendants are correspondingly liable as controlling persons under §15 of the Securities Act.

## VIII. PRAYER FOR RELIEF

232. WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a) Declaring this action to be a class action, certifying Lead Plaintiffs as Class Representatives, and appointing Lead Counsel as Class Counsel, pursuant to Rules 23(a), (b)(3), and (g) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding all damages and other remedies available under the Securities Act in favor of Lead Plaintiffs and all other members of the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, and other costs and disbursements; and

(d) Awarding such other and further relief as this Court deems appropriate.

## IX. JURY DEMAND

233. Lead Plaintiffs demand a trial by jury.

Dated: March 30, 2026

Respectfully submitted,

By: /s/ *Matthew I. Henzi*
Matthew I. Henzi (P57334)
**ASHERKELLY, PLLC**
25800 Northwestern Hwy Suite 1100
Southfield, MI 48075
Tel.: (248) 746-2762
mhenzi@asherkellylaw.com

*Local Counsel for Lead Plaintiffs*

**SAXENA WHITE P.A.**
Steven B. Singer
Joshua H. Saltzman
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

**SAXENA WHITE P.A.**
Maya Saxena
Lester R. Hooker
Omar D. Davis
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
odavis@saxenawhite.com

**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas
Jake Bissell-Linsk
Christian J. Macaluso
140 Broadway
New York, NY 10005

Tel.: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
jbissell-linsk@labaton.com
cmacaluso@labaton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: *_/s/ Matthew I. Henzi_*
Matthew I. Henzi (P57334)