**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE LINEAGE, INC. SECURITIES LITIGATION | Case No.: 2:25-cv-12383-SJM-CI<br>Hon. Stephen J. Murphy, III<br>Hon. Curtis Ivy, Jr.<br>ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Pursuant to Rules 7.1(c) and 5.1 of the Local Rules of the United States District Court for the Eastern District of Michigan, Lead Plaintiffs Public Employees' Retirement System of Mississippi and Indiana Public Retirement System (collectively, "Plaintiffs"), by and through their attorneys, respond to Defendants' (i) Lineage, Inc. ("Lineage"); (ii) Adam Forste, Kevin Marchetti, Walter Gregory Lehmkuhl, Robert Crisci, Abigail Fleming, Shellye Archambeau, John Carrafiell, Joy Falotico, Luke Taylor, Michael John Turner, Lynn Wentworth, James Wyper (the "Individual Defendants"); (iii) Bay Grove Capital Group, LLC ("Bay Grove," along with Lineage and the Individual Defendants, the "Lineage Defendants"); and (iv) Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, BofA Securities, Inc., J.P. Morgan Securities LLC, and Wells Fargo Securities, LLC (the "Underwriter Defendants," along with the Lineage Defendants, the "Defendants") motion to dismiss (ECF No. 45, the "Motion" or "MTD") Plaintiffs' Amended Complaint (ECF No. 43, the "Complaint" or "AC," cited as "¶#").

The grounds for Plaintiffs' opposition to the Motion are explained more fully below in Plaintiffs' accompanying opposition brief. Plaintiffs respectfully request this Court deny Defendants' Motion in its entirety. In the event that the Court grants Defendants' Motion, either in whole or in part, Plaintiffs respectfully request any such dismissal be without prejudice so that Plaintiffs may move to cure any defect in the pleadings by amending the pleadings.

Dated: July 28, 2026

Respectfully submitted,

**SAXENA WHITE P.A.**
Steven B. Singer
Joshua H. Saltzman
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

**SAXENA WHITE P.A.**
Maya Saxena
Lester R. Hooker
Omar D. Davis
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
odavis@saxenawhite.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

By: */s/ Jake Bissell-Linsk*
**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas
Jake Bissell-Linsk
Christian J. Macaluso
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
jbissell-linsk@labaton.com
cmacaluso@labaton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

**ASHERKELLY, PLLC**
Matthew I. Henzi (P57334)
25800 Northwestern Hwy Suite 1100
Southfield, MI 48075
Tel.: (248) 746-2762
mhenzi@asherkellylaw.com

*Local Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

Dated: July 28, 2026

Respectfully submitted,

By: */s/ Jake Bissell-Linsk*
Jake Bissell-Linsk

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE LINEAGE, INC. SECURITIES LITIGATION | Case No.: 2:25-cv-12383-SJM-CI<br><br>Hon. Stephen J. Murphy, III<br><br>Hon. Curtis Ivy, Jr.<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... iii

STATEMENT OF ISSUES PRESENTED ..... vii

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ..... viii

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 9

A. In the Years Leading up to the IPO, Lineage Capitalized on a COVID-Fueled Spike in Demand for Cold Storage ..... 9

B. Customer Destocking Caused a "*Network Wide Meltdown of Customer Demand*" ..... 10

C. The Offering Documents ..... 12

D. Lineage's Successful IPO Was Followed by a Sustained Decline ..... 14

III. LEGAL STANDARD ..... 17

A. Elements of Section 11 Claims and Applicable Rule 8 Standard ..... 17

B. The Court Should Consider the Former Employee Accounts ..... 19

IV. ARGUMENT ..... 21

A. Plaintiffs Sufficiently Alleged Misstatements and Omissions ..... 21

1. The Offering Documents Materially Misled Investors About Lineage's Demand, Growth Prospects, and the Drivers of Its Occupancy Rates ..... 21

a. The Offering Documents Did Not Disclose the Full Truth About COVID's Impact on Lineage's Business ..... 23

b. The Omitted Facts "Fit" the Misstatements ..... 28

c. The Demand Statements Are Legally Actionable ..... 29

d. The Growth and Decline Statements Were Misleading Half-Truths ....................................................................33

2. The Offering Documents and Roadshow Presentation Materially Misled Investors About Lineage's Automation Technology and Automated Facilities ......................................36

3. The Offering Documents Contained Materially False and Misleading Statements About Lineage's Acquisition Strategy ..........................................................................38

4. The Offering Documents Omitted Material Facts That Were Required to Be Disclosed by Item 303 of Regulation S-K............................................................................39

B. Defendants Do Not Prove the Defense of Negative Causation ..........41

C. Defendants Are Statutory Sellers Under Section 12(a)(2)..................44

D. Plaintiffs Sufficiently State a Control Person Claim ..........................45

V. CONCLUSION...............................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010) ........ 44-45

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
665 F. Supp. 2d 404 (S.D.N.Y. 2009) ........ 43

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010) ........ 44

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ........ 29

*City Pension Fund for Firefighters & Police Officers v. Generac Holdings Inc.*,
765 F. Supp. 3d 775 (E.D. Wis. 2025) ........ 31

*In re Concord EFS, Inc., Sec. Litig.*,
2004 WL 7390451 (W.D. Tenn. Jan. 7, 2004) ........ 32

*Constr. Workers Pension Tr. Fund – Lake Cnty. v. Genoptix, Inc.*,
2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) ........ 32

*In re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025) ........ 21, 34

*In re FirstEnergy Corp. Sec. Litig.*,
2022 WL 681320 (S.D. Ohio Mar. 7, 2022) ........ 17

*Gaynor v. Miller*,
273 F. Supp. 3d 848 (E.D. Tenn. 2017) ........ 45

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ........ 21, 29, 40

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ........ 1, 17

*In re Home Point Cap. Inc. Sec. Litig.*,
2022 WL 18932069 (E.D. Mich. Oct. 5, 2022) .......................................... *passim*

*In re Honest Co. Sec. Litig.*,
615 F. Supp. 3d 1149 (C.D. Cal. 2022) ........................................................ 35-36

*In re Hut 8 Corp. Sec. Litig.*,
2025 WL 2636150 (S.D.N.Y. Sep. 12, 2025) ....................................................20

*Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ....................................................................8, 41, 42

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ..............................................................................25

*Kolominsky v. Root, Inc.*,
100 F.4th 675 (6th Cir. 2024) .............................................................................18

*Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*,
731 F. Supp. 2d 689 (S.D. Ohio 2010) .........................................................19, 20

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024) ........................................................................................21, 40

*McKenna v. Smart Techs. Inc.*,
2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012) .......................................................19

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...............................................................35

*Michalski v. Weber, Inc.*,
695 F. Supp. 3d 964 (N.D. Ill. 2023) .................................................................35

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
2024 WL 759246 (S.D.N.Y. Feb. 23, 2024) .......................................................44

*Newtyn Partners, LP v. Alliance Data Sys. Corp.*,
165 F.4th 947 (6th Cir. 2026) ........................................................................28, 29

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).......................................................................*passim*

*Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*,
799 F. Supp. 3d 310 (S.D.N.Y. 2025) ..............................................................19

*Padilla v. Cmty. Health Sys., Inc.*,
2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022)................................................21

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) ...........................................................................40

*Pappas v. Qutoutiao Inc.*,
2024 WL 4588491 (2d Cir. Oct. 28, 2024) .......................................................19

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000) ...........................................................44

*In re Scotts Miracle-Gro Co. Sec. Litig.*,
2026 WL 1094854 (S.D. Ohio Apr. 22, 2026)................................31, 32, 34, 35

*Sharma v. Rent the Runway, Inc.*,
751 F. Supp. 3d 82 (E.D.N.Y. 2024)................................................................19

*Sharma v. Rent the Runway, Inc.*,
799 F. Supp. 3d 129 (E.D.N.Y. 2025)..............................................................43

*In re Shoals Techs. Grp, Inc. Sec. Litig.*,
802 F. Supp. 3d 1024 (M.D. Tenn. 2025) .........................................................17

*Shupe v. Rocket Cos.*,
660 F. Supp. 3d 647 (E.D. Mich. 2023) ...........................................................20

*In re Sirrom Cap. Corp. Sec. Litig.*,
84 F. Supp. 2d 933 (M.D. Tenn. 1999)............................................................45

*Sodha v. Golubowski*,
154 F.4th 1019 (9th Cir. 2025) ..............................................................21, 39, 40

*St. Clair Cnty. Emps' Ret. Sys. v. Acadia Healthcare Co.*,
808 F. Supp. 3d 828 (M.D. Tenn. 2025) ...........................................................33

*Stein v. U.S. Xpress Enters., Inc.*,
2020 WL 3584800 (E.D. Tenn. June 30, 2020) ....................18

*In re Violin Memory Sec. Litig.*,
2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ....................44

*Wong v. Hesai Grp.*,
821 F. Supp. 3d 445 (S.D.N.Y. 2026) ....................17

**Statutes & Rules**

15 U.S.C. §77k (Section 11 of the Securities Act) ....................*passim*

15 U.S.C. §77l (Section 12 of the Securities Act) ....................1, 44

15 U.S.C. §77o (Section 15 of the Securities Act) ....................1, 45

17 C.F.R. §229.303(b)(2)(ii) (Item 303 of Regulation S-K) ....................39

17 C.F.R. §230.159A(a)(1) ....................45

Fed. R. Civ. P. 8 ....................17, 20

Fed. R. Civ. P. 9 ....................18, 19

## STATEMENT OF ISSUES PRESENTED

1. Whether Plaintiffs adequately allege that all Defendants except Defendant Bay Grove Capital Group LLC ("Bay Grove") violated Section 11 of the Securities Act of 1933 by making materially misleading misstatements and omissions in the Offering Documents for its IPO.

2. Whether Defendants have established that loss causation is impossible from the face of the complaint.

3. Whether Defendants are statutory sellers under Section 12(a)(2) of the Securities Act.

4. Whether Defendants Adam Forste, Kevin Marchetti, Walter Gregory Lehmkuhl, Robert Crisci, Abigail Fleming, Shellye Archambeau, John Carrafiell, Joy Falotico, Luke Taylor, Michael John Turner, Lynn Wentworth, James Wyper, and Bay Grove Capital Group LLC are liable as control persons under Section 15 of the Securities Act of 1933 for Lineage's underlying Securities Act violations.

# CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Applicable Statutes, Regulations, and Federal Rules of Civil Procedure**

Fed. R. Civ. P. 8

Fed. R. Civ. P. 12(b)(6)

15 U.S.C. §77k (Section 11 of the Securities Act)

15 U.S.C. §77l (Section 12 of the Securities Act)

15 U.S.C. §77o (Section 15 of the Securities Act)

17 C.F.R. §229.303(b)(2)(ii) (Item 303 of Regulation S-K)

**Applicable Case Law**

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001)

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983)

*In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587 (6th Cir. 2025) ("*FirstEnergy II*")

*In re Home Point Cap. Inc. Sec. Litig.*, 2022 WL 18932069 (E.D. Mich. Oct. 5, 2022)

*In re Scotts Miracle-Gro Co. Sec. Litig.*, 2026 WL 1094854 (S.D. Ohio Apr. 22, 2026)

*Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009) ("*Omnicare I*")

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) ("*Omnicare II*")

*Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022)

*Pappas v. Qutoutiao Inc.*, 2024 WL 4588491 (2d Cir. Oct. 28, 2024)

*Sodha v. Golubowski*, 154 F.4th 1019 (9th Cir. 2025)

## I. INTRODUCTION[1]

This is a class action brought under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Section 11 imposes strict liability where a registration statement or prospectus contains a material misstatement or omission. Plaintiffs do not need to allege scienter — *i.e.*, wrongful intent or recklessness. Even innocent misstatements are actionable. Plaintiffs bear only the "relatively minimal burden" of plausibly identifying at least one material misstatement or omission. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). The Complaint easily meets this burden, identifying numerous material misstatements and omissions in the Offering Documents for Lineage's 2024 IPO.

In the years leading up to its IPO, demand for Lineage's cold storage services soared to unprecedented levels. This increase was due to a one-time surge in "overstock[ing]," whereby customers stockpiled excess inventory to weather supply chain disruptions caused by COVID-19. ¶48. By Q3 2023 — nearly a year before the IPO — that trend had reversed, as customers "destock[ed]" their excess inventory, and demand went back to far lower, pre-pandemic levels. ¶¶52, 85-87.

Against this backdrop, Lineage launched its IPO in July 2024, filing the Offering Documents with the SEC. ¶¶57-58. Notably, those documents did not

[1] Terms are defined as in the Amended Complaint (ECF No. 43, cited as "¶_"). Unless stated, all emphasis is added and internal citations are omitted. References to "Rule 8" or "Rule 9" refer to the Federal Rules of Civil Procedure.

disclose Lineage's historical occupancy levels, or the fact that, as of the IPO, occupancy remained artificially inflated well above those levels. ¶62. Instead, the Offering Documents assured investors that demand for Lineage's warehouses remained "***large, growing and resilient***," and "***naturally resilient across macroeconomic cycles***." ¶¶163, 165. Indeed, Lineage claimed that demand was so robust that "***additional temperature-controlled warehousing capacity***" was needed "***to meet current and anticipated future market demand***," and that there was "***still ample demand to fill new space as it delivers***." ¶¶61, 163, 169. Lineage also credited its own "***organic business initiatives***" and "***utilization initiatives***" for what was, in fact, a one-time pandemic effect; it then assured investors that it "***expect[ed] to continue***" that growth going forward through those same initiatives. ¶¶174-76.

The Offering Documents also assured investors that Lineage held durable "***competitive advantage[s]***" that would preserve its edge over rivals. ¶183. Foremost among them was "[d]ifferentiated [a]utomation," which Lineage claimed powered a portfolio of "81 fully- and semi-automated warehouses" and made its network the "most technologically advanced" in the industry, lowering costs and winning business. ¶¶6, 183. Lineage likewise touted a "***proven acquisition strategy***" that "***targets profitable businesses with strategic, high-quality assets that complement [its] warehouse network and customers' needs***." ¶¶193, 194.

Based on these representations, Lineage's IPO was a resounding success. Lineage sold more than 65 million shares at a premium price of $78 per share, raising over $5 billion in the largest U.S. IPO of 2024. ¶68.

However, as Lineage's own executives would later disclose, the Offering Documents were materially misleading. In a series of disclosures beginning just months after the IPO, Lineage admitted that, at the time of the offering, demand was not "***growing and resilient***," and was not attributable to its "***competitive advantage***" or "***organic business initiatives***." ¶¶163, 174-76, 183. To the contrary, in the years leading up to the IPO, the Company's occupancy levels were materially inflated due to customers overstocking inventory "[i]n response to the COVID supply chain shocks," causing those levels to "increase in excess of the typical seasonality trends" seen pre-pandemic. ¶86. This trend was not only unsustainable, it was *already reversing at the time of the IPO*. Indeed, in May 2025, Defendants admitted that, "[b]eginning in Q3 2023" — nearly a year prior to the IPO — "Lineage customers began to destock excess inventory looking for leaner, more rational supply chains overall." *Id.*

Defendants also made clear that, at the time of the IPO, occupancy remained artificially elevated, with the unwind far from complete. Indeed, Defendants explicitly admitted that "inventory levels remained elevated for the first half of 2024" — meaning that there was still significant "excess inventory" and inflated

occupancy at the time of the IPO. ¶75. Further, Defendants admitted that Lineage's business would revert to its "normal" pre-pandemic levels — far below the levels touted at the IPO. In Defendants' own words, there was not "a normal year in food since 2019" (¶91), and moving forward, its business would track "pre-pandemic data back when our industry was more normal." ¶77. Significantly, Defendants disclosed none of this material information to investors before the IPO.

Lineage's post-IPO deterioration was swift. In its first quarterly report after the IPO, Lineage reported zero revenue growth, a $543 million net loss, and "pretty widespread" competitive pressures. ¶72. Within six months of the IPO, Lineage announced surprise layoffs, and by February 2025, Lineage's full-year net loss ballooned from $96 million to $751 million. ¶¶73-74.

Then, in a May 2025 investor presentation, Lineage disclosed what the Offering Documents did not: that occupancy had been inflated by COVID-era overstocking; that customers had begun destocking in Q3 2023 — a year before the IPO; and, for the first time, what Lineage's "normal" occupancy actually looked like. ¶¶85-87. The comparison was stark. In the Offering Documents, Lineage had reported occupancy levels of nearly 80% for Q1 2024. Now, ten months after the IPO, Lineage acknowledged that, in a "normal" and "typical" year, occupancy levels for Q1 would only be in the low 70s. ¶¶86-87. Moreover, even during Q4 of a year, when the Company's business was strongest, occupancy levels would not exceed

77%. *Id.* In other words, the occupancy level that Lineage reported and touted in the IPO was inflated by approximately 10% over its normal occupancy levels. In sum, far from reflecting "***growing and resilient***" demand, the occupancy level disclosed in the IPO was a pandemic artifact already unwinding, with much further to fall.

As Lineage's deterioration came to light, its share price dropped, plummeting to $42.35 on August 1, 2025 — 46% below the IPO price. ¶100. Significantly, in the wake of these disclosures, sophisticated industry analysts emphasized that Lineage had failed to disclose material information in connection with the IPO. Deutsche Bank concluded that Lineage's reversals may lead to a "loss of management credibility," commenting that Lineage had been "overpromising" since the IPO. ¶95. Piper Sandler also explained that the disclosures belatedly revealed that "the inventory disruption from pandemic overstocking hid normal seasonal trends," and that Lineage's recent poor results were a "return to normalcy." ¶88.

Plaintiffs' investigation confirms that the Offering Documents were materially misleading based on facts in existence at the time they were filed. Seven former Lineage employees show that the marked decline in demand for Lineage's services was already underway pre-IPO, and that it was caused by the unwinding of COVID-era overstocking. One employee, a Director of Finance and member of the IPO Readiness Team recounted that overstocking and anticipated destocking were discussed in the runup to the IPO, and that Lineage understood that the high

occupancy the Company was experiencing was not representative of the normal state of its business, but had in fact been driven by COVID. ¶¶128-30. Similarly, a Sales Manager who oversaw more than 50,000 pallet positions described 2023 and 2024 as "a network wide meltdown of customer demand" that "just evaporated," with the decline beginning as early as July 2023 — approximately one year before the IPO. ¶¶147, 152-53. The Director of Global Procurement also confirmed that the 2024 occupancy decline stemmed from destocking and customer losses, and that senior executives were "absolutely observing a trend of customer losses." ¶¶102, 104-05.

Defendants nonetheless argue that the Offering Documents contained not a single misstatement and omitted not a single material fact. Their central contention is that Lineage *did* disclose the overstocking dynamic by stating: "Following widespread supply chain backlogs during 2021 and early 2022, customers in North America increased production later in 2021 leading to higher inventories by the end of 2022. As a result, we experienced increased physical occupancy in 2023." MTD at 11, 21. But that sentence merely disclosed why occupancy had *risen* in 2023. It said nothing about the facts that mattered to investors in July 2024: that occupancy *remained* inflated at the time of the IPO; that the unwind had already begun in Q3 2023 and was far from complete; and what Lineage's normal occupancy was, without which investors had no way to gauge how far occupancy had left to fall. Indeed, contrary to what Defendants contend, the Offering Documents did not

attribute occupancy levels to pandemic overstocking, but to the Company's own "***organic business initiatives***" and "***utilization initiatives***," statements that were unquestionably false. ¶¶174-76.

Defendants fare no better with the Offering Documents' statement that occupancy "***may*** decrease ***relative to 2023 as customers rationalize inventory levels***." ¶181. *First*, the statement framed an ongoing, systemic reversal as a mere future possibility, when the reversal had already been underway *for a year*. *Second*, the Offering Documents separately described this potential rationalization as a reaction to "***interest rates***" — not the unwinding of pandemic-era overstocking. ¶179. *Third*, it did nothing to apprise investors that Lineage's pre-IPO results were not indicative or representative of the Company's true business. Indeed, the Offering Documents benchmarked the potential decline against 2023 —*the height of overstocking* — rather than the pre-pandemic baseline levels that represented the Company's "normal" and "typical" business, and that were materially omitted from the Offering Documents. ¶¶179, 181.

Defendants also seek to immunize their misstatements as mere puffery, opinion, or forward-looking predictions. Each argument ignores what the statements actually conveyed. For example, Defendants argue the misstatements were inactionable opinions. But the assurance that demand for Lineage's services was "***large, growing and resilient***" is a factual assertion — demand was, in fact, not

"***growing***" but declining at the time of the IPO, as Defendants later expressly admitted. ¶¶85-87. And even where, unlike here, a statement is framed as an opinion, it remains actionable when it creates an impression that conflicts with facts. Likewise, a statement is not puffery because it uses optimistic language; it is puffery if it lacks factual content and only expresses vague optimism. None of the misstatements fit that description. In the same way, statements are not protected as forward-looking merely because they mention the future, where they misleadingly omit information or fail to qualify for the strictures of the bespeaks caution doctrine.

Moreover, Defendants' puffery, opinion, and forward-looking arguments have no bearing on the allegation that Defendants omitted information they were affirmatively obligated to disclose. Item 303 of Regulation S-K requires any registration statement to disclose known trends "reasonably likely to have a material . . . unfavorable impact on net sales or revenues or income from continuing operations." The failure to disclose the destocking trend is independently actionable.

Finally, Defendants argue that, even if their statements were misleading, they did not cause Plaintiffs' losses. MTD at 41-44. But "[l]oss causation . . . is not an element of a §11 claim, but an affirmative defense." *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 947 (6th Cir. 2009) ("*Omnicare I*"). At this stage, Defendants can prevail "only . . . if the complaint facially demonstrates that loss causation is impossible." *In re Home*

*Point Cap. Inc. Sec. Litig.*, 2022 WL 18932069, at *5 (E.D. Mich. Oct. 5, 2022). Thus, Defendants' attack on a corrective disclosure theory — that Plaintiffs never pled — is irrelevant. Their own chart even shows sharp declines after two earnings reports — coming closer to proving loss causation than proving it "impossible."

Section 11 asks only whether the Offering Documents told investors the truth about Lineage's business. They did not. Defendants' Motion should be denied.

## II. FACTUAL BACKGROUND

### A. In the Years Leading up to the IPO, Lineage Capitalized on a COVID-Fueled Spike in Demand for Cold Storage

Lineage operates a global network of over 460 temperature-controlled warehouses used by food producers, distributors, and retailers. ¶40. Most of its revenue is derived from fees charged to store goods in those warehouses — making warehouse occupancy, measured both physically and economically, one of the "most important driver[s] of [Lineage's] financial results." ¶¶42-45.

The COVID-19 pandemic dramatically interrupted patterns in global food production, distribution, and consumption. ¶48. Supply chain chaos caused Lineage's customers to stockpile large amounts of extra inventory in the Company's warehouses to ensure they could weather ongoing disruptions. *Id.* Cold storage facilities operate optimally at 80-85% occupancy (¶47), yet during this period, Lineage facilities sometimes exceeded 95% (¶¶124, 144) — and sometimes even exceeded 100%, such that inventory was stored in docks and aisles. ¶130.

Surging occupancy and near-capacity warehouses enabled Lineage to significantly raise its prices and fees. ¶¶138, 142, 179. This drove a dramatic increase in Lineage's same-warehouse net operating income ("NOI") — a critical measure of the business's organic growth — by 12.7% in 2022 and another 15.3% in 2023. ¶49. But those market conditions, like the high occupancy that produced them, were a function of pandemic-era scarcity and would soon begin to reverse as customers destocked inventory or left Lineage entirely. ¶¶52, 85-86, 105.

Simultaneously, Lineage sought to expand its network of warehouses by embarking on a massive acquisition spree. ¶50. Between 2020 and 2024, Lineage completed approximately 75 acquisitions, which left it carrying more than $9 billion in long-term debt. ¶¶50, 55. Through these acquisitions, Lineage's network, which was the largest in the world by 2019, grew 67% by March 2024. ¶50.

### B. Customer Destocking Caused a "*Network Wide Meltdown of Customer Demand*"

Beginning in Q3 2023, the COVID-era "overstocking" that had filled Lineage's warehouses began to unwind, as customers started to "destock" excess inventory. ¶52. Supply chain disruptions had subsided, and customers no longer needed to house extra goods. *Id.* FE-5 explained that, by September 2023, customers had shifted away from pandemic-era stockpiling to a "just-in-time" model, keeping less inventory in storage. ¶¶141, 146. Defendants later admitted the timing, conceding in disclosures made well after the IPO, that, "[b]eginning in Q3

2023, Lineage customers began to destock excess inventory." ¶86.

Destocking was a gradual process, because clearing excess inventory in a managed way took time. ¶125. Lineage's own conduct during the overstocking period extended the destocking further: the Company pushed "minimum storage guarantees," contracts that reserved warehouse space for a fee and delayed the full financial impact of the decline, while not preserving the underlying demand. ¶¶54, 131, 139, 144. The unwind was also severe. Former employees described occupancy in facilities dropping from pandemic-levels above 95% to the 70% range or lower. ¶¶124, 130, 136, 140, 144, 146. FE-6 described 2023 and 2024 as a "network wide meltdown of customer demand," as demand "just evaporated." ¶152.

This decline was recognized inside Lineage before the IPO. FE-2 recalled that Lineage held regional leadership conferences in the leadup to the IPO to confront customer losses and falling occupancy, where attendees acknowledged that destocking and price competition were causing the business to struggle and that Lineage was being killed by competitors. ¶127. FE-3, a Director of Finance and member of the IPO Readiness Team, likewise recalled that overstocking and anticipated destocking were discussed internally in the runup to the IPO. ¶¶128-30. And FE-1 confirmed that Lineage senior executives "were absolutely observing a trend of customer losses." ¶105. Lineage acted on these observations, beginning workforce reductions as early as Q3 2023 and releasing more than 10% of its drivers

in several markets. ¶126. Thus, by the time of the IPO, the destocking trend was nearly a year old, its effects were visible across Lineage's network, and the Company's own personnel had been discussing it internally for months.

### C. The Offering Documents

Against this backdrop, Lineage went to market. On June 26, 2024, Lineage filed the Registration Statement for its IPO with the SEC, which, after amendments, was declared effective on July 24, 2024 (together with other IPO-related SEC filings, the "Offering Documents"). ¶58 & n.8 (full definition therein). On July 16, 2024, Lineage commenced its investor roadshow to market its IPO. *Id.*

The Offering Documents depicted Lineage as poised for continued growth and strong performance. ¶57. They described demand for its cold storage facilities as "***large, growing and resilient***" and "***naturally resilient across macroeconomic cycles***." ¶¶163, 165. They attributed Lineage's recent growth to its own "***organic business initiatives***" and "***utilization initiatives***," and told investors Lineage "***expect[ed] to continue***" that growth through those same initiatives. ¶¶174-76. And they represented that the vacancy rate was "still very low," "***indicating there is still ample demand to fill new space as it delivers***." ¶169.

Significantly, the Offering Documents omitted the information investors needed to evaluate those representations. They did not disclose that Lineage's occupancy remained inflated by pandemic-era overstocking at the time of the IPO,

or that customers had been destocking that excess inventory since Q3 2023. ¶¶60, 62. Tellingly, they disclosed virtually nothing about Lineage's pre-COVID occupancy — the historical levels and seasonal patterns toward which the business was reverting. *Id.* Without that baseline, investors had no way to know that the occupancy Lineage reported was abnormally high, or how far it had left to fall. The Offering Documents did note the possibility that occupancy "***may decrease relative to 2023 as customers rationalize inventory levels***," but tied that possibility to "***economic pressures driven by higher interest rates***" — not to the destocking that was then underway and nowhere near complete. ¶¶63, 179, 181.

Lineage also touted its supposed competitive advantages. It claimed that its automated warehouses "[c]reate[d] [v]alue" by reducing costs and increasing inventory turns, and that its network was the "most technologically advanced" in the industry. ¶¶6, 65. The Offering Documents did not disclose that the automation technology experienced widespread failures and could not generate the promised efficiencies and cost savings. ¶66. They likewise touted a "***proven acquisition strategy***" that "***targets profitable businesses with strategic, high-quality assets***." ¶¶67, 193. In reality, that strategy had devolved into a rush to acquire virtually any available property, regardless of quality or condition, reducing profitability. ¶67.

FEs confirmed this. FE-1, who oversaw the team that helped administer Lineage's budget spent on new automated warehouses, described automation as a

"vision" rather than something "tangible," and that "nothing" about automation's claimed "value proposition" was accurate. ¶¶106, 116. FEs described repeated failures at two flagship automated warehouses: breakdowns that required Lineage to bring in temporary labor, triggering a $10 million customer dispute, and breakdowns could leave hundreds of pallets inaccessible for days. ¶¶109, 114, 158-59. FE-7, who maintained automated equipment at a facility, explained that it was not designed to operate in a -5° freezer and that at least one automated cart broke down virtually every week, often taking days to repair. ¶¶154, 156, 159.

### D. Lineage's Successful IPO Was Followed by a Sustained Decline

On July 25, 2024, Lineage sold over 65 million shares in its IPO at $78 per share, raising more than $5 billion. ¶68. It was the largest U.S. IPO of 2024, and the largest REIT IPO in history. *Id.* *The Wall Street Journal* touted Lineage's automation and hailed the offering as "the Year's Hottest IPO." ¶69.

Almost immediately, Lineage's performance deteriorated. On November 6, 2024 — in its first post-IPO quarterly results (Q3 2024) — Lineage reported zero revenue growth and a $543 million net loss. ¶72. On January 14, 2025, Lineage announced surprise layoffs. ¶73. Then, on February 26, 2025, Lineage released its full-year 2024 results, reporting a massive increase in its full-year net loss ($751 million versus $96 million in 2023) and substantial occupancy declines. ¶74. On the earnings call that day, Defendants began to admit what the Offering Documents

had omitted — namely, that the information presented therein was not a true and accurate representation of Lineage's business. Indeed, they acknowledged that inventory levels had "remained elevated for the first half of 2024" — the period immediately preceding the IPO; that the business reverted to its historical baseline—*i.e.*, a "more normal seasonal pattern"; and that its performance going forward would track "pre-pandemic data back when our industry was more normal." ¶¶75-77.

On April 30, 2025, Lineage's Q1 2025 results showed declines in nearly every major metric, including occupancy, and Same Warehouse NOI declined 7.9% year-over-year. ¶78. The accompanying slide presentation conceded that occupancy had been "elevated" throughout 2024 and reiterated the expected "return" to "normal seasonality." ¶79. Analysts noted the "confusion" Lineage had created by failing to provide a clear picture of normal occupancy levels prior to the IPO. ¶84.

One week later, Lineage's May 2025 investor presentation made clear just how much the Offering Documents fundamentally misrepresented the true state of Lineage's business. That presentation conceded that, "[i]n response to the COVID supply chain shocks," customers had built up "excess" inventory in Lineage's warehouses, causing occupancy to "increase in excess of the typical seasonality trends" that prevailed before the pandemic; that, "[b]eginning in Q3 2023, Lineage customers began to destock excess inventory looking for leaner, more rational supply chains overall"; and that Lineage's "typical" occupancy peaked near 77% in

the fourth quarter of any given year before falling into the low 70s by Q2. ¶¶86-87.

The comparison between Lineage's "typical" and "normal" occupancy levels, and the levels reported in the Offering Documents, was dramatic. In the Offering Documents, Lineage had touted occupancy for Q1 2024 of nearly 80%, an amount that even exceeded the peak levels Lineage reported for any normal and typical quarter. ¶¶87, 179. Analysts pointedly noted the materiality of this information: Piper Sandler, for example, reported that management was finally "taking an honest self-assessment of how to improve transparency to better reflect the return to normality." ¶88.

The admissions continued. On June 3, 2025, Defendant Lehmkuhl acknowledged that "in the last couple of years you've seen pretty much flat demand" for Lineage's services, and that the Company "ha[dn't] had a normal year in food since 2019." ¶¶90-91. By Q2 2025, physical occupancy had fallen to 73.3%. ¶93. And, on November 5, 2025, Lehmkuhl conceded that occupancy had been lower still before the pandemic—there were "certainly times prior to 2021 where our occupancy was lower than it is today," including in "2016, '17, [and] '18." ¶98.

By August 1, 2025 — the date this action was filed — the Company's stock had fallen to $42.35, approximately 46% below the $78 IPO price. ¶100. Days later, Deutsche Bank opined that Lineage "has been overpromising but under delivering since the July IPO last year, leading to a stock that is off -43% since the IPO," and

warned of a "loss of management credibility." ¶95.

## III. LEGAL STANDARD

### A. Elements of Section 11 Claims and Applicable Rule 8 Standard

Section 11 imposes strict liability for material misstatements or omissions in a registration statement and requires no showing of scienter, reliance, or loss causation. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192-93 (2015) ("*Omnicare II*"). Section 11 thus "places a relatively minimal burden on a plaintiff." *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at *33 (S.D. Ohio Mar. 7, 2022) (quoting *Huddleston*, 459 U.S. at 382). A purchaser of securities issued under a registration statement "need only show a material misstatement or omission to establish his *prima facie* case." *Id.*

Because such claims rest on negligence and strict liability, "they generally are governed by Rule 8's notice-pleading standard." *Wong v. Hesai Grp.*, 821 F. Supp. 3d 445, 459 (S.D.N.Y. 2026). The Complaint pleads only Securities Act claims by detailing the misstatements and what the Offering Documents "failed to disclose." ¶¶162, 198, 206-07, 218-19, 228. It does not allege fraud or intentional misconduct, and it disclaims fraud. ¶¶207, 219. Where plaintiffs "exclude any allegations which might sound in fraud," Rule 8 applies; the Complaint must be sustained unless it is facially implausible. *In re Shoals Techs. Grp, Inc. Sec. Litig.*, 802 F. Supp. 3d 1024, 1049-50 (M.D. Tenn. 2025); *see also Omnicare II*, 575 U.S. at 181.

Defendants nonetheless urge the Court to apply a higher pleading standard under Rule 9(b), arguing the Complaint "sound[s] in fraud." MTD at 16-17. Their argument fails, and their cases are inapposite. Each involved complaints pleading Exchange Act fraud claims alongside Securities Act claims on a shared factual nexus, without carefully distinguishing the two. *See Kolominsky v. Root, Inc.*, 100 F.4th 675, 684 (6th Cir. 2024) (claims "all grounded in *one* fraudulent course of conduct relying on *one* set of facts"); *Stein v. U.S. Xpress Enters., Inc.*, 2020 WL 3584800, at *8 (E.D. Tenn. June 30, 2020) ("The Securities Act claims rest on the same factual background . . . as the Exchange Act claims."). There is no Exchange Act claim here and no allegation of fraud at all.

Defendants invent allegations of fraud by wrenching phrases out of context, seizing on words like "capitalized." MTD at 16-17.[2] But the Complaint merely alleges that Lineage "capitalized" on surges in demand to raise prices (¶¶2, 15) — ordinary commercial conduct, not a representation to investors or an act of deceit. Likewise, Defendants cite an FE's claim that Lineage's automation "story" was false, but a witness's statement is not an allegation of fraud, and the statement itself does not allege fraudulent intent. ¶106; MTD at 16. In any event, a complaint that disclaims fraud cannot "sound in fraud" based on a few stray quotes. ¶¶207, 219.

---

[2] Defendants make no argument as to why Rule 9(b) would apply as to the Underwriter Defendants, Bay Grove, and Lineage Director Nominees. No allegation could in any sense be interpreted to suggest they acted with fraudulent intent.

Defendants also argue that, because Plaintiffs identified an undisclosed known trend, the Complaint alleged scienter. Courts have repeatedly confirmed this argument is contrary to law. Item 303 requires disclosure of "known trends" and merely alleging the elements of a §11 claim does not plead scienter. *See* ¶¶207, 219; *Sharma v. Rent the Runway, Inc.*, 751 F. Supp. 3d 82, 101 (E.D.N.Y. 2024). Even when a trend is "known," failure to disclose it can reflect negligence; without an allegation of fraudulent intent, there is no allegation of fraud. *See Pappas v. Qutoutiao Inc.*, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024).[3]

Even if applicable, Rule 9(b) adds little here. The only disputed element of Plaintiffs' Section 11 claims is falsity, and Rule 9(b) does not change that. *See, e.g.*, *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.,* 731 F. Supp. 2d 689, 709 (S.D. Ohio 2010). The rule merely requires particularity as to the requisite element; Plaintiffs meet that by identifying each misstatement, when and where it appeared, and why it was false and misleading.

### B. The Court Should Consider the Former Employee Accounts

The Former Employees are described with adequate detail, tying their

---

[3] The Second Circuit rebuked Defendants' case, *McKenna v. Smart Techs. Inc.*, 2012 WL 1131935, at *8 (S.D.N.Y. Apr. 3, 2012) — "that a fact was known . . . does not mean . . . the resulting omission sound[s] in fraud." *Qutoutiao*, 2024 WL 4588491, at *2; *see Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 799 F. Supp. 3d 310, 338-40 (S.D.N.Y. 2025) (collecting cases and stating: "allegations that a defendant knew . . . an undisclosed fact are consistent with negligence").

allegations to specific events, including their title, tenure, and responsibilities. ¶¶102, 122, 128, 135, 141, 147, 154. Since each was positioned to "possess the information alleged," their accounts are accepted at this stage. *Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 680 n.15 (E.D. Mich. 2023) (citing *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037 n.2 (6th Cir. 2016)).

Defendants' objections to the FEs at most impact the weight their accounts might later receive, but, at this stage, well-pled facts must be credited. *Id.*[4] The objections are also facially misplaced. Defendants broadly call the FE accounts conclusory, but they clearly describe firsthand observations. Defendants argue that the FEs did not interact with Lineage executives, and regardless, their observations do not depend on such interaction. *See Rocket*, 660 F. Supp. 3d at 680 n.15 (crediting FE "several layers removed" from executives).

Likewise, Defendants comment that some FEs left before the IPO. However, FE-3, FE-6, and FE-7 did not (¶¶128, 146-47, 154), and those that did depart explain the conditions leading up to the IPO. MTD at 24. Defendants' authority concerns scienter, not falsity; far from imposing a bright line rule, it only found a specific FE would not have known a defendant's state of mind when a statement was made after the FE departed. *See Fifth Third Bancorp.*, 731 F. Supp. 2d at 722.

---

[4] *See In re Hut 8 Corp. Sec. Litig.*, 2025 WL 2636150, at *20-21 (S.D.N.Y. Sep. 12, 2025) (distinguishing Section 10(b) claims—where competing inferences of scienter must be weighed—from non-fraud Rule 8 claims where allegations are credited).

## IV. ARGUMENT

### A. Plaintiffs Sufficiently Alleged Misstatements and Omissions

An issuer must "provide complete and non-misleading information with respect to subjects on which [it] undertakes to speak." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561-62 (6th Cir. 2001) (en banc). "A speaker must provide the whole truth . . . literal accuracy is not enough." *Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *19 (M.D. Tenn. Aug. 17, 2022) (citing *Omnicare II*, 575 U.S. at 192). Half-truths — literally true statements that misleadingly omit key context — are therefore actionable. *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 608-09 (6th Cir. 2025) ("*FirstEnergy II*"); *see Omnicare II*, 575 U.S. at 192-93. Unlike Section 10(b) claims, Section 11 imposes liability for omission of any such information required to be disclosed, even absent a misleading statement. 15 U.S.C. §77k(a); *see Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263-65 (2024) (distinguishing §11(a) from Exchange Act claims on this ground); *Sodha v. Golubowski*, 154 F.4th 1019, 1034 n.3 (9th Cir. 2025).

The Complaint identifies six categories of misstatements and omissions. ¶¶161-98. Because the first three are misleading for interrelated reasons, they are addressed together below; the remaining three are addressed separately.

#### 1. The Offering Documents Materially Misled Investors About Lineage's Demand, Growth Prospects, and the Drivers of Its Occupancy Rates

The Offering Documents presented Lineage as well-positioned for ongoing

growth driven by continued demand for its warehouse services. They described demand as "***large, growing and resilient***," and as "***growing and naturally resilient across macroeconomic cycles***." ¶¶163, 165. They represented that demand was so strong that "***additional temperature-controlled warehousing capacity***" was needed "***to meet current and anticipated future market demand***," and that there was "***still ample demand to fill new space as it delivers***." ¶¶163, 169.

The Offering Documents further credited the growth in Lineage's occupancy levels to its own "***numerous organic business initiatives***" and "***utilization initiatives***," and told investors Lineage "***expect[ed] to continue***" that growth through those same initiatives. ¶¶174-76. And to the extent they acknowledged any decline in occupancy leading up to the IPO, they attributed it to temporary macroeconomic conditions — "***economic pressures driven by higher interest rates***." ¶¶179, 181.

These statements were materially false and misleading. Demand was not "***growing***" or "***resilient across macroeconomic cycles***"; it had been driven by a one-time, unsustainable COVID boom that was already reversing. ¶¶59, 86-87, 165. Lineage's high occupancy was not the product of its initiatives or competitive advantages, but of pandemic overstocking. ¶¶60, 71, 85, 174-78. With occupancy still inflated above pre-COVID norms and falling, there was nothing close to "***ample demand to fill new space***." ¶¶61, 169-70.

Defendants have since admitted as much. They conceded that occupancy had

been inflated because customers built up excess inventory "[i]n response to the COVID supply chain shocks," causing occupancy to "increase in excess of the typical seasonality trends" that prevailed before the pandemic. ¶86. Defendants admitted that elevated inventory existed at the time of the IPO: Lineage's "***inventory levels remained elevated for the first half of 2024***," meaning significant "excess inventory" remained at the time of the IPO. ¶75. And they conceded that the business would revert to "normal" pre-pandemic levels, far below those touted in the IPO — there was not "a normal year in food since 2019," and going forward would track "pre-pandemic data back when our industry was more normal." ¶¶77, 91.

Lineage was required to disclose these facts at the IPO. Its own historical data — undisclosed until May 2025 — showed that "normal" pre-COVID occupancy oscillated seasonally between the low and high 70s, far below the levels Lineage reported at the offering. ¶¶85-87. Nothing in the Offering Document disclosed that baseline, and without it, investors had no way to recognize that, as Piper Sandler later observed: "***pandemic overstocking hid normal seasonal trends***." ¶88.

#### a. The Offering Documents Did Not Disclose the Full Truth About COVID's Impact on Lineage's Business

In response, Defendants primarily argue that the Offering Documents disclosed enough for investors to understand Lineage's post-COVID dynamics. MTD at 18-27. They did not. Nowhere did the Offering Documents disclose what Defendants' later admissions revealed: that Lineage's occupancy levels "***remained***

***elevated for the first half of 2024***" — right up to the IPO; that significant "***excess inventory***" remained to be unwound as of the offering; and that occupancy had much further to fall before reaching its historical baseline. ¶¶75-76, 85-87.

Defendants claim that they made full disclosure through statements in the Final Prospectus that "widespread supply chain backlogs" led to "higher inventories," and that occupancy may "decrease relative to 2023 as customers rationalize inventory levels." MTD at 19.[5] Neither statement disclosed the truth. Lineage told investors only that occupancy "may" decrease "relative to 2023" — not that it was already decreasing, that the decline had begun a year earlier, or that it had much further to fall before returning to the "normal" and "typical" pre-COVID levels they never disclosed to investors. ¶¶63, 71, 80, 87, 181. By withholding this information, Defendants presented a fundamentally misleading picture of the true state of Lineage's business. And the same passage attributed any decline to

[5] Defendants mischaracterize the quote. *See* MTD at 19 ("Lineage expected demand to continue 'decrease[ing] relative to 2023 as customers rationalize [*i.e.*, 'normalize'] inventory levels.'"). The Offering Documents stated only that "physical occupancy ***may decrease relative to 2023*** as customers rationalize inventory levels," (Ex. 1 at 121) not that they "***expected demand to continue 'decreas[ing]*** relative to 2023 as customers 'normalize' their inventory levels." MTD at 19. Defendants also cite that, "in the wake of pandemic-era supply chain disruptions, throughput [the volume of inventory flowing in and out of Lineage facilities] has been down moderately from pre-pandemic levels." MTD at 19 (quoting Ex. 1 at 168). This statement is irrelevant: it concerns *throughput*, *not* occupancy, and states that the metric was down from "pre-pandemic levels," *not* from the pandemic.

"***economic pressures driven by higher interest rates***" — ***not*** the unwinding of pandemic overstocking. ¶179, 181. Indeed, the Complaint alleges that the very statements Defendants now offer as curative were themselves materially false and misleading. ¶¶181-82.[6]

Defendants' argument also ignores their own disclosures in the Offering Documents. Significantly, in the filings, Defendants attributed Lineage's strong occupancy levels to its "***numerous organic business initiatives***" and "***utilization initiatives***" — and ***not*** the pandemic. ¶¶174-78. Defendants cannot both claim that occupancy gains were due to Lineage's own initiatives and then turn around and claim that they really said those gains were due to the pandemic.

Defendants also invoke several analyst reports to argue that the market already knew the truth. MTD at 21. The Court may not consider them, as they are outside the Complaint.[7] In any event, they undercut Defendants' argument. Defendants rely on an August 19, 2024 Deutsche Bank report observing that supply chain backlogs had led to "high inventories (and higher occupancy)." MTD at 21 (citing Ex. 5).

---

[6] For the same reason, it does not help that the Offering Documents reported some decline in occupancy in the first half of 2024. Defendants misattributed that decline to "***higher interest rates***," and investors had no way to know that even the reduced occupancy (roughly 80% as of Q1 2024) remained well above Lineage's normal seasonal peak, and that the decline had barely begun. ¶¶63, 87, 179.

[7] Specifically, MTD Exs. 3, 5-6, 18-22, 24-27 are outside the Complaint, and thus, inappropriate for consideration here. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (rebuking "unscrupulous use of extrinsic documents to resolve competing theories against the complaint").

But that same report predicted only “***slower occupancy gains***” (*not* losses) and a possible dip like the one Lineage “experienced in 1Q24” — not a reversion to levels far below those reported at the IPO. And Deutsche Bank set a $90 price target (*above* the $78 IPO price), citing a “competitive advantage that no one other player can match in the cold storage space” and “an attractive long term backdrop for LINE to grow both physical and economic occupancy over time.” Ex. 5 at 1, 3. Analysts who understood that occupancy was artificially inflated and still falling would not have forecast growth from that baseline.[8]

Indeed, the same Deutsche Bank analysts wrote a year later that Lineage “*has been overpromising but under delivering since the July IPO last year*,” which may result in a “*loss of management credibility*.” ¶95. Other analysts said the same. CapitalOne noted “*confusion*” around “the cold storage demand cycle,” explaining that “[i]nvestors need to know when at a minimum they can expect stabilized revenue levels.” ¶84. And after the May 2025 presentation, Piper Sandler noted that

---

[8] The same is true of Defendants’ other reports. For example, the August 19, 2024 Mizuho report cited by Defendants (MTD at 21, Ex. 26) expected a “*slow and steady recovery and conservatively forecast[s] economic occupancy rising*” in the near term (Ex. 26. at 1), and further opined that “*[s]easonal factors, particularly in the second half of the year, can drive improvement in occupancy*” — the exact opposite of what was happening and Defendants would later reveal. The August 19, 2024 JPMorgan report (MTD at 21, n. 5; Ex. 27) rated the stock “overweight,” set a $93 target, and forecast significant near-term growth in key operating metrics in 2024 and 2025 (*see, e.g.*, Ex 27 at 23 (“Estimates and Financial Assumptions”)), showing that JPMorgan did not understand Lineage *was still* unwinding its inventory.

management's belated disclosure "*improve[d] transparency to better reflect the return to normality*." ¶88. Analysts would not have criticized management credibility and transparency if the Offering Documents had not misled them.

Defendants next argue that Plaintiffs cannot fault Lineage for failing to predict, at the IPO, how much further occupancy would fall, particularly given later developments like tariffs and inflation. MTD at 26-27. That is not Plaintiffs' claim. The omitted facts were present conditions and historical data, not forecasts. Defendants have admitted that occupancy was still "***elevated***" at the time of the IPO and that customers did not finish unwinding "excess inventory" until the end of 2024 — two quarters after the IPO. ¶¶85-87. They have also admitted that occupancy would thereafter track "typical seasonality" at pre-pandemic levels (¶¶77, 79), a baseline Lineage quantified from its own history and possessed at the IPO. ¶87. And the destocking trend itself was underway and understood inside Lineage before the offering: it began in Q3 2023 and was discussed by the team preparing the IPO. *See supra* §II; ¶¶104-05, 129-30, 152-53. None of that required clairvoyance.

Finally, Defendants suggest that the stock decline of Lineage's competitor Americold shows Lineage's own statements were not misleading. MTD at 3, 8, 14. The Americold materials are outside the Complaint and should be disregarded. *Supra* at 25 n.7; Exs. 7-17, 19-23. Regardless, Lineage did not present itself as an ordinary industry participant tracking sector trends. It credited its occupancy gains

to its own "***organic business initiatives***" and "***utilization initiatives***" and told investors it "***expect[ed] to continue***" that growth through those same initiatives. ¶¶174-78. That a competitor may have performed poorly says nothing about whether Lineage disclosed the truth about its own business.

#### b. The Omitted Facts "Fit" the Misstatements

Defendants argue that their omissions did not render their statements misleading because the undisclosed information lacked a "reasonably close fit" to what was disclosed and did not operate at the same "levels of generality" as the challenged statements. MTD at 27-28; *see Newtyn Partners, LP v. Alliance Data Sys. Corp.*, 165 F.4th 947, 963 (6th Cir. 2026).[9]

This argument fails, and *Newtyn* itself illustrates why. There, the Sixth Circuit held that general statements about a company's "deep, long-standing relationships" and "stable client base" were not necessarily inconsistent with the collapse of negotiations with a single client. *Id.* The mismatch was one of scope: broad characterizations of a business on one hand, a discrete event on the other.

Nothing of the sort is present here. Lineage did not speak in generalities about its customer relationships; it made specific representations about demand for its warehouse services and about the drivers of its occupancy — the precise subjects

[9] As set forth further below at §IV.A.4, Defendants' argument is also unavailing for the independent reason that the Offering Documents were required to disclose the omitted information under Item 303, regardless of their affirmative statements.

the omitted facts concerned. ¶¶163, 165, 167, 169, 171, 174-76. Lineage stated that demand was "***growing and resilient***"; it omitted that demand had been inflated by pandemic overstocking that began reversing in Q3 2023. ¶163. It credited rising occupancy to its own "***organic business initiatives***"; it omitted that the increase was a pandemic artifact. ¶175. And it attributed declining occupancy to "***higher interest rates***"; it omitted that the actual cause was destocking. ¶179. Those omissions bear directly on the same subjects. *Newtyn* identified *Helwig* and *Bridgestone* as examples of statements operating at the same level of generality as the omitted facts, and both are on point. *See Helwig*, 251 F.3d at 554-56 (stating a company was "comfortable" with profit predictions required disclosure of contradictions); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005) (expression of confidence in tire safety required disclosure of contradictions).

**c. The Demand Statements Are Legally Actionable**

Defendants argue that certain demand statements are inactionable opinion, immaterial puffery, or protected by the bespeaks caution doctrine. MTD at 28-32. Not so. Lineage's statements were specific, quantified, and framed in the present tense: occupancy percentages, causal attributions for particular increases in occupancy, and representations about current demand conditions, all made in connection with a $5 billion securities offering. ¶¶163-82. These are not "loosely optimistic statements" that the law immunizes. *Newtyn*, 165 F.4th at 960-61.

***__Statements of Opinion__***: Defendants wrongly contend that certain demand-related statements were inactionable opinions under *Omnicare II*. MTD at 29.

First, several contain embedded factual assertions that are actionable regardless of how they are framed. The statement that "the vacancy rate is still very low as of December 31, 2023—***indicating there is still ample demand to fill new space as it delivers***" (¶169), draws a factual inference from a datapoint, and that inference was contradicted by the destocking data Lineage possessed and withheld.

Second, the statements Defendants label as opinions are assertions about present conditions, not expressions of belief. That demand "***is growing and*** "***naturally resilient***" (¶165) describes the state of the market, not the speaker's view of it, and is not qualified by language signaling opinion. Nor does a word like "***appears***" (¶171) convert an otherwise factual statement into inactionable opinion.

Even if the demand statements are opinions, they are actionable: "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then §11's omissions clause creates liability." *Omnicare II*, 575 U.S. at 189. A reasonable investor reading that "***demand is growing and naturally resilient***" (¶165) would understand Lineage to have inquired into demand conditions and found them supportive — that its view "fairly aligns with the information in the issuer's possession at the time."

*Omnicare II*, 575 U.S. at 188-89. Lineage's information told a different story: demand was not growing, customers began destocking in Q3 2023, pre-COVID data showed normal seasonality peaking below IPO levels, and Lineage convened leadership conferences in late 2023 and early 2024 to "address the loss of customers and lower occupancy." ¶¶86-87, 127. These were not merely "some fact[s] cutting the other way," *Omnicare II*, 575 U.S. at 176; Lineage's internal information rendered the Offering Documents incomplete and misleading.

Defendants argue that Lineage relied on "concrete third-party data" showing industry growth. MTD at 30. But *Omnicare II* directs courts to the particular facts underlying the issuer's opinion, including "the knowledge it did or did not have." 575 U.S. at 194. Third-party projections about cold-chain growth do not relieve Lineage of the obligation to disclose its own occupancy data — which Lineage would later tell investors was the key to understanding its business cycles. ¶91.

Defendants' reliance on *City Pension Fund for Firefighters & Police Officers v. Generac Holdings Inc.*, 765 F. Supp. 3d 775 (E.D. Wis. 2025), is misplaced. MTD at 5-6, 20. *Generac* reasoned that "demand for a particular product is not a set data point that can be objectively known at a given point in time." *Id.* at 793. Lineage's occupancy is different. It followed seasonal patterns that Lineage itself had quantified from years of operating data — data Lineage disclosed ten months after the IPO. ¶87; *see In re Scotts Miracle-Gro Co. Sec. Litig.*, 2026 WL 1094854,

at *14, *28 (S.D. Ohio Apr. 22, 2026) (COVID-era demand statements actionable).

***Puffery***: Defendants next contend that several statements are puffery. MTD at 31. Not so. Puffery is a materiality argument, and statements are not puffery where the issuer "emphasize[s]" them and "induce[s] reliance upon" them. *Scotts*, 2026 WL 1094854, at *18 (quoting *Bridgestone*, 399 F.3d at 672).

A representation that "***demand is growing and naturally resilient***" (¶165) is not puffery; it describes a concrete state of affairs that mattered to investors, particularly where demand was, in fact, declining. *Supra* at §IV.A.1.a; *Constr. Workers Pension Tr. Fund – Lake Cnty. v. Genoptix, Inc.*, 2013 WL 12123841, at *4 (S.D. Cal. Mar. 22, 2013) ("statements regarding the strength of demand" not puffery). Statements about growth opportunities (¶¶163, 171) are likewise actionable because they are tied to future performance. *In re Concord EFS, Inc., Sec. Litig.*, 2004 WL 7390451, at *11 (W.D. Tenn. Jan. 7, 2004) ("continued profitable growth" not puffery). And statements about business and utilization initiatives are not puffery where Lineage credited specific, quantified occupancy increases to them. ¶174.

***Bespeaks Caution***: Defendants invoke the bespeaks caution doctrine as protecting their purportedly "forward-looking" statements. MTD at 31-32. But the doctrine does not apply for two reasons.

First, many of the challenged statements are not forward-looking at all, but

present-tense characterizations of existing conditions — that demand "***is growing and naturally resilient***," and that the vacancy rate "is still very low . . . ***indicating there is still ample demand***." ¶¶165, 169; *see Home Point*, 2022 WL 18932069, at *5 ("we *are* able to operate with a lower fixed cost," and "[w]e *benefit* from . . . our distinct wholesale strategy," and "flexible cost structure, *has positioned* us" — were "all representations relating to the present or past, not the future").

Second, Lineage's cautionary language was not meaningful, given that the "risks identified as possibilities had, in fact, already materialized." *St. Clair Cnty. Emps' Ret. Sys. v. Acadia Healthcare Co.*, 808 F. Supp. 3d 828, 838 (M.D. Tenn. 2025). Lineage warned that occupancy "may decrease," while destocking had been underway for nearly a year. *Supra* §II.D. Nor can Defendants rely on cautionary language that was itself misleading — the same passage attributed any anticipated decline to interest rates rather than destocking, and benchmarked it against anomalously inflated 2023 levels, while withholding the historical baseline. ¶63; MTD Ex. 1 at 121. The bespeaks caution doctrine does not apply.

#### d. The Growth and Decline Statements Were Misleading Half-Truths

The Offering Documents' statements attributing growth to "***organic business initiatives***" (category 2), and attributing the early-2024 occupancy decline to "***higher interest rates***" (category 3), were misleading half-truths. Each disclosed a fact while withholding essential context.

***__Decline Statements__***: The statement that Lineage "expect[ed] physical occupancy ***may*** decrease ***relative to 2023 as customers rationalize inventory levels***" (¶181), was a misstatement. By framing the decline as a contingency ("may"), benchmarking it against 2023, and attributing it to interest rates, that statement conveyed a possible modest retreat from a strong year. The reality was a systemic destocking already a year underway, occupancy still "elevated" as of the IPO, and a reversion toward a pre-COVID "normal" and "typical" baseline that Lineage had quantified but not disclosed. ¶¶86-87.

***__Growth Statements__***: Defendants first argue that accurate historical data cannot be misleading merely because less favorable results were foreseeable. MTD at 34. That is not the claim. Plaintiffs allege that Lineage used accurate historical figures to convey a false message about present and future demand — that it was "***growing***" and sustainable. *See Scotts*, 2026 WL 1094854, at *14-15, *28 (historical data used to support misleading message about current and future performance).

Defendants next argue that attributing growth to "organic business initiatives" was not misleading because the underlying metrics were accurate and growth could be attributed to both initiatives and overstocking. MTD at 33-34. But Plaintiffs allege those initiatives were *not* the primary driver of pre-IPO growth — overstocking was — and could not sustain growth as destocking accelerated. *See FirstEnergy II*, 149 F.4th at 608-09. Attributing a condition mainly to one cause while offering only

generic warnings about the true principal cause is misleading. *See Scotts*, 2026 WL 1094854, at *18, *23 (actionable where defendants blamed post-COVID declines on weather rather than known reversal of pandemic-driven demand).

Finally, Defendants contend that the growth statement at ¶176 is puffery and that certain statements carried meaningful cautionary language. MTD at 34-35. That misconstrues Plaintiffs' theory. ¶178. Plaintiffs allege these statements were false because they attributed Lineage's *past* growth to management-led initiatives rather than to COVID-era overstocking — a representation about historical causation, not a forecast. And as to future growth, Lineage's stated expectation that it would "continue" growing through those initiatives rested on a factual predicate Plaintiffs allege was false. *See Omnicare II*, 575 U.S. at 183-85. The minimum storage guarantees statement (¶177) is actionable for the same reason. ¶178.

Defendants' reliance on *Michalski v. Weber, Inc.*, 695 F. Supp. 3d 964 (N.D. Ill. 2023), is misplaced. The *Michalski* plaintiffs challenged the phrasing rather than the substance of the defendants' disclosures (*id.* at 968-69), and the defendants there gave a generic warning that demand might decline. *Id.* at 970. Lineage did the opposite: it pegged investor expectations to an already inflated demand environment while withholding the baseline against which that inflation could be measured. This case is closer to *In re Honest Co. Securities Litigation*, where the offering documents were issued at a time when "COVID-19 related product demand was declining . . .

due to consumers' stockpiling." 615 F. Supp. 3d 1149, 1156 (C.D. Cal. 2022).

### 2. The Offering Documents and Roadshow Presentation Materially Misled Investors About Lineage's Automation Technology and Automated Facilities

Lineage told investors its "Differentiated Automation Creates a Competitive Advantage," that its network of "81 fully- and semi-automated warehouses" was the "most technologically advanced" in the industry, and that its automation "***produc[ed] a lower cost to serve and lower resource consumption***" while "***driv[ing] customer retention***." ¶¶6, 183, 187, 190-91. It held out four flagship automated facilities as proof. ¶¶187, 190-91. Those claims were false.

FE-1, the Director of Global Procurement, whose team administered Lineage's ~$400 million annual automation budget, explained that two of the four flagship facilities were — in his words — "major fuckups" where the automation simply did not work. ¶¶102, 106, 109-10, 114. At one facility the failures were severe enough that a major customer brought in temporary workers and sued Lineage. ¶¶66, 109, 114. Much of the automation could not function in frozen conditions, despite years of development and $40-50 million in annual spending. ¶110. FE-1 contrasted the "expectation" Lineage marketed with the "reality" of its operations, explaining that the self-driving forklifts depicted in Lineage's materials reflected a technology that never scaled. ¶¶111-12, 116. Indeed, a Senior VP of Finance described the automated warehouses as a "shit sandwich" at a May 2023

finance meeting. ¶115. And FE-7, who managed the automated portion of a flagship facility, witnessed the failures firsthand. ¶¶154-59. FE-7 recounted that the automation worked only about 85% of the time, that carts broke down nearly every week, and that if even one cart broke down, hundreds of pallets could become inaccessible. ¶¶156, 158-59.

Defendants ask the Court to discount FE-1 and FE-7. MTD at 35-36, 41-42. The request fails at the threshold: the heightened pleading standards Defendants invoke do not govern these Securities Act claims. *Supra* §III.A. In any event, both witnesses are described with the particularity that would satisfy any standard. FE-1 administered the very budget that funded Lineage's automation program and dealt directly with senior leadership; FE-7 managed the automated operations at one of the four facilities Lineage showcased. ¶¶102, 106, 154. Their accounts establish not merely that technology underperformed, but that Lineage lacked any basis for representing that automation lowered costs, improved reliability, or drove customer retention. ¶¶102-21, 154-59.

Defendants alternatively argue that the automation statements are puffery but reach that conclusion only by quoting them selectively. They cite Lineage's statement that automation would "improv[e] the customer experience" (MTD at 37), while omitting that the same passage represented that automation would "***driv[e] customer retention***." ¶191. Customer retention is measurable; whether automation

drove it is a question of fact, not corporate optimism. *See supra* §IV.A.1.c.

Defendants do the same with Lineage's statement that automation positioned the Company "well to win new business" (MTD at 37), ignoring that Lineage also represented that automation "***produc[ed] a lower cost to serve and lower resource consumption***." ¶190. That is a quantifiable claim about operating economics. A company whose automation failed to work in freezing conditions, broke down weekly, and rendered pallets inaccessible was not producing a lower cost to serve.

**3. The Offering Documents Contained Materially False and Misleading Statements About Lineage's Acquisition Strategy**

The Offering Documents touted Lineage's "***proven acquisition strategy***," which purportedly "***targets profitable businesses with strategic, high quality assets that complement our warehouse network and customers' needs***." ¶¶193-94. Lineage represented that this strategy would allow it to grow not merely through acquisition, but profitably — generating synergies with its existing network. *Id.*

That was not the strategy Lineage was executing. FE-1 explained that due diligence deteriorated in the runup to the IPO, that acquisitions became "super sloppy," and that Lineage was buying low-quality and distressed properties. ¶¶121, 195. The shift was pronounced enough to change how the markets saw Lineage: sellers of distressed assets continued calling FE-1 to offload poor-quality warehouses even after he left. ¶195.

Defendants respond that anecdotes about individual warehouses don't

undermine Lineage's description of its strategy. MTD at 38-40. But FE-1's accounts were not mere anecdotes; he described *systemic acquisition practices* so careless that outside sellers sought Lineage out for that reason. ¶195. Defendants also argue puffery. MTD at 40. But a statement that Lineage "***targets profitable businesses with strategic, high-quality assets***" is a verifiable claim about acquisition criteria, not vague optimism, and Plaintiffs allege it was false. ¶¶193, 195; *see supra* at §IV.A.1.c. Acquisitions were central to Lineage's growth story — roughly 75 transactions and a 67% network expansion — so how it selected them mattered to investors. ¶50.

#### 4. The Offering Documents Omitted Material Facts That Were Required to Be Disclosed by Item 303 of Regulation S-K

Item 303 requires registrants to describe known trends or uncertainties "reasonably likely to have a material . . . unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). Disclosure of the trend alone does not discharge the duty: "[e]ven when a particular known trend, event, or uncertainty is disclosed, whether and *to what extent* that trend, event, or uncertainty will affect the registrant may be key information that should be disclosed," as "disclosing trends . . . but not disclosing any information about the extent of those effects would be of little use." *Sodha*, 154 F.4th at 1040 (cleaned up).

A failure to make a required Item 303 disclosure is independently actionable under Section 11 whether or not it also rendered an affirmative statement misleading.

That is what distinguishes Section 11 from Exchange Act claims. In *Macquarie*, the Supreme Court held that an Item 303 omission will not support an Exchange Act claim — but did so precisely because, unlike the Exchange Act, Section 11(a) "prohibits any registration statement that omits to state a material fact required to be stated therein." 601 U.S. at 263-65; *accord Sodha*, 154 F.4th at 1033 n.3.

The Offering Documents did not disclose known trends, including: (a) the inventory buildup during and after the pandemic; (b) the destocking of that inventory beginning in Q3 2023; and (c) the resulting downward pressure on occupancy as inventory normalized. ¶¶197-98; *supra* §IV.A.1. Each was likely to have a material unfavorable impact on Lineage's revenues: the Company itself described occupancy as one of the "important driver[s] of [its] financial results." ¶45.

The Offering Documents also omitted the baseline occupancy data and patterns investors needed in order to understand how far the destocking trend had to run. Lineage thus did not "disclose the manner in which [the] then-known trend, event, or uncertainty might reasonably be expected to materially impact" its business. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (cleaned up). That data would have "significantly alter[ed] the total mix of information" available to investors, *Helwig*, 251 F.3d at 556 — as the analyst reaction to its belated disclosure confirms. ¶88; *see also supra* at §IV.A.1.a.[10]

---

[10] Even after the May 2025 presentation, analysts still felt they had not been given

Defendants argue that Lineage could not have predicted at the time of the IPO how long destocking would last, particularly given later developments like tariffs and inflation. MTD at 26-27. That argument is answered above (*supra* at IV.A.1.a), and is doubly beside the point here. Both the trend and the baseline toward which it was traveling were known: Lineage has admitted that customers began destocking in Q3 2023, and its historic occupancy patterns were derived from its own operating data. ¶¶85-88. Omitting both left investors unable to assess Lineage's typical occupancy or to recognize that occupancy "remained elevated" as of the IPO. ¶75.

**B. Defendants Do Not Prove the Defense of Negative Causation**

Loss causation "is not an element of a §11 claim, but an affirmative defense to it." *Omnicare I*, 583 F.3d at 947. The statute says so: damages are reduced only "if the defendant proves" that the decline resulted from something other than the misstatement or omission. 15 U.S.C. §77k(e). Defendants bear the burden, and can only carry it at the pleading stage is "if the [C]omplaint on its face demonstrates that loss causation is ***impossible***." *Home Point*, 2022 WL 18932069, at *5.

Defendants devote four pages to a strawman. MTD at 40-44. They say every event described in §IV.F of the Complaint is a "corrective disclosure," arguing that

full disclosure, with one BofA analyst asking on a November 5, 2025 earnings call: "[d]o you have data going back prior to . . . 2020? Just trying to see if there was any other time before 2020 . . . where occupancy was below 80% . . . I was trying to figure out how today's levels compare to historically before 2020." ¶97.

none caused Plaintiffs' losses. MTD at 8-9, 40-44. The Complaint does not plead corrective disclosures. Plaintiffs do not have to: loss causation is not an element of these claims. *Omnicare I*, 583 F.3d at 947. Defendants tilt at windmills.

Moreover, Defendants' argument collapses on its own terms: their own price chart shows a $6.81 per share (9%) decline immediately following Lineage's November 2024 earnings and a $7.05 (13%) decline immediately following its April 2025 earnings. MTD at 43. Both are dates Defendants themselves designate as "[c]orrective [d]isclosures." *Id.* Loss causation cannot be "impossible" on the face of the Complaint when Defendants' own chart shows the stock dropping sharply after the disclosures they selected. That alone defeats the defense.

None of Defendants' other arguments prove that the Complaint "eliminate[s] the possibility of loss causation." *Home Point*, 2022 WL 18932069, at *5.

***Previously Disclosed Information***: Defendants argue that all information about destocking was "disclosed" prior to the purported "corrective disclosures." MTD at 42-43. But this rehashes their falsity argument and fails. *Supra* §IV.A.

***Other Contributing Factors***: Defendants also argue that other factors contributed to Lineage's post-IPO stock price decline. MTD at 41-42. But this argument fails, as Defendants "must prove not the mere possibility that some other factor caused the [Plaintiffs'] loss but rather that all or an identified portion of [Plaintiffs'] loss *was* caused by that other factor," which "typically requires expert

testimony." *Sharma v. Rent the Runway, Inc.*, 799 F. Supp. 3d 129, 147-48 (E.D.N.Y. 2025). Defendants do no such thing.

***<u>The Timing of the Decline</u>***: The percentage of the total price decline that occurred before a given disclosure has no relevance; courts regularly reject that argument. *Home Point*, 2022 WL 18932069, at *5 (pre-disclosure stock price decline "does not preclude the possibility that the price decline after the . . . disclosure stemmed from that disclosure"). That is particularly so here, where the truth emerged in a series of disclosures.

***<u>Automation and Acquisitions</u>***: Finally, Defendants argue that the disclosures they identify were not linked to Lineage's statements about automation or acquisitions. MTD at 41-42. Even accepted, that would show at most that *some* portion of the decline was not caused by *some* of the challenged statements — not that loss causation is "impossible." A partial defense is not a basis for dismissal; it is an argument about damages for a later stage of the case. *See* 15 U.S.C. §77k(e). *In re Britannia Bulk Holdings Inc. Sec. Litig.* (MTD at 42), does not help Defendants. 665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009). There, the stock "had already fallen almost 90% from the IPO price" before any corrective information reached the market, and the remaining decline following a statement that "did *not* disclose even 'partially'" anything new. *Id.* Nothing comparable is alleged here. The same court recognized that negative causation is ordinarily resolved at summary judgment, that

pre-disclosure declines may reflect misstatements leaking into the market gradually, and that such declines do not establish negative causation. *Id.* (citing cases).[11]

### C. Defendants Are Statutory Sellers Under Section 12(a)(2)

Any person who "offers or sells" a security by means of a materially misleading prospectus, whether by transferring title or by soliciting the purchase for financial gain, motivated at least in part by its own financial interest, is a statutory seller under §12(a)(2). *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 691 (M.D. Tenn. 2000) (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)). Defendants' argument about the "transfer of title" (MTD at 45) addresses only half the statute.

The Underwriter Defendants satisfy both prongs. They acquired and resold the shares, and they solicited purchases in exchange for more than $191 million in fees — assigning bankers, analysts, and counsel to the IPO working group to market Lineage stock and approve the Offering Documents. ¶¶34-35, 39. That is far more than the conclusory "solicited and sold" allegations rejected in Defendants' cases.[12]

---

[11] The *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, plaintiff no longer held shares of the companies mentioned in new post- disclosure information, making it impossible for later losses to be attributed to alleged concealed information. 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003) (MTD at 44). And *In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *20 (S.D.N.Y. Feb. 23, 2024) was an Exchange Act case where a short-seller report recapped already public information.

[12] Defendants' cases are inapposite. MTD at 44-45; *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *19 (N.D. Cal. Oct. 31, 2014) (plaintiffs did not plead underwriters "actively and directly solicited"); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (plaintiffs only alleged signatures). Their argument about *In re Bare Escentuals, Inc. Sec. Litig.* ignores that case. 745

Lineage is a statutory seller as well. In a registered offering, an issuer "shall be considered to offer or sell the securities" where it solicits investors "by means of" a prospectus. 17 C.F.R. §230.159A(a)(1). Lineage solicited investors through the Offering Documents and the Roadshow Presentation. ¶57.

Bay Grove and the Individual Defendants solicited investors through their preparation and promotion of the Offering Documents, and they did so for their own financial benefit. The IPO proceeds repaid Lineage's debt and purchased $75 million of Bay Grove's operating units, and Bay Grove received a $200 million profit-sharing payment and an $8 million annual services agreement. ¶¶32-33; *In re Sirrom Cap. Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 945 (M.D. Tenn. 1999) (soliciting defendants "motivated by a desire to serve their own financial interests").

### D. Plaintiffs Sufficiently State a Control Person Claim

Defendants argue that the §15 claims fail because the primary claims fail. MTD at 45. Because Plaintiffs adequately pled primary violations, the control person claims survive. *Gaynor v. Miller*, 273 F. Supp. 3d 848, 873 (E.D. Tenn. 2017).

## V. CONCLUSION

The Court should deny Defendants' motion in its entirety. If the Motion is granted, Plaintiffs request leave to amend.

---

F. Supp. 2d 1052, 1073 (N.D. Cal. 2010) (rejecting idea that "'firm commitment' underwritten offerings prohibits defendants from qualifying as statutory 'sellers'").

Dated: July 28, 2026

Respectfully submitted,

By: /s/ Jake Bissell-Linsk

**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas
Jake Bissell-Linsk
Christian J. Macaluso
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
jbissell-linsk@labaton.com
cmacaluso@labaton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

**SAXENA WHITE P.A.**
Steven B. Singer
Joshua H. Saltzman
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

**SAXENA WHITE P.A.**
Maya Saxena
Lester R. Hooker
Omar D. Davis
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
odavis@saxenawhite.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

**ASHERKELLY, PLLC**
Matthew I. Henzi (P57334)
25800 Northwestern Hwy Suite 1100
Southfield, MI 48075
Tel.: (248) 746-2762
mhenzi@asherkellylaw.com

*Local Counsel for Lead Plaintiffs*